Filed 6/27/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S066940 |
| v. | ) | |
| | ) | |
| WILLIAM CLINTON CLARK, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 94CF0821 |
| _____ | ) | |

An Orange County jury found defendant William Clinton Clark guilty of the first degree murders of Kathy Lee (count 1) and Ardell Williams (count 7). (Pen. Code, §§ 187, 189.)[1]  The jury found true the five special-circumstance allegations charged, as follows:  that defendant committed the murder of Lee while engaged in the commission of a burglary (§ 190.2, subd. (a)(17)(G)) and while in the attempted commission of a robbery (§ 190.2, subd. (a)(17)(A));[2] that the murder of Williams was the murder of a witness for the purpose of preventing her from testifying in a criminal proceeding (§ 190.2, subd. (a)(10)) and a murder while lying in wait (§ 190.2, subd. (a)(15)); and a multiple-murder special-

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     We will refer to the event comprising the burglary, attempted robbery, and murder at the CompUSA store as the CompUSA felony murder.

circumstance allegation (§ 190.2, subd. (a)(3)).**3** The jury hung on a penalty verdict, but a new jury returned a verdict of death at the penalty phase retrial. The trial court denied defendant's motions for a new trial (§ 1181) and modification of the penalty (§ 190.4, subd. (e)), and it sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We vacate the burglary-murder and robbery-murder special-circumstance findings, but otherwise affirm the judgment.

INTRODUCTION

The jury convicted defendant and sentenced him to death for two murders. He was the shooter in neither of them. The first murder was that of Kathy Lee, who was shot by Nokkuwa Ervin on the evening of October 18, 1991, during an attempted robbery of a CompUSA store in a Fountain Valley shopping center.**4** The second murder was that of defendant's former associate Ardell Williams, who was shot in Gardena during the early morning of March 13, 1994, by either Antoinette Yancey, who was defendant's girlfriend at the time, or by someone acting at Yancey's direction.**5** The prosecution's theory of defendant's accomplice

---

**3** The jury also found defendant guilty of second degree burglary (§ 459), three counts of attempted second degree robbery (§§ 664 & 211), and conspiracy to commit murder (§ 182, subd. (a)(1)). The jury found true the enhancement allegation that a principal was personally armed with a firearm (§ 12022, subd. (d)). Defendant admitted as true the enhancement allegation that he had served five prior prison terms (§ 667.5, subd. (b)).

**4** Prosecutors separately charged and tried Ervin for the CompUSA shooting. He received a sentence of life imprisonment without the possibility of parole.

**5** Defendant and Yancey were originally charged as codefendants for Williams's murder, but their trials were severed. Yancey was found guilty of first degree murder but her jury found the personal use of a firearm allegation to be not true. She received a sentence of life imprisonment without the possibility of parole.

liability for Lee's murder was that defendant organized, and was present at, the CompUSA murder. The prosecution's theory of defendant's accomplice liability for Williams's murder was that defendant conspired with Yancey to have Williams killed because Williams had testified to a grand jury about defendant's involvement in the CompUSA murder, and she was going to testify against defendant at his trial.

Defendant denied involvement in either murder. As to the first murder, the defense sought to challenge the credibility of the prosecution witnesses, including Williams. Defendant also presented as an alibi evidence that he was present at a recording studio in Glendale during the time of the CompUSA murder. As to the second murder, the defense acknowledged defendant's close personal relationship with Yancey, but it contended there was no evidence he conspired with Yancey to have Williams murdered.

## I. FACTS

A. Guilt Phase

### 1. The Prosecution's Case

#### a. The CompUSA Murder

##### i. Surveillance of the Store

The prosecution introduced Williams's Orange County grand jury testimony to establish defendant's preparations for the attempted robbery at the CompUSA store.[6]

At the end of August or in the early part of September 1991, Ardell Williams accompanied defendant while he surveilled a CompUSA computer store

---

[6] Defendant's challenge to the admission of Williams's grand jury testimony is addressed on pages 53 to 57, *post*.

in the Fountain Valley Mall near its 10 p.m. closing time.[7]  From the vantage point of a Del Taco restaurant parking lot — which faced the CompUSA store about 500 feet away — defendant, his brother, Eric Clark,[8] and his cousin, Damian Wilson, scrutinized the closing operations of the computer store and noted the amount of time it took the employees to leave.  During Williams's conversations with defendant that night, defendant implied several times that he was planning some sort of crime involving the CompUSA store.  After defendant and his companions finished watching the CompUSA store, they drove to a street near the mall where defendant checked on a U-Haul truck that he had parked there.

### ii.  The Night of the Crime

At approximately 10 p.m. on October 18, 1991, after the CompUSA store had closed for the evening, a man later identified as Ervin approached the three remaining employees in the store with a gun and eventually handcuffed them in the men's restroom.  At about 10:30 p.m., Fountain Valley Police Officer Raymond Rakitis was on car patrol near the CompUSA store when he heard a gunshot.  From 15 to 20 yards away, he saw a silver BMW back out of the parking lot and Ervin run from an open loading door in the back of the CompUSA store toward the BMW.  When Ervin reached the BMW, he tried to enter the car through the driver's window and then tried to open the passenger side door.  But

---

[7]    Williams had previously served as defendant's accomplice in stealing from another computer store.  Williams had worked as a cashier at the store, and she allowed defendant to take computer equipment through her checkout line without paying.  The trial court admitted evidence of defendant's involvement in this earlier crime for the limited purpose of showing the relationship between defendant and Williams; see pages 59 to 64, *post*.

[8]    We will generally refer to Eric Clark as Eric to avoid confusion with defendant.

4

the BMW did not wait for him, and it drove off, leaving him in the parking lot. Officer Rakitis exited his police car and subdued Ervin. Officer Rakitis then noticed a dead woman lying on her back with blood pooling under her head near the CompUSA loading doors. The police later determined that the woman, Kathy Lee, had come to pick up her son, who was an employee at the store. The autopsy showed that she died as a result of a single gunshot wound to the head, fired while the gun directly touched the skin behind her left ear.

Police recovered a blue-steel .38-caliber revolver with a two-inch barrel, from the left inside pocket of Ervin's jacket. The cylinder of the revolver contained one expended .38 caliber cartridge casing and some human tissue. Ballistic testing matched the bullet that killed Lee to the revolver found on Ervin. At trial, two CompUSA employees identified Ervin as the man who held them at gunpoint.

### iii. Matthew Weaver's Testimony

Matthew Weaver was present in the CompUSA parking lot that night and placed defendant at the scene of the crime. Weaver testified under a grant of transactional immunity. Weaver knew Eric and Wilson, who were fellow members of the Moorpark College basketball team. They had offered to pay Weaver $100 to help them move computers to a warehouse from a store they said belonged to defendant. On the night of the crime, Eric drove Weaver to the mall parking lot where they waited for the CompUSA store to close. While they were waiting, Wilson introduced Weaver to his brother "Bill," who had driven up in a BMW. Weaver identified defendant in court as the man to whom he had been introduced.

Defendant eventually told Weaver that the group could start moving the computers, and he drove Weaver over to the store in the BMW.[9]  As they approached the store, Weaver saw a woman lying on the ground next to a car.  Suddenly Weaver saw an African-American man, later identified as Ervin, run up and unsuccessfully attempt to dive through the driver's side window of the BMW.  Weaver ducked down toward the dashboard and noticed that two police cars with flashing lights were approaching the BMW.  Defendant made a U-turn and drove off, leaving Ervin in the parking lot.  After driving some distance away from the mall, defendant stopped at the side of the road and told Weaver and the other passenger to get out.

*iv.  Investigation of the U-Haul Truck*

On October 22, 1991, four days after the CompUSA murder, police investigators found a U-Haul truck that had been parked near the store for several days.  They determined that Jeanette Moore had rented the truck on October 3, 1991, using a fraudulent driver's license with her picture but with the name "Dena Carey."[10]  Moore testified under a grant of transactional immunity.  She testified that, in June or July of 1991, defendant obtained the fraudulent driver's license for her.[11]  Defendant and Moore had gone to the DMV where defendant knew the clerk who processed the license.  Moore subsequently rented the U-Haul truck at

---

[9]     Weaver sat in the front passenger seat, and another man was in the rear passenger seat.  The third man in the BMW was not identified at trial.

[10]     Carey was an innocent victim of identity theft, who was not involved in any of defendant's activities.

[11]     For the license, Moore used an address that defendant instructed her to use.  The address was defendant's home address at the time.

defendant's request using the license.[12] Eric drove Moore to the U-Haul lot and drove the truck away after Moore filled out the forms and obtained the key. Defendant rewarded Moore with $100 the next day. A U-Haul clerk testified that, on October 9, 1991, which was six days after Moore rented the truck, an African-American male came to the U-Haul lot in Glendale and extended the contract.[13]

Moore moved to Yuma, Arizona in 1992 or 1993 and did not see defendant again. But while living in Arizona in 1993, she received a three-way phone call from Gary Jackson (an ex-boyfriend through whom she had met defendant) and a woman identifying herself as "Nina," who claimed to be defendant's wife.[14] Nina told Moore to expect some money via Western Union. In the winter of 1993, Moore received $100.

In June 1994, while Moore was in custody at the Orange County Jail pursuant to a commitment under section 1332 to ensure her availability as a witness at defendant's preliminary hearing, she received an anonymous letter

---

[12] Moore also testified about other fraudulent acts in which defendant helped her engage using the fraudulent license. Defendant provided Moore with credit cards (also in Carey's name), which Moore used to buy expensive items for defendant at department and electronics stores.

[13] The clerk could not positively identify the African-American male at trial. In an earlier photo line-up with investigators, the clerk had identified photos of two different individuals who "could have been" the man, one of whom was Ervin, the gunman at the CompUSA robbery murder.

[14] The prosecution's theory was that "Nina" was Yancey, defendant's accomplice in the Williams murder. As recounted below, after the murder of Williams, police searched Yancey's apartment and, among other things, recovered a receipt for a Western Union money order for $100 sent to Yuma, Arizona in December 1993.

urging her not to testify.  The letter included a photocopy of a newspaper article describing a witness who was released from jail after refusing to testify at a trial.**15**

### v. Sale of Defendant's BMW After the CompUSA Murder

Defendant bought a BMW model 735i on July 31, 1991.  On October 24, 1991, six days after the CompUSA murder, he arranged to sell it through the dealer from whom he had bought it.  The dealer suggested that defendant would get more money selling it retail rather than on auction wholesale, but defendant told him that he just needed to get rid of it and wanted to sell it wholesale.

### b. The Murder of Williams

### i. Arrest of Defendant and Williams in Las Vegas and Her Cooperation with the Authorities

In September 1991, sometime after Ardell Williams had accompanied defendant during his surveillance of the CompUSA store, she traveled with him to Las Vegas.  On the evening of September 22, the police arrested Williams and defendant for passing stolen traveler's checks at the Mirage Hotel.  Defendant posted bail and was released the next day, but Williams remained in jail.  While in custody, Williams helped the local police and the FBI in their investigation of the Mirage Hotel incident and other related bad check cases.

Williams subsequently testified to the Orange County grand jury that she had a conversation with Eric approximately two weeks after her arrest in Las Vegas, when she had returned to Los Angeles.  Eric asked her whether she had been talking to anyone about "this Las Vegas thing" because someone was "pointing the finger" at defendant, saying that he was "the top dog in this case."  Williams denied talking to the authorities.  She asked Eric, "[W]hatever happened

---

**15** The prosecutor's theory was that this letter was from defendant who sought to dissuade Moore from testifying against him.  See pages 69 to 74, *post*.

8

to the computer store?"  Eric answered that "it went down bad."  He recounted that his group of burglars went into the store and handcuffed a cashier and a night manager to a hand rail in the bathroom.  But the mother of one of the employees came into the store looking for her son and surprised one of the burglars, who shot her.  Eric told Williams not to mention what he said to anyone.[16]

Seven to ten days after this conversation, defendant called Williams, telling her that he was going to find her a lawyer in Las Vegas to take care of the bad check charges pending against her.   Williams asked defendant about his BMW, and defendant stated that he had sold it "because you never know who could have seen the two of us sitting eating nachos that one night," and "he didn't want anybody to suspect anything."

After her conversation with Eric, Williams decided to tell the authorities about the CompUSA murder because her own sister had been the victim of an unsolved murder many years before.  On December 31, 1991, she contacted FBI Special Agent Todd Holliday, whom she had met following the bad check incident in Las Vegas.  Williams told Holliday about the surveillance of CompUSA and about her later conversations with defendant.  Agent Holliday contacted the Fountain Valley police and the Orange County District Attorney's investigators to tell them that Williams claimed to have information about the CompUSA murder.  Williams agreed to talk on the phone with Frank Grasso, an inspector with the Orange County District Attorney's Office, on April 1, 1992.  In two interviews, which were tape-recorded and played to the jury, Williams implicated defendant in the CompUSA murder.

---

[16]     We later discuss in greater detail Eric's conversation with Williams about the plan for the robbery.  (See pages 112 to 117, *post*.)

9

### ii. Tape Recordings of Defendant's Phone Calls

In August 1992, Inspector Grasso provided Williams's sister, Elizabeth Fontenot, with a tape recorder so that Fontenot could record phone calls she received from defendant. The tape of defendant's conversations with Fontenot was played in court to the jurors. During these conversations, defendant expressed concern that Williams might talk to authorities and try to link him to a murder in Orange County. Defendant told Fontenot that the authorities knew things that only Williams knew. He said he was "shocked" that Williams "rolled over so quickly." He told Fontenot that if Williams were to testify against him, it would be "serious" and would "wipe [him] out." He stated that the best answer that Williams could tell the authorities about him was "I don't know." He explained, "[Y]ou're her big sister, she don't know nothing about me. Whatever she's told them, that's it. You follow me? . . . She can 'I don't know' 'em to death." "Anything that she might of [sic] already said, she could come to court and get complete amnesia."

### iii. Defendant's Admissions to a Fellow Inmate

While defendant awaited trial for the CompUSA murder, he was incarcerated in the Orange County Jail. There, he met fellow inmate Alonzo Garrett. Unbeknownst to defendant, Garrett was acquainted with Williams because one of Garrett's friends was married to Williams's sister. At one point, defendant showed Garrett what appeared to be a trial transcript and referred to Williams.[17] Garrett stated in a phone call to an acquaintance, which was recorded and played to the jury, that defendant had said, " 'Hey, this is the woman right

---

[17]    The prosecution's theory was that this was the transcript of Williams's grand jury testimony.

here that could put me away.' "[18] Concerned that Williams was involved in a dangerous situation because she was "snitching," Garrett phoned Williams, who admitted that she was the key witness in defendant's case, but assured him that there was nothing to worry about.

Before trial, prison authorities seized from defendant's cell an apparently undelivered letter to Garrett threatening him for talking to the police.[19]

### iv. How Defendant Received the Grand Jury Transcripts

The prosecution's theory was that the transcripts that defendant had shown to Garrett concerning Williams were transcripts of her grand jury testimony. The prosecution had provided these transcripts through discovery to defendant's attorney, who gave them to defendant. Criminal defense attorney John D. Barnett testified as an expert witness that a competent defense attorney would have given a defendant information about Williams's interviews with the police and her grand jury testimony — information that would had been produced in discovery by the prosecution. Barnett testified that Williams's police interviews and grand jury testimony would be, absent certain exceptions, inadmissible at trial if she was unavailable as a witness because she had not been subject to cross-examination at those proceedings.

### v. The Flower Delivery at the Home of Williams

On February 10, 1994, an African-American woman who said her name was "Carolyn" and claimed to be from a local flower delivery shop, delivered

---

**18**     In his testimony at trial, Garrett acknowledged that he had made this statement to the acquaintance, but he also stated that he had lied because he was trying out a story on the acquaintance to see how she reacted before taking it to the authorities.

**19**     For further background on this letter, see pages 69 to 74, *post*.

flowers bearing a card signed "Secret Admirer" to Williams at the Gardena home where she lived with her mother, Angelita Williams, and her sister, Nena Williams. Nena thought the delivery girl was suspiciously trying to loiter around the house after making the delivery, including spending a long time in the restroom. In court, Nena identified the woman who had called herself "Carolyn" as Yancey. During defendant's preliminary hearing, the parties stipulated that Angelita also identified Yancey as "Carolyn."

On March 9, 1994, Williams phoned Inspector Grasso and told him about "Carolyn" and the unusual flower delivery. Grasso assembled a series of photos of women associated with defendant, including Yancey, and showed them to Williams, Nena, and Angelita. All three identified Yancey as the person who delivered the flowers. The parties stipulated at trial that one of Yancey's fingerprints was found on the box in which the flowers were delivered.

### vi. Phone Calls to the Home of Williams and a Purported Job Interview

After the flower delivery, someone calling herself "Janet Jackson" telephoned Williams. This person had previously spoken by phone several times to Angelita. "Janet Jackson" asked Williams to come for a job interview at a company named Continental Receiving on Sunday, March 13, 1994 at 6:30 a.m.[20]

### vii. The Morning of the Murder and the Crime Scene

Williams went to the purported job interview sometime after 6:00 a.m. on the morning of March 13, 1994. At 8:00 a.m., a neighborhood resident discovered

---

[20] The president of Continental Receiving testified that his company had never employed anyone named "Janet Jackson" and that it did not operate on Sunday mornings. To his knowledge, Yancey had never been employed by the company.

Williams's body near Williams's car in the driveway of Continental Receiving in Gardena, which was about a two-minute drive from her home. Williams had a gunshot wound behind her left ear. She was clothed with no evidence of sexual assault, and had $114 in cash on her person. A .25-caliber bullet casing and two job application forms were found near her body — one on the trunk of the car, and the other one on the ground. The application form on the ground was partially completed. A photograph of patterns in dust on the trunk of the car suggested that an arm had been resting on the trunk lid near where the partially completed form had been.

Yancey visited defendant at the Orange County Jail the same morning. Her visit began at 8:45 a.m. and ended at 9:35 a.m. According to Inspector Grasso, it would take 37 minutes to drive from Continental Receiving to the Orange County jail, driving on average at the speed limit of 55 miles per hour.[21]

### viii. Investigation of Williams's Murder

Five days after Williams's murder, police conducted a voice lineup, where they played tapes of four voices to Angelita and Nena. Both of them identified Yancey's voice as that of the woman who had called herself "Janet Jackson" in her telephone calls.

On March 17, 1994, the police searched Yancey's apartment. They found: (1) a California driver license with Yancey's picture on it and the name "Keia Thomas"; (2) a resume with Thomas's name; (3) a Western Union receipt for $100

---

[21] The prosecutor's theory was that Yancey went to visit defendant after the murder of Williams and that, even if Williams was killed only shortly before 8:00 a.m., which was the time her body was discovered, Yancey would still have had time to commit the murder and get to the jail to meet defendant at 8:45 a.m.

13

sent to "Jeanette Alexander" from "Nina Howard" on December 27, 1993;[22] (4) an income tax return and receipts in defendant's name; (5) a phone bill receipt in Eric's name; and (6) numerous love letters from defendant to Yancey where defendant expressed explicit sexual fantasies. The trial court provided edited versions of the letters to the jury.[23]

Yancey's phone records for the period of January through March of 1994 listed numerous calls to the home of Williams; to the office of defendant's attorney, Jack Earley; to the office of defense investigator, Alan Clow; and to a pay phone in Orange County Jail accessible to defendant.

### 2. Defense Case

#### a. Williams's Credibility

To challenge Williams's credibility, the defense called Satanand Sharma, a neuropsychologist who had seen Williams on four occasions through court-ordered counseling. In his notes from one of the sessions, Dr. Sharma wrote: "She [Williams] feels that Bill [defendant] was involved in that case [the computer store attempted robbery and murder] because she was pushed [*sic* - parked] in front of a computer store and had conversations with Bill regarding the bust at the store." Dr. Sharma's recollection was that Williams said she was present at the attempted robbery.

A loss prevention officer at the Disney Store in Torrance where Williams had worked described how she was fired in February 1994. The Disney Store

---

[22] Moore used the name "Jeanette Alexander" while she lived in Yuma, Arizona in 1993.

[23] The trial court admonished the jury that the letters — discussed in detail on pages 76 to 78 — were admitted for the limited purpose of "tending to show the nature of the relationship between Mr. Clark and Ms. Yancey."

14

fired Williams after the officer investigated her for employee theft. Williams admitted to the officer that she had put extra merchandise into her friends' bags when they made purchases.

### b. Alibi Evidence

As an alibi, defendant presented evidence of his whereabouts during the CompUSA murder on the night of October 18, 1991 through the testimony of Geoffrey Gilstrap, a musician in a band called Full Swing that defendant was managing at the time. Defendant had booked time for the band at a Glendale recording studio and, on the evening of a Friday at the end of October (either Friday, Oct. 18, or Friday, Oct. 25), Gilstrap was at the studio at about 8:30 p.m. for a scheduled recording session. Defendant was there, but no recording took place because the recording engineer did not show up, owing to a pay dispute concerning the previous session. Gilstrap left the studio after about 15 to 20 minutes, which was between 8:30 and 9:00 p.m. The manager of the recording studio also testified and brought the studio's schedule book, which showed that defendant had reserved time there for October 12, 13, and 18, 1991. She did not remember seeing defendant in the studio on October 18, the night of the CompUSA murder.

### B. Penalty Phase Retrial

#### 1. Prosecution Evidence

Defendant's first penalty trial resulted in a hung jury.[24] At the penalty phase retrial, the prosecution re-presented the guilt phase evidence from both the

[24] The jury was split with seven favoring death and five favoring life without parole.

15

CompUSA murder and the murder of Williams. The prosecutor did not present any other evidence in aggravation.

### 2. Defense Evidence

For his case in mitigation at the penalty phase retrial, defendant mounted a lingering doubt defense for both murders. As in the guilt phase, he again attacked the credibility of the main prosecution witnesses and presented alibi evidence for his whereabouts on the night of the CompUSA felony murder. Defendant also presented evidence in mitigation based on his family background, his good character, and his ability to be a positive influence on other inmates. Finally, he presented evidence that he had brain damage and psychological impairments because of head injuries he suffered during childhood and young adulthood.

### a. Credibility of Moore

The defense presented the testimony of Gary Jackson, Moore's former boyfriend. Moore, as described above, had linked defendant to the CompUSA murder by testifying that defendant had obtained a fraudulent driver license for her and then asked her to use it to rent the U-Haul truck that the police later found parked near the crime scene.

Jackson portrayed Moore in a negative light, describing her as a fellow drug user and thief whom he had dated for about six months between 1990 and 1991. In May 1991, Jackson and Moore found a wallet that contained department store credit card receipts in the name of Dena Carey. Moore devised a plan to obtain a driver license with Carey's name so that she could use the department store receipt numbers to buy merchandise on those accounts. But she needed to have an address for the driver license, and Jackson refused to let her use that of his father. In May 1991, Moore met defendant through Jackson. Moore asked

16

defendant if she could use his address for her welfare checks because she did not have a stable address.

Jackson further testified that a man called "Ricky," not defendant, asked Moore to rent the U-Haul truck that was found parked near the CompUSA robbery scene. Jackson described Ricky as one of his "dope dealers" who was a five foot, 10 inch tall light-complected African-American man with a Jheri curl.[25] Ricky drove a grey BMW.

### b. Family Background

Many of defendant's family — including defendant's father, mother, aunt, first wife, and two cousins — along with several family friends, testified about defendant's life. Defendant's mother and father married at a young age and had a tumultuous 10-year marriage, during which defendant and his brother Jonathan were born. Defendant's father remarried and had two more children: defendant's half brothers Eric and Jason.

Defendant was described as having a high IQ but failing to perform academically the way he should have; he had a C average in high school. With a combination of high Scholastic Aptitude Test scores and his basketball ability he was admitted to UCLA. But he did not complete a degree there, nor did he become a starting player on the basketball team. He eventually went to Fresno, where his father was living, and attended Fresno State University, where he continued playing basketball. He left Fresno, returned to Los Angeles, and moved into an apartment building owned by his mother. He was married for five years, and had two children. During this time, defendant and his brother Jonathan started

---

[25] The defense contended that "Ricky's" appearance was closer than defendant's to the person that Officer Rakitis had described in the BMW on the night of the CompUSA robbery murder.

a business venture to design and license animated characters for the 1984 Olympic games in Los Angeles. Defendant lost approximately $750,000 of investment money provided by his mother and aunt on this unsuccessful business.

Many of defendant's family members described him as lively and positive in attitude as a young man but, as his first wife testified, he became depressed and distant after the business failure. She eventually filed for divorce. In 1985, soon after the divorce, defendant's young son from his first marriage died. The deaths of defendant's grandmother and brother-in-law followed in close succession. Defendant's first wife testified that defendant was deeply affected by all these deaths in the family. By 1987 or 1988, defendant married his second wife, with whom he had a son and daughter.

Family members described several serious accidents that defendant suffered in his life. When he was six or seven, he was accidentally hit in the head with a champagne bottle by his young cousin at a wedding, and, as a result, suffered convulsions. While playing football at Fresno State, he tripped on a lawn sprinkler and broke his jaw and leg. Just before his first marriage, he was in a car accident and remained in a body cast for six months.

### c. Inmate Testimony

Three inmates testified about defendant's positive influence on them while they were incarcerated in the Orange County Jail. Two of these inmates also testified that it was common for inmates to write sexually explicit letters to women outside of jail.[26]

---

[26]     This was offered to rebut the prosecution theory that defendant's letters to Yancey, which included explicit sexual content, indicated a particularly intense personal relationship, see pages 76 to 78, *post*.

### d. *Asserted Brain Damage*

Through the testimony of Dr. Joseph Wu, the director of the University of California, Irvine Brain Imaging Center, defendant presented evidence that he had brain damage and psychological impairments. Based on a positron emission tomography (PET) scan of defendant's brain done on June 11, 1996, Wu stated that defendant had abnormalities in his frontal lobes that were consistent with a closed head injury. Wu gave his opinion that the abnormalities shown in the PET scan indicated that defendant had "suffered some kind of serious blow to the head which caused some kind of severe malfunction of his frontal lobes." What the PET scan showed was consistent with the fact that, when defendant was six years old, he had been struck on the head with a champagne bottle. Wu further stated that people with damage to their frontal lobes, "in many cases," exhibit personality changes in which they "seem to lack the ability to be able to fully understand or appreciate the significance of their actions" and have "impaired social judgments."

Psychiatrist George Woods testified to his clinical assessment that defendant suffered from a mild case of bipolar affective disorder. Woods explained that people suffering from this mood disorder experience periods of elevated mood, are very easily distracted, and lack good insight into their actions. The diagnosis of this mood disorder was consistent with the frontal lobe damage shown in defendant's PET scans.

## II. PRETRIAL ISSUES

### A. Order Denying Defendant Telephone Access from Jail

On March 23, 1994, at the initial arraignment of defendant and his then-codefendant Yancey for the murder of Williams, the trial court granted, over defense objection, the prosecutor's request for an order restricting defendant from making any telephone calls from jail, including any calls to defense counsel. About a year later, defense counsel successfully moved the court to modify the

19

restriction to allow defendant to call his defense counsel or defense investigator at specified hours. Defendant contends the March 23, 1994 restriction prevented him from communicating with his counsel, investigator, and potential witnesses in the case, which violated his federal constitutional rights and his rights under state law. As discussed below, we conclude: (1) the court did not err in granting the prosecutor's request for the initial March 23, 1994 restriction on defendant's telephone calls; (2) defendant forfeited his claim concerning the continuing application of the restriction order when defense counsel expressly declined to argue against it in the April 15, 1994 hearing and asked to take his motion challenging the order "off calendar"; and (3) even if his claim is not forfeited, defendant has failed to show that his defense was prejudiced by the phone call restriction.

### 1. Background

Attorney Jack Earley began representing defendant in September 1992 for the charges arising from the CompUSA murder.[27] Earley was defendant's attorney when Williams was murdered on March 13, 1994. Four days later, on March 17, the police searched Yancey's apartment. Among other evidence connecting Yancey and defendant was Yancey's personal phonebook, which contained the name and phone numbers of Earley and his investigator, Alan Clow.

---

[27] Earley represented defendant continuously from September 1992 through defendant's guilt phase trial and his first penalty phase trial (which ended in a mistrial), until July 1996, when the prosecutor elected to retry the penalty phase. Earley then declared a conflict and, at defendant's penalty retrial, defendant was represented by Robison Harley, who had been second counsel at the guilt phase and first penalty phase. Earley was called as a witness by the prosecution at the penalty retrial, which is where some of the background information recounted here was put on the record. Defendant had waived the attorney-client privilege for Earley so that Earley could testify at the penalty retrial.

Phone records showed several telephone calls from Yancey's apartment to Earley's office in the period before Williams's murder, as well as several phone calls from Yancey's apartment to Clow's office both before and after Williams's murder. On March 23, 1994, 10 days after Williams was murdered, the prosecutor charged defendant and Yancey with her murder. The prosecutor initially refused to give discovery information to Earley because the prosecutor was fearful for the safety of the other witnesses in the case.[28]

On March 23, 1994, at the initial arraignment hearing for defendant and his then-codefendant Yancey, the prosecutor stated that new information had developed, and that Earley and his investigator might be potential witnesses in the case.[29] The prosecutor asked that Earley come to the prosecutor's office to discuss the situation. The prosecutor also requested "a blanket order" to deny defendant any telephone access (including to Earley) for at least 48 hours until the prosecutor had a chance to discuss the situation with Earley and devise a course of action. The prosecutor, however, agreed to allow Yancey telephone contact with her attorney if a deputy sheriff dialed the number. The trial court granted the prosecutor's request for the order over defense counsel's objection and continued

---

[28] Earley (in his opposition to a later, ultimately unsuccessful, motion by the People to recuse him) described the prosecutor's position at this time as follows: "Deputy District Attorney Randolph Pawloski told defense counsel . . . that counsel had a 'conflict of interest' (without telling him what the conflict was), announced that he would not give defense counsel any discovery **because he did not wish to see any more witnesses dead,** and intimated that defense counsel was responsible for Ardell Williams' death. [Defendant] was subsequently denied phone access — even to defense counsel — on the grounds that he had used the phones to plan the homicide of Ardell Williams."

[29] Presumably, the prosecutor was referring to the discovery of Yancey's personal phonebook containing the name and phone numbers of Earley and Clow and the phone records indicating three-way phone communications between defendant, Earley, and Yancey prior to the murder of Williams.

the arraignment to two days later, Friday, March 25, 1994, when the court would review the restrictions on phone calls.

At the March 25 hearing, Earley raised the issue of the telephone restrictions, which Earley thought would expire at this point. The prosecutor stated his position that the court's order should remain in effect. The parties agreed to a hearing on the issue, with the restrictions remaining in the meantime. The hearing was held on April 15.

At the April 15 hearing, Earley stated, "[T]he people at this point are alleging that my client made various phone calls from the jail to make some arrangements. I'm not asking that we change the order at this point today." Earley said he could work out an agreeable order with the prosecutor concerning defendant's telephone access and stated, "I don't mind taking it off calendar to deal with it at the preliminary hearing, if need be." Yancey's defense counsel, however, argued that the trial court should modify its order to allow Yancey to telephone people other than her attorney. After hearing argument from Yancey's counsel and the prosecution, the court ruled that it was retaining the existing restrictions on Yancey's telephone access as stated in the March 23, 1994 order.

Earley did not again ask the court to modify the restrictions on defendant's telephone access until about a year later, on March 10, 1995, when he made a motion, unopposed by the prosecutor, to allow defendant to have contact with defense counsel at specified times if the number was dialed by a deputy sheriff.

*2. Analysis*

Citing *Small v. Superior Court* (2000) 79 Cal.App.4th 1000, 1010, petitioner contends that former section 2600, the statute defining the civil rights of prisoners, is the starting point for matters involving security measures affecting

22

prisoner rights.[30]  But, unlike *Small,* petitioner's claim does not involve a
challenge to a security measure promulgated by prison authorities.  Rather, it
involves a restriction imposed by the trial court at the urging of the prosecutor due
to concerns that defendant would use telephone access to threaten or order the
execution of witnesses in the case.  In the absence of authority applying former
section 2600 to a court-ordered limitation on the telephone access of a pretrial
detainee, we decline to apply it here.

Yet defendant may challenge the telephonic restriction based on his right to
access to counsel under the state and federal Constitutions.  Restrictions on the
ability of a prisoner, including a pretrial detainee, to use the telephone to consult
with counsel implicate the right to assistance of counsel in the prisoner's defense.
(See *In re Grimes* (1989) 208 Cal.App.3d 1175, 1182.)  Nevertheless, "[n]ot every
restriction on counsel's time or opportunity . . . to consult with his client or
otherwise to prepare for trial violates a defendant's Sixth Amendment right to
counsel." (*Morris v. Slappy* (1983) 461 U.S. 1, 11.)

We recently rejected a claim with similar facts.  A defendant who was a
pretrial detainee in jail faced restrictions on telephone contact with her attorney
based on her misuse of that privilege to attempt to solicit the murder of a witness.
(*People v. Rodriguez* (2014) 58 Cal.4th 587, 621.)  As we noted, "[j]ail authorities

---

**30**     The version of section 2600 operative at the time of the restrictions on
defendant's phone calls stated that prisoners may "be deprived of such rights, and
only such rights, as is necessary in order to provide for the reasonable security of
the institution" and "the reasonable protection of the public." (Stats. 1975,
ch. 1175, § 3, p. 2897.)  Section 2600 was amended in 1994 (effective Sept. 13,
1994) to permit regulations that are "reasonably related to legitimate penological
interests."  By this amendment, the Legislature adopted the federal test for the
validity of prison regulations established in *Turner v. Safley* (1987) 482 U.S. 78,
89. (*Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 130.)

23

and the court did limit defendant's telephone privileges, but properly so given her criminal behavior in jail that abused those privileges." (*Ibid.*)

Given the grave and highly unusual circumstances under which the prosecutor made the initial request to restrict defendant's phone access, we find no error in the trial court's ordering a complete restriction of defendant's telephone access. Initial evidence indicated that defendant had used the jail telephones to arrange the murder of a prosecution witness, and the prosecutor subsequently discovered evidence that defendant's attorney or his investigator had been in communication with the individual suspected of carrying out that murder.[31] Under these circumstances, a blanket restriction of defendant's phone access was justified for at least the limited period between the March 23, 1994 order and the April 15, 1994 hearing at which the court took up its continuing status. At that hearing, the court asked defense counsel to address the issue of whether the restriction should be modified after the limited period, and defense counsel asked that the court take the issue off calendar in favor of defense counsel's working out an agreement with the prosecutor. Defendant therefore forfeited the issue of the restriction on defendant's telephone access from the period of April 15, 1994, until March 10, 1995, when defense counsel again raised the issue and sought modification of the order.

Finally, even if defendant's claim were not forfeited for that period, he has failed to show that his defense was negatively affected by this period of telephonic restriction such that we could conclude he had been denied his right to the effective assistance of counsel. Defendant acknowledges that he was not denied

---

[31]     At the penalty retrial, the prosecution introduced charts showing three-way phone calls from Yancey's apartment to the phone in the Orange County jail used by defendant and to Earley's law offices.

24

personal visits from trial counsel. As reflected in the record, defendant's trial counsel actively litigated the case during this period at the preliminary hearing and through various pretrial motions and hearings. Defendant generally contends that his "input" was crucial to the defense's investigations of his alibi and other aspects of the case, including his life history in preparation for a possible penalty phase. But he fails to show that he was unable to provide this input during personal visits from trial counsel, and fails to indicate any area of the defense's investigation of the case that was inadequate because of his lack of telephone communication with his attorney during the period in question.

B. Continuance of the Preliminary Hearing

Defendant contends that his right to a speedy preliminary hearing was violated because the trial court continued the date of the preliminary hearing over defendant's objections. As discussed below, the court did not violate defendant's statutory rights concerning his preliminary hearing. Even if it had, defendant fails to show any prejudice.

*1. Background*

Defendant entered a not guilty plea to the amended complaint on April 15, 1994, and requested that his preliminary hearing be set for April 28. On April 28, on the motion of codefendant Yancey, and over the objection of defendant, the trial court ordered the continuance of both Yancey's and defendant's preliminary hearings to June 30, 1994 for good cause under section 1050.1. On June 29, 1994, the prosecutor filed the second amended complaint, to which defendant also pleaded not guilty. Yancey's counsel also requested another continuance based on the need to review additional discovery material that the prosecutor had disclosed in connection with the second amended complaint. Again, over defendant's objection, the court found good cause for the continuance and continued the matter

25

for both codefendants to July 13. On July 13, both defense counsel agreed to a continuance to July 18, when the preliminary hearing commenced.

### 2. Analysis

Defendant now contends that the trial court's granting of the first continuance on April 28, 1994 violated his statutory right under section 859b. Section 859b provides that a criminal defendant has a right to a preliminary hearing within 10 court days of the arraignment or plea, unless the parties waive this right or the court finds good cause to continue the preliminary hearing under section 1050. (*Landrum v. Superior Court* (1981) 30 Cal.3d 1, 5.) Under section 1050, a "trial court has broad discretion to determine whether good cause exists," and we review its decision on the motion for abuse of discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) Section 1050.1 provides that, "[i]n any case in which two or more defendants are jointly charged in the same complaint" and the magistrate finds good cause to continue the preliminary hearing regarding one defendant, the continuance constitutes "good cause to continue the remaining defendants' cases so as to maintain joinder." (§ 1050.1; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299.) At the April 28 hearing, the court found good cause to continue the preliminary hearing for Yancey because her counsel requested additional time to review the large amount of discovery recently disclosed by the prosecutor. This, in turn, established good cause to continue defendant's preliminary hearing for the purpose of maintaining joinder. We therefore conclude that the court did not abuse its discretion.

In his reply brief, defendant raises an additional argument. He notes that section 859b also provides that the "magistrate shall dismiss the complaint if the preliminary examination is set or continued more than 60 days from the date of the arraignment [or] plea . . . , unless the defendant personally waives his or her right

26

to a preliminary examination within the 60 days." (§ 859b, subd. (b).) Defendant contends that section 859b was violated because he entered a not guilty plea on April 15, 1994, and the preliminary hearing started 94 days later, on July 18, 1994. But he fails to address whether his not guilty plea to the second amended complaint on June 29, 1994 reset the 60-day period under section 859b. If so, defendant's July 18, 1994 preliminary hearing, which commenced 19 days later, was timely under the 60-day rule. Nonetheless, we need not resolve this apparently still-undecided issue of California law. (See *Ramos v. Superior Court* (2007) 146 Cal.App.4th 719, 724, fn. 3 (*Ramos*) [deferring the question of whether an arraignment on an amended felony complaint starts a new 60-day period under section 859b].) This new argument is forfeited both because defendant failed to raise it in the opening brief (*People v. Tully* (2012) 54 Cal.4th 952, 1075) and because he failed to object below. Moreover, even if he had preserved the claim, defendant shows no prejudice from the delay. (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529-530.)

Defendant contends, citing *Ramos*, *supra*, 146 Cal.App.4th at page 737, that violation of the 60-day rule does not require a showing of prejudice. To the extent the *Ramos* court correctly concluded a defendant need not show prejudice, that case involved circumstances where the defendant objected to the delay and sought a pretrial writ to dismiss the information. Here, defendant did not object; moreover, he raises the issue for the first time on appeal. As we stated in *People v. Pompa-Ortiz*, *supra*, 27 Cal.3d at page 529, "[t]he presence of a jurisdictional defect which would entitle a defendant to a writ of prohibition prior to trial does not necessarily deprive a trial court of the legal power to try the case if prohibition is not sought." We further stated that non-jurisdictional irregularities in preliminary examination procedures do not require reversal unless the defendant establishes that he or she was deprived of a fair trial or otherwise suffered

27

prejudice as a result.  (*Ibid.*)  A denial of a defendant's right to trial within a prescribed statutory time period falls within this class of irregularities that are not jurisdictional in the fundamental sense and which, therefore, require a showing of prejudice.  (*Ibid.*)  The same analysis applies to a violation of the 60-day rule in section 859b.

In the alternative, defendant contends that, because his trial was severed from that of codefendant Yancey after the preliminary hearing, and because the strategy and tactics in preparing for a joint trial are different than that of preparing for a single trial, he ended up with less time to prepare for trial as a single defendant.  Defendant bases this contention on the assumption that the severance with Yancey would have occurred earlier if the preliminary hearing had occurred earlier.  Even assuming for the sake of argument that this is so, defendant points to no specific issue at his trial that he would have presented differently and thus fails to make a showing of prejudice.

C.  Asserted Violations of Venue and Vicinage Rights

Defendant contends that his venue and vicinage rights under the United States Constitution, the California Constitution, and California statutes were violated because he was tried in Orange County for the Williams murder, which took place in Los Angeles County.  Defendant raised a vicinage claim as one of several claims in an unsuccessful motion to dismiss the indictment under section 995.  He raised the vicinage claim again during pretrial motions, and the trial court rejected it.  As we conclude below, the venue of defendant's trial was proper under statutory law and did not violate defendant's vicinage rights under the federal and state Constitutions.

Venue and vicinage are distinct.  Venue concerns the location where the trial is held; vicinage refers to an area from which the jury pool is drawn.  (*Price v.*

28

*Superior Court* (2001) 25 Cal.4th 1046, 1054.)  Defendant's contentions implicate both venue and vicinage because he contends that the venue of his trial, Orange County, was statutorily improper and that the racial composition of the jury pool of Orange County violated his vicinage rights because there were fewer jurors of defendant's race (African-American) in Orange County than in Los Angeles County (where defendant contends venue was proper).

Under section 790, the proper venue for a murder trial lies in the county where the fatal injury was inflicted, where the victim died, or where the victim's body was discovered.  But under section 781, venue is also proper in the county where "the defendant made preparations for the crime."  (*People v. Price* (1991) 1 Cal.4th 324, 385.)  "The long-standing former rule was that venue presented a question of fact and was thus for the jury to decide."  (4 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Jurisdiction and Venue, § 65, p. 179 [citing cases].)  Ten years after the completion of defendant's trial, we rejected that rule in favor of the new rule that venue is a question of law to be determined by the trial court.  (*People v. Posey* (2004) 32 Cal.4th 193, 215 (*Posey*).)  Following *People v. Simon* (2001) 25 Cal.4th 1082, 1086-1087 (*Simon*), *Posey*, at page 200, set forth a prospective rule that a defendant must raise a claim of improper venue to the court prior to the commencement of trial.  Since defendant's case was not final at the time of the new rules set forth in *Simon* and *Posey*, these new rules do not apply to him.

Defendant could have proceeded under the authority at that time and submitted the issue of venue to the jury.  Instead he elected to challenge venue in front of the trial court before the commencement of trial (a procedure that would become the exclusive method for deciding the issue after *Posey*.)  The burden of proof for proper venue remains unchanged — it rests with the prosecutor and must be proved by a preponderance of the evidence.  (4 Witkin & Epstein, Cal.

29

Criminal Law, *supra*, Jurisdiction and Venue, §§ 66-67, pp. 181-182 [citing cases].) Either direct or circumstantial evidence may suffice. (4 Witkin & Epstein, § 67, p. 181.) Whether we review the sufficiency of the evidence in light of the court's decision or in light of the possible decision of a hypothetical jury to whom defendant could have submitted the issue, the result is therefore the same. The evidence presented by the prosecutor was sufficient to prove, by a preponderance of the evidence, that Orange County was an appropriate place for the trial under section 781. (*Posey*, *supra*, 32 Cal.4th at pp. 220-221.)

The evidence establishes numerous visits and phone calls between defendant and Yancey while defendant — in the months before Williams's murder — was incarcerated in the Orange County Jail. A reasonable conclusion from this evidence is that it was during this period that the two planned for Yancey to lure Williams to her death. Defendant objects that the evidence of Yancey's visits and phone calls was not sufficient to support the conclusion that defendant and Yancey conspired to kill Williams because this evidence is circumstantial — not direct — evidence of defendant's guilt. Defendant protests that there was no direct proof of what was discussed during those visits or phone calls. But the evidence supporting venue can be either direct or circumstantial. In combination with the totality of incriminating evidence in the case, the visits and phone calls were compelling circumstantial evidence that it was within Orange County that defendant conspired with Yancey to have Williams murdered. Venue in Orange County was therefore proper for the Williams murder under section 781 because it was the county in which defendant made preparations for the crime.

Defendant's vicinage claim also falters. His rights under the United States and California Constitutions, we conclude, were not violated. The vicinage clause

of the Sixth Amendment[32] has not been incorporated by the Fourteenth Amendment to apply in a state criminal trial. (*Price v. Superior Court*, *supra*, 25 Cal.4th at pp. 1063-1069.) For vicinage rights under the state Constitution, "the vicinage right implied in article I, section 16 of the California Constitution . . . constitutes simply the right of an accused to a trial by an impartial jury drawn from a place bearing some reasonable relationship to the crime in question." (*Posey*, *supra*, 32 Cal.4th at p. 222, citation omitted.) Defendant contends that, at the time of defendant's trial, African-Americans comprised 21.5 percent of potential jurors in Compton, the superior court judicial district of Los Angeles for Gardena, where the Williams murder was committed, but comprised only 1.77 percent of the potential jurors of Orange County, where the trial occurred. The prosecutor below stipulated to the truth of defendant's statistical breakdown of the racial composition of the jury pools in Compton and Orange County. But the prosecutor pointed out that defendant failed to produce any authority that the vicinage right under the state Constitution gives rise to a defendant's right to have a trial moved to a county that has a greater percentage of jurors with the same race as that of the defendant. On appeal, defendant likewise fails to produce any authority for this position. To the contrary: because venue was proper in Orange County under section 781, as the place where preparations for the crime were committed, the place of trial did bear "some reasonable relationship to the crime in question" and therefore satisfied the implied vicinage requirement of the California Constitution. (*Posey*, at p. 222.)

---

[32] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have previously been ascertained by law . . . .*" (U.S. Const., 6th Amend., italics added.)

D.  Asserted Unduly Suggestive Identification of Defendant by Weaver

Weaver identified defendant to police investigators as being present at the CompUSA murder through a pretrial photographic array.  Defendant unsuccessfully made a pretrial motion to exclude admission of the identification on the ground that the photographic array was unduly suggestive.  Defendant contends the trial court erred and that Weaver's in-court identification was tainted due to the photographic array.  As we conclude below, the court did not err in denying defendant's pretrial motion.  And because the pretrial photographic array was not unduly suggestive, Weaver's in-court identification of defendant was not tainted.

### 1.  Background

According to Weaver's testimony, he met defendant in the CompUSA parking lot on the night of the CompUSA murder.  Inspector Grasso testified that, at a hearing on defendant's pretrial motion to suppress that about eight months after the CompUSA murder, he showed Weaver three photographic array cards.  Each photographic array card contained six photographs.  Grasso gave Weaver a lengthy admonition that instructed him, among other things, that he did not have to identify anyone (because it was just as important to free innocent persons from suspicion as it was to identify those who were guilty); that photographs do not always depict the true complexion of a person, which might be lighter or darker than that shown in the photograph; and that he should pay no attention to whether the photos were in color or black and white or to any other difference in the type or style of the photographs.[33]  The first photographic group included a photograph

---

[33]     All the photographs shown to Weaver were in color.  As discussed below, defendant contends that variations in the background color of the photographs were unduly suggestive.

of defendant's brother Eric and photographs of five other men. The second photographic group contained a photograph of defendant and photographs of five other men. The third photographic group contained a photograph of Ervin (the shooter in the CompUSA murder) and photographs of five other men.

Eric is a dark-complexioned African-American man, as were the five other men in his photographic array card. Defendant, however, is a light-complexioned African-American man, and the five other men in his photographic group were apparently White, Hispanic, or of mixed race. [34] Ervin is a dark-complexioned African-American man, as were the five other men in his photographic group. Weaver identified Eric from the first photographic array card and defendant from the second, but he did not identify anyone from the third.

At trial, during his direct examination by the prosecutor, Weaver made an in-court identification of defendant. In recounting his interviews with the police during the investigation and his pretrial identification of defendant through the photographic array, he was again shown the pretrial photographic array card, from which he also identified defendant.

### 2. *Analysis*

In determining whether a defendant's right to due process is violated by the admission of identification evidence, we consider "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances." (*People v. Kennedy* (2005) 36 Cal.4th 595, 608.) A claim that an identification procedure was unduly suggestive raises a mixed question of law and

---

[34] Evidence at the penalty phase established that defendant and Eric were half brothers, with the same father but different mothers. The trial court observed that it did not find much family resemblance between the two brothers.

fact to which we apply a standard of independent review, although we review the determination of historical facts regarding the procedure under a deferential standard. (*Id*. at p. 609.)

Defendant contends that the background color of the photographs of defendant and his brother was darker than the background color of the other photographs. Examining the array cards, we note that the background colors of the photographs of defendant and his brother are a slightly darker shade of gray. But this difference did not render the photographic lineup unduly suggestive, particularly in light of the express admonition given to Weaver that he should pay no attention to whether the photos were in color, in black and white, or to any other difference in the type or style of the photographs. We have previously rejected claims that photographic arrays were unduly suggestive based on minor variations in background color or discoloration of the photograph. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217; *People v. Gonzalez* (2006) 38 Cal.4th 932, 943.)

Defense counsel asserted below, and defendant renews on appeal, the argument that defendant's photographic array card was unduly suggestive because defendant was the only African-American man in it. But, as the prosecution argued below, the races of the five other men in the photographic array card were never established. Like defendant, the five other men were similarly complexioned, had dark hair, and had mustaches. As the trial court remarked, defendant's "racial characteristics are not outstandingly apparent." Indeed, defendant's substantial mustache, almost a handlebar, was his most distinctive feature. In preparing the photographic array, the police were faced with matching at least three relevant features of defendant's appearance — his complexion, his prominent mustache, and his apparent racial or ethnic identity. The police here did an admirable job of matching complexion and mustaches. But apparent racial

34

or ethnic identity is something that is harder to quantify and agree on, so opinions in this area can vary.

The additional factor here is that Weaver knew that his teammate Eric Clark, defendant's brother, was African-American.  Given this, Weaver may have (correctly) assumed that defendant, as Eric's brother, was also African-American. and been primed to look for a photograph of an African-American on the card, or, conversely, to reject out of hand a photograph of someone of another race.

But we need not decide the issue here because, even if we assume for the sake of argument that the photographic array was unduly suggestive in regard to apparent racial or ethnic identity, we conclude that the pretrial identification was "nevertheless reliable under the totality of the circumstances." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)  In making this determination we take into account "such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*Ibid*.)  Weaver certainly had a meaningful opportunity to closely observe defendant during their extended contact on the night of the CompUSA murder, including both a face-to-face meeting in the parking lot and being in the passenger seat while defendant drove towards and later made a quick getaway from the computer store.  That Weaver was a passenger in defendant's car as defendant engaged in a high-speed escape from police cars with their signals flashing also supports the inference that Weaver was focused on defendant during such a memorable event.

35

E.  Asserted Unconstitutional Coercion of Alonzo Garrett

Prosecution witness Alonzo Garrett refused to take the oath at defendant's preliminary hearing and was held in contempt of court.  But he later testified at defendant's trial.  Defendant contends that Garrett's trial testimony was coerced and unreliable because Garrett had been held in contempt for refusing to take the oath at the preliminary hearing.  But as we explain below, defendant fails to show that Garrett's trial testimony was made unreliable by coercion.

*1. Background*

At the preliminary hearing, the prosecution called Garrett as a witness.  As Garrett had previously told the authorities and later testified at defendant's trial (recounted, *ante* at pages 10 to 11), Garrett was a fellow prisoner with defendant at the Orange County jail and knew Ardell Williams.  Defendant had shown Garrett transcripts of Williams's grand jury testimony and stated, " 'Hey, this is the woman right here that could put me away.' "  Concerned that Williams was involved in a dangerous situation because she was "snitching," Garrett later phoned Williams, who admitted that she was the key witness in defendant's case but assured him that there was nothing to worry about.

Garrett refused to even be sworn as a witness at the preliminary hearing.  Before Garrett was brought to the courtroom, his counsel stated that he believed that Garrett had a Fifth Amendment right to remain silent if asked any questions about the murder of Williams.  Garrett's counsel also acknowledged that he did not "know if we'll ever get there because . . . [Garrett] doesn't even want to be in the courtroom."  Garrett had asked counsel "to inform the court that he's not going to say a word."  Garrett's counsel contended that Garrett could invoke his Fifth Amendment privilege on the grounds that his phone call to Williams could be interpreted as an attempt to dissuade a witness.  The prosecutor's position was that the burden was on the witness for taking the Fifth Amendment and that the

36

prosecution should at least be allowed to ask the witness questions before he could assert the privilege.

Garrett was then brought before the trial court and refused to speak. After twice instructing Garrett, in the face of his continued silence, to take the oath, the court informed him that he could be found in contempt of court under section 166, subdivision (a)(6), which provides that an unlawful refusal of any person to be sworn as a witness constitutes a misdemeanor. When Garrett continued to refuse to take the oath, the court found that he had unlawfully refused to be sworn as a witness and found him in contempt. The court committed him to custody "until such time as he can purge himself of contempt by taking the oath as a witness." Garrett never agreed to return to court as a witness at the preliminary hearing. He pleaded guilty to the contempt charges and was sentenced to one additional year to be served consecutively to the 25-year sentence he was already serving.

But almost two years later, when the prosecution called Garrett to testify at defendant's trial, he agreed to testify. As part of his testimony, Garrett acknowledged that he had refused to testify at the preliminary hearing. But he stated that he was testifying at defendant's trial for a number of reasons: (1) the prosecutor persisted in bringing Garrett to court to testify; (2) Garrett did not want to accrue any additional prison time by being held in contempt of court again for refusing to testify; and (3) he had "finally gotten over" the anger he had before the preliminary hearing, when he refused to testify.

    *2. Analysis*

Defendant contends that Garrett's Fifth Amendment right against self-incrimination was violated at the preliminary hearing when the trial court found him in contempt of court for refusing to testify. Respondent counters that Garrett failed to properly invoke his privilege against self-incrimination at the preliminary

37

hearing and that, even if Garrett had made a proper invocation, his claim would have failed because Garrett's testimony would not have been incriminating to him. But we need not evaluate the substantive legal issues surrounding *Garrett's* constitutional rights. Even if his Fifth Amendment rights were violated at the preliminary hearing, such an error alone does not provide a basis for excluding his trial testimony. Defendant has no standing to raise a claim involving an alleged violation of Garrett's Fifth Amendment privilege. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 965.) The issue in this appeal is whether the circumstances of Garrett's testimony impacted *defendant's* constitutional rights.

Defendant can raise a claim that the admission of Garrett's allegedly coerced testimony rendered defendant's trial fundamentally unfair. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 966.) But he can succeed only if he demonstrates "fundamental unfairness at trial," usually by establishing that the evidence was made unreliable by coercion. (*Ibid*.) Defendant fails to do so.

What defendant contends is that Garrett's testimony was coerced because Garrett had been previously held in contempt for refusing to testify and he stated that one of the reasons that he was now agreeing to testify was that he did not want to be held in contempt again and accrue additional prison time. Under these circumstances, though, Garrett was no more "coerced" than is any witness at trial who is subject to compulsory process and called to testify. Furthermore, an analysis of the immediate circumstances surrounding Garrett's testimony at defendant's trial shows that Garrett was not coerced when he testified there. Whether or not he had properly invoked his privilege against self-incrimination at the preliminary hearing by refusing even to be sworn, he took the oath at defendant's trial and would have been able to invoke his privilege against self-incrimination when being questioned if he chose to do so. He did not. Defendant points to the fact that Garrett's attorney was not present when he testified at

38

defendant's trial as indicating that he would have not believed that he could successfully assert his Fifth Amendment privilege. But before he testified in front of the jury, the trial court held a colloquy with Garrett in which he stated that he was agreeing to proceed with his testimony even though his attorney was not present and that his decision to do so was uncoerced and voluntary. Defendant also points to Garrett's statement to the court and the parties, outside the presence of the jury, that Garrett had heard rumors that if he did not testify he would "find [himself] somewhere in Pelican Bay," the state's supermaximum security prison. But outside the presence of the jury, the prosecutor told him, "I want you to know before the jury is brought in, that, as a representative of the District Attorney's office, I am telling you that there is not going to be a recommendation from the District Attorney's office to send you to Pelican Bay." Defendant therefore fails to show that Garrett was threatened with retaliation that would have rendered his testimony unreliable.

Considering Garrett's testimony in light of the wider circumstances also indicates that coercion did not render his testimony unreliable. First, any pressure that was exerted on Garrett was for him to testify, not for him to testify in a particular manner. Defendant fails to show that there was any pressure on Garrett to testify in a way that helped the prosecutor and hurt the defense. Along these lines, defendant fails to show that Garrett had something to gain personally by testifying against defendant. Indeed, defendant acknowledges that, in Garrett's testimony, he "demonstrated that he cared only about avoiding additional jail time and his own 'snitch' status." Defendant concludes that this shows that "Garrett therefore clearly did not have appellant's interests in mind when he testified, nor should he have." But by the same reasoning, Garrett did not have a motivation to skew his testimony against defendant either. Second, the fact that Garrett gave the same account of his jailhouse discussion with defendant before the allegedly

39

coercive events at the preliminary hearing further undercuts the claim that the events at the preliminary hearing rendered his trial testimony unreliable.[35] Finally, the jury heard Garrett's own account that he was now testifying at defendant's trial, at least in part, because he had previously been held in contempt. The jury could therefore evaluate his testimony in light of that fact. In conclusion, because defendant has not met his burden of showing that Garrett's testimony was unreliable as a result of coercion, defendant fails to show that the admission of the testimony rendered his trial fundamentally unfair.

### F. Admission of Conversations Between "Janet Jackson" and Members of the Williams Family

Defendant contends the trial court erred in admitting Yancey's statements under the Evidence Code section 1223 coconspirator exception to the hearsay rule. As recounted, *ante*, at page 12, the prosecutor presented evidence of the delivery of flowers to Williams's home on February 10, 1994 and a subsequent series of phone calls where a woman identifying herself as "Janet Jackson" arranged a "job interview" for Williams, resulting in her murder. Defendant contends insufficient evidence was presented to support a prima facie case of the existence of the conspiracy under Evidence Code section 1223 to allow the admission of Yancey's statements under the coconspirator exception to the hearsay rule.

Respondent contends that no objection was made at trial, thus forfeiting this claim on appeal. Defendant responds that, at the preliminary hearing, defense counsel raised an objection under Evidence Code section 1223, which was rejected, to the admission of Yancey's statements. We agree with respondent that

---

[35] As described above, shortly after Garrett's conversation with defendant about Williams, Garrett described it in a phone call to a friend. This phone call was recorded by prison authorities and the tape was played to the jury at defendant's trial.

the claim is forfeited for failure to raise it below. Defendant fails to provide any authority that an objection at a preliminary hearing is sufficient to preserve the issue at trial and on appeal. Defendant is also unconvincing in his argument that raising the hearsay issue again at trial would have been futile. The absence of an objection deprived the prosecutor and the court the opportunity to identify which statements were actually hearsay and which were not, and, for the hearsay ones, to assess the exceptions under which they might be admissible. For example, many, if not most, of the statements Yancey made in posing as "Carolyn," the flower delivery girl, and as "Janet Jackson" were lies and part of a scheme of deception to lure Williams to her death. Thus, these statements were not offered for the truth of the matters asserted, but for the effect they had on Williams. "[A]n out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief." (*People v. Montes* (2014) 58 Cal.4th 809, 863.) On the other hand, some parts of Yancey's statements to Williams, like the date and time of the job interview to which Williams was lured, arguably were meant to be used for the truth of the matter asserted. But because there were no hearsay objections at trial to Yancey's statements generally, let alone objections to specific statements, the court was deprived of the opportunity to rule on these issues.

Even if we considered this claim on the merits, we would conclude that Yancey's statements were properly admitted under Evidence Code section 1223. Under Evidence Code section 1223, three preliminary facts must be established for evidence of a coconspirator's declaration to be admissible: (1) that the declarant was participating in the conspiracy in question at the time of the declaration, (2) that the declaration furthered or was meant to further the conspiracy's objective, and (3) that the party against whom the evidence is offered was — at the time of

41

the declaration — participating in the conspiracy, or would later participate in it. (*People v. Leach* (1975) 15 Cal.3d 419, 430-431, fn. 10; see also *People v. Hardy* (1992) 2 Cal.4th 86, 139.) The party offering the coconspirator statements is required to present "independent evidence to establish prima facie the existence of . . . [a] conspiracy." (*People v. Leach*, *supra*, 15 Cal.3d at p. 430.) As we have stated in the context of establishing criminal liability for a conspiracy, "[e]vidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

In this case, the prosecution presented sufficient independent evidence from which the trial court could have found a conspiracy between defendant and Yancey to kill Williams. Williams's grand jury testimony, in which she described her knowledge of defendant's involvement with the CompUSA murder and her subsequent cooperation with the police, was evidence pointing to defendant's motive to have her murdered to prevent her from testifying at his trial.[36] Garrett testified about defendant's awareness that Williams was a damaging witness by recounting defendant's remark that "this is the woman right here that could put me away." Yancey's relationship with defendant in the period leading up to the Williams murder (Jan. through Mar. 1994) was established through evidence of her phone records indicating numerous calls to defendant's attorney and investigator, a pay phone in the Orange County Jail accessible to Clark, and to

[36] Defendant's contention that the grand jury testimony of Williams was itself inadmissible is analyzed and rejected on pages 53 to 57, *post*.

42

Williams's home.  During a search of Yancey's apartment, police recovered numerous letters between Yancey and defendant.

Moreover, considerable evidence established that Yancey was the woman who delivered the flowers to the Williams's household and who represented herself as "Janet Jackson" in the phone conversations with Williams's mother.  In a voice lineup, Williams's mother and sister identified Yancey's voice as that of "Janet Jackson."  They also identified Yancey in a photo lineup as the person who delivered the flowers.  One of Yancey's fingerprints was found on the box in which the flowers were delivered.

Defendant also raises questions about the evidence showing that Yancey was the flower delivery girl and the "Janet Jackson" of the phone calls.  He contends that "this evidence is meaningless in the absence of what was said during the Janet Jackson calls or flower delivery" because "the prima facie finding of the conspiracy must be made in the absence of those statements."  In making this argument, defendant presupposes that the only basis for admitting  any of Yancey's statements was through Evidence Code section 1223, the coconspirator hearsay exception.  But defendant fails to appreciate the point, discussed above, that many, if not most, of Yancey's statements were also admissible as nonhearsay.  Thus, the trial court admitted the statements independent of the requirements of the coconspirator hearsay exception.  As independent evidence, these statements supported the inference that Yancey was involved in a conspiracy with defendant to kill Williams.

Finally, defendant contends that the admission of the statements under the coconspirator exception to the hearsay rule violated his right to confrontation under the Sixth Amendment to the United States Constitution as it has subsequently been defined in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  Defendant failed to raise a confrontation clause objection at trial.

But because defendant's trial occurred before the decision in *Crawford*, he has not forfeited his *Crawford* challenge. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1215-1216.) Defendant's claim nonetheless fails on the merits because he fails to show how Yancey's statements to Williams and her family were "testimonial" under *Crawford*. The high court has left open the possibility that statements to individuals who are not law enforcement officers may, in certain circumstances, qualify as testimonial. (*Ohio v. Clark* (2015) 576 U.S. \_\_\_\_ [135 S.Ct 2173, 2181].) It has also noted, however, that "statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." (*Id.* at p. 2182.)[37]

### III. JURY SELECTION ISSUES

#### A. Asserted *Witt* Error

Defendant contends that various prospective and serving jurors were erroneously included or excluded by trial court rulings on prosecution and defense motions to exclude prospective jurors for cause based on their views of the death penalty under *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*). We reject all of defendant's *Witt* claims.

The federal constitutional standard for excusing a prospective juror for cause based on his or her views of capital punishment is whether "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Witt*, *supra*, 469 U.S. at

---

[37] Furthermore, *Crawford* states, in dicta that the high court has yet to apply in a case, that historically, statements in furtherance of a conspiracy present an example of "statements that by their nature were not testimonial," and which therefore do not implicate the confrontation clause. (*Crawford*, *supra*, 541 U.S. at p. 56.)

44

p. 424, fn. omitted.) Applying *Witt*, we have stated that a prospective juror "is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1146.) "On appeal, we will uphold the trial court's ruling if it is fairly supported by the record," and we accept "as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." (*People v. Mayfield* (1997) 14 Cal.4th 668, 727.) "The same analysis applies to claims involving erroneous juror exclusion or inclusion." (*People v. Hoyos* (2007) 41 Cal.4th 872, 905.)

### 1. *Erroneous Inclusion Claims*

Defendant contends the trial court erred in denying his challenges for cause against 12 prospective jurors. Respondent contends defendant has forfeited these claims. "[A] defendant challenging on appeal the denial of a challenge for cause must fulfill a trio of procedural requirements: (1) the defense must exercise a peremptory challenge to remove the juror in question; (2) the defense must exhaust all available peremptory challenges; and (3) the defense must express dissatisfaction with the jury as finally constituted." (*People v. Weaver* (2001) 26 Cal.4th 876, 910-911.) Defendant acknowledges that he failed to meet these requirements, to which there are no exceptions. He has therefore forfeited his claims.

Even if these claims were not forfeited, defendant fails to show any possible prejudice. The 12 prospective jurors defendant challenges are from defendant's first trial in which the jury returned a guilt phase verdict but failed to return a penalty phase verdict. *Witt* error does not require reversal of a guilty verdict. (*People v. Tate* (2010) 49 Cal.4th 635, 666.) Therefore, even if a *Witt*

45

violation occurred for any of these jurors, defendant is not entitled to a reversal of his guilt phase conviction.

Defendant advances further *Witt* claims regarding five of the jurors who sat at his penalty retrial, where the jury returned a sentence of death. But defendant acknowledges that he failed to meet the procedural requirements for an erroneous inclusion claim. In fact, defendant acknowledges that "[s]everal of these jurors were not challenged for cause by appellant's counsel." And defendant does not identify where in the record trial counsel challenged *any* of these jurors. Defendant therefore forfeited these claims. Contrary to defendant's assertions otherwise, a trial court has no sua sponte duty to excuse jurors for their views on the death penalty. (*People v. Taylor* (2009) 47 Cal.4th 850, 884.) As noted *ante*, to preserve a claim of error, the defendant must challenge the juror for cause, exercise a peremptory challenge, exhaust the available peremptory challenges, and express dissatisfaction with the jury ultimately selected. (*Ibid*.) Defendant, satisfying none of these requirements, has forfeited these claims.

### 2. *Erroneous Exclusion Claims*

Defendant contends that the trial court erroneously granted, over his objection, three of the prosecutor's challenges for cause based on the prospective jurors' death penalty views. These three prospective jurors, however, were at defendant's first trial, where no death verdict was returned. As explained above, defendant cannot show any prejudice from a *Witt* error at his first trial because no death verdict was returned at that trial and any *Witt* error would not be reversible on the guilty verdict.

### B. *Batson/Wheeler* Challenge

Defense counsel brought a motion under *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 and *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 based on the

prosecutor's use of a peremptory challenge against a Native American prospective juror. The trial court denied the motion, finding that defense counsel failed to make a prima facie showing that the prosecutor had exercised a peremptory challenge in a discriminatory manner. As discussed below, we conclude the trial court did not err in its ruling.

### 1. Background

The prosecutor exercised a peremptory challenge against Prospective Juror P. M., to which defense counsel objected on *Batson/Wheeler* grounds. The trial court then held a hearing outside the presence of the prospective jurors. Defense counsel explained that he had brought the motion because of the small number of minority prospective jurors in the pool and stated: "I don't see anything in his questionnaire that would make him any different than any other member that's on the jury. This is as vanilla as you can get, this juror." When defense counsel was asked to make his prima facie showing of discrimination, he stated that P. M. had been one of the two minority prospective jurors in the jury box. Defense counsel explained that there had been three minority prospective jurors: Prospective Juror C. T., whom the parties dismissed by stipulation; juror number 9, a Hispanic woman, who was currently in the jury box; and P. M., whom the prosecutor had dismissed. P. M. self-identified as "American Indian" in his jury questionnaire. The prosecutor responded that defense counsel had not made a prima facie case, and the prosecution would not indicate its reasons for the peremptory challenge unless the court made such a finding. The court denied the motion, finding that the defense had not made a prima facie showing of discrimination.

### 2. Analysis

We follow a familiar three-step analysis in considering a *Batson/Wheeler* motion: (1) a defendant must make a prima facie case by demonstrating that the

47

totality of the relevant facts establishes an inference of discriminatory purpose; (2) if the defendant makes a prima facie case, the prosecutor bears the burden of adequately explaining the exclusion with permissible race-neutral justifications; and (3) if the prosecutor offers a race-neutral explanation, the trial court must decide whether the defendant has proved purposeful racial discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

Defendant argues that we should presume the trial court applied the "strong likelihood" standard for the first stage, which was controlling California law before the United State Supreme Court's articulation of the standard in *Johnson v. California*, *supra*, 545 U.S. at page 168. But, as we have held, "[r]egardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson* . . . [we] are able to apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73, citation omitted.)

Defendant contends that the trial court erred in denying the motion because the court at one point referred to "no prima facie showing of pattern." Defendant points to the United States Supreme Court's statement that even " ' "a single invidiously discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions." ' " (*Johnson v. California*, *supra*, 545 U.S. at p. 169, fn. 5.) But the court merely referred to defendant's failure to make a prima facie showing of discrimination on the grounds that defendant himself raised in explaining his basis for the motion, which was based on pattern — namely the fact that P. M. was one of two minority jurors in the jury box at the time that the prosecutor excused him. The court did not state that only evidence of a pattern of improper challenges could establish a prima

facie showing of a violation. As we have stated, "To be sure, the ultimate issue to be addressed on a *Wheeler-Batson* motion 'is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias.' [Citation.] But in drawing an inference of discrimination from the fact one party has excused 'most or all' members of a cognizable group [citation], a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges. Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case, including this one, to make a prima facie case after the excusal of only one or two members of a group is very difficult." (*People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3.)

We agree with the trial court: defendant failed to make a prima facie case based on the excusal of this one Native American prospective juror. Defense counsel below pointed to no circumstances beside an asserted pattern of exclusion of minority prospective jurors in support of his *Batson*/*Wheeler* motion. But one challenge is not a pattern. The excusal of one minority juror was the result of a stipulation by the parties. There was one minority juror remaining in the jury box when the prosecutor challenged P. M. The fact that defense counsel said he saw no reason for the prosecutor to challenge P. M. does not raise an inference that the prosecutor's reason for doing so was improper group bias.

On appeal, defendant seeks, for the first time, to make a case based on comparative juror analysis, contending that, based on statements made during voir dire, R. R., a Caucasian prospective juror not challenged by the prosecutor, was more likely to vote for a sentence of life without the possibility of parole than P. M. We decline to engage defendant's attempt to raise comparative juror analysis for the first time on appeal in this stage one *Batson*/*Wheeler* claim. Our obligation to consider comparative juror analysis for the first time on appeal only

49

applies to stage three *Batson*/*Wheeler* claims, not stage one claims. (*People v. Lenix* (2008) 44 Cal.4th 602, 622, fn. 15.) Defense counsel did not engage in comparative juror analysis below by pointing to any specifics about any other prospective jurors. Defense counsel merely made the generic claim that P. M. was no different than the other jurors. As we have stated in declining to consider comparative juror analysis in a first-stage *Batson*/*Wheeler* claim, "[w]here, as here, no reasons for the prosecutor's challenges were accepted or posited by either the trial court or this court, there is no fit subject for comparison. Comparative juror analysis would be formless and unbounded." (*People v. Bell*, *supra*, 40 Cal.4th at p. 601.)

## IV. GUILT PHASE ISSUES

### A. Exclusion of Defendant from the Immunity Proceedings of Prosecution Witnesses

Under the Fifth Amendment to the federal Constitution, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding . . . critical to its outcome if his presence would contribute to the fairness of the procedure." (*Kentucky v. Stincer* (1986) 482 U.S. 730, 745.) Defendant contends that his federal constitutional right was violated because he was excluded from the section 1324 immunity hearings for prosecution witnesses Matthew Weaver and Jeanette Moore.[38] Defendant forfeited this claim by failing to object or seek relief

---

**38** Defendant also claims error on state law grounds, because he never waived the statutory requirement that capital defendants be present at all phases of their trial pursuant to sections 977 and 1043. These statutes concern the requirement of a defendant's attendance at the phases of *his or her own trial*. Defendant, however, presents no authority or persuasive argument to support the conclusion that a separate proceeding to grant immunity to a witness under section 1324 — a proceeding to which defendant was *not* a party — falls under sections 977 and 1043.

50

from the trial court.  Defendant also contends that the appellate record is inadequate because transcripts of the immunity hearings are not included in the record.  Defendant fails to meet his burden of showing that this deficiency is prejudicial to his ability to prosecute his appeal.

Weaver and Moore were important witnesses for the prosecution in tying defendant to the CompUSA murder.  Both witnesses were also potentially liable for prosecution for aiding and abetting the crime.  Weaver was at the scene of the CompUSA murder in order to help move the computers.  Moore fraudulently obtained a driver's license in someone else's name, which she used to rent the U-Haul truck that defendant intended to use to haul away the computers.  Thus, the prosecutor sought immunity for Weaver and Moore under section 1324, which was granted by another judge in a separate proceeding that occurred on the mornings that Moore and Weaver testified at defendant's trial.

Defendant contends that he was "excluded" from the Moore and Weaver immunity hearings.  But defendant failed to raise any objection to his or his attorney's absence from the hearings.  The prosecutor informed defendant and the trial court about the immunity proceedings for Moore and Weaver that were to take place in front of another judge.  Defendant did not seek any ruling from the court on these immunity proceedings.  Rather, the court, out of a stated concern for the record, independently inquired:  "Have adequate provisions been made for the reporting, and is there any requirement that for that proceeding, in view of the status of the trial, that [defendant] and his counsel be present at any proceeding involving a during-the-trial grant of immunity?"  The prosecutor replied, "Not to my knowledge, there is none.  I mean, it's not between [defendant] — [defendant] is not a party to that."  The court stated, "I will rely on your opinion.  I just wanted to throw it out."  Defendant states that "ultimately appellant and counsel were not present at the immunity hearing for either Jeanette Moore or Matt Weaver," but

51

nothing in the record establishes the defense asserted a right to be present or even asked to attend. Similarly, at no point during the trial did the defense assert that these witnesses could not be effectively cross-examined in light of the defense's absence from the hearings or the lack of a transcript of the hearings. On this record, defendant has forfeited his claim that his rights were violated and we therefore do not address the merits of the claim.

Defendant also contends that the appellate record is inadequate because transcripts of the immunity hearings are not included in the record in violation of his constitutional rights and section 190.9 and its implementing rule of court, currently rule 8.610 of the California Rules of Court. In fact, Weaver's immunity hearing on Tuesday, April 2, 1996, was reported and is included in the record. Moore's immunity hearing, however, does not appear to be in the record.

Defendant fails to point to any particular provision of the rules to support his contention that the transcripts of the immunity proceeding should have been included. But even if they should have been, defendant fails to show prejudice. " ' "A criminal defendant is . . . entitled to a record on appeal that is adequate to permit meaningful review. . . . The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 204.) Defendant contends that defense counsel was prejudiced by the lack of a transcript because counsel could not effectively cross-examine Moore and Weaver about the precise nature of the immunity they were granted and any other benefits they received. Defendant contends that, on appeal, he cannot now show that their testimony before the jury was false.

Defense counsel had the opportunity to cross-examine Moore and Weaver on the precise nature of the immunity these witnesses were granted. Indeed, the

topic of their immunity was thoroughly explored when each one testified at trial. At the beginning of each witness's testimony, the prosecutor extensively questioned each one about the immunity that had been granted. Defense counsel cross-examined Moore on the topic, but did not raise the issue with Weaver. Because defendant fails to specify what aspect of these witnesses' grant of immunity was not already explored at trial — and would have been illuminated by the transcripts of Moore's hearing — he has failed to show how the assumed deficiency in the record is prejudicial to his appeal.

B. Admission of Williams's Statements for a Nonhearsay Purpose

Defendant contends the trial court improperly admitted Williams's grand jury testimony and police interview statements for the nonhearsay purposes of establishing defendant's motive to kill her and establishing that she was a witness against defendant, as alleged in the murder of a witness special-circumstance allegation under section 190.2, subdivision (a)(10). The court did not err in admitting this material for these nonhearsay purposes or in denying defendant's objection to this material under Evidence Code section 352.

### 1. Background

The prosecutor initially sought to admit Williams's grand jury testimony and police interview statements under Evidence Code section 1350, a hearsay exception for instances in which a defendant causes the unavailability of a witness. The prosecutor also raised the possibility of admitting the material for the nonhearsay purpose of showing motive. [39] The trial court conducted a hearing and

---

[39] Specifically, these materials were the transcripts of Williams's September 1992 grand jury testimony, and the tape-recordings of conversations she had with Inspector Grasso on April 1 and May 30, 1992. The prosecutor made an offer of proof to the trial court that information from these sources had been given to

*(footnote continued on next page)*

called witnesses to assess whether Williams's statements were made under circumstances that indicated trustworthiness, as required by Evidence Code section 1350, subdivision (a)(4). Ultimately, the court ruled that Williams's statements did not meet the trustworthiness requirement of Evidence Code section 1350 and denied the admission of the statements under that section.

But the trial court also ruled that the statements were admissible for the nonhearsay purposes of showing motive and establishing the corpus delicti of the witness-killing special-circumstance allegation. Defendant argued, however, that only the fact that Williams testified to the grand jury and gave statements to the police should have been admissible, not the content of her statements. The court inquired whether there was another way of placing before the jury the information that she had been a witness adverse to defendant, other than admitting the statements verbatim. The court presented as a possibility, "thinking out loud," that someone who had been present at the grand jury proceeding could testify that Williams was called as witness against defendant and gave statements that were detrimental to him. The prosecutor replied that "the heart of the People's case . . . is how the information was given by the prosecution to the defense team during that period of time, and what [defendant] then did with that knowledge," and that this information "fuel[ed] the motive for [defendant's] wanting Ardell Williams murdered in retaliation for giving the information, and to prevent her testimony" at trial. The prosecutor stated that merely calling a witness to testify that Williams testified at the grand jury and implicated defendant would deny the prosecution

_(footnote continued from previous page)_

defendant's defense team, and through them to defendant, and fueled defendant's motive to have Williams killed to prevent her testimony.

"the ability to show the specifics and the detail which [the prosecution] can prove [defendant] knew." The prosecutor pointed out that defendant "knew all of the details of her information" and to deny the prosecution the ability to present those details "would take away the legitimate force and effect" of what the prosecution believed was the motive in the case.

In ruling that the entirety of the statements could be admitted, the trial court accepted the prosecutor's argument that the details of Williams's statements against defendant were relevant to establishing his motive to kill her and rejected defendant's argument that the statements were unduly prejudicial under Evidence Code section 352.

Defendant subsequently agreed to have the Williams statements admitted for their truth so he could impeach Williams as a hearsay declarant. After a lengthy colloquy with the trial court, defendant expressly waived any objections to Williams's statements' being offered for their truth.

### 2. Analysis

Defendant reiterates on appeal an argument he advanced below. He claims that only the fact that Williams testified before the grand jury and gave statements to the police should have been admissible, not the content of her testimony statements. He notes Williams's testimony was lengthy, taking up more than 100 pages of transcripts. Moreover, he contends the testimony and statements contained incriminating details that the jury could not help but use for their truth.

The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence. (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1124.) "The exercise of discretion is not grounds for reversal unless ' "the court exercised its discretion in

55

an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438.)

Citing *People v. Edelbacher* (1989) 47 Cal.3d. 983, 1027-1028, defendant contends the trial court abused its discretion. In *Edelbacher*, defendant was charged with murdering his wife, and evidence was admitted that defendant had previously been arrested for and charged with spousal rape. (*Ibid.*) We rejected defendant's claim that the evidence of spousal rape should have been excluded under Evidence Code section 352 because the probative value was substantially outweighed by the risk of undue prejudice. (*Id*. at p. 1028.) We concluded that the evidence was highly relevant on the issue of motive, which was an important issue in the case, and that the risk of undue prejudice was not excessive because no evidence regarding the circumstances of the alleged spousal rape was admitted — only the fact that he had been charged, tried, and acquitted of the crime was admitted. (*Ibid*.)

From this, defendant mistakenly contends that *Edelbacher* is authority for the proposition that only the fact of a previous legal proceeding can be admitted for the purpose of showing motive, and any additional details must be excluded under Evidence Code section 352. In *Edelbacher*, however, we merely concluded that the lack of the details from the spousal rape trial undermined the defendant's argument that he was prejudiced. We did not reach the inverse conclusion that the presentation of the details would have been unduly prejudicial under Evidence Code section 352. In *Edelbacher* the prosecution only presented the fact of the spousal rape charge and trial and never sought to admit the wife's testimony, so the probative value of her testimony was never weighed against the risk of undue prejudice. Here, however, the prosecutor argued that the details of Williams's statements were crucial to establishing his case for defendant's motive to murder her. We see no abuse of discretion in the trial court's ruling that – given the

56

circumstance of this case — the details of Williams's testimony and police statements were particularly probative for establishing defendant's motive for murder and that the probative value of this evidence was not outweighed by the risk of undue prejudice. The extent to which Williams could incriminate defendant was an issue that was highly probative for the jury in assessing the prosecution's theory that defendant took the extraordinary step of organizing her murder from inside the jail.

Defendant renews on appeal defense counsel's argument that some evidence is too difficult for a jury to consider for a nonhearsay use, even when the jury is provided with a limiting instruction. Defendant obliquely references *Bruton v. United States* (1968) 391 U.S. 123, 127-128, 135-137, which holds that a nontestifying codefendant's confession implicating a defendant cannot be admitted at a joint trial, even if the jury is instructed to disregard that confession in determining the guilt or innocence of the defendant. Defendant's case does not fall under *Bruton*, and we are unpersuaded that the trial court here abused its discretion in abiding by the usual presumption that a jury will follow limiting instructions. (See, e.g., *Greer v. Miller* (1987) 483 U.S. 756, 766, fn. 8.)

Finally, defendant points to the prosecutor's comments during closing argument and complains that "[r]ather than argue non-hearsay purposes for which [the prosecutor] had purportedly introduced them, the prosecutor repeatedly directed the jurors to believe the truth of [the] statements." As recounted above, however, after the trial court ruled that Williams's statements were admissible for nonhearsay purposes, defendant expressly waived any objections to having these statements admitted for their truth because defendant wanted to impeach Williams as a hearsay declarant. Thus, the prosecutor's use of Williams's statements for their truth was not improper during closing argument or at any point in the trial.

57

C. Admission of Williams's Hearsay Statements Through the Testimony of an FBI Agent

Defendant contends the trial court improperly admitted double hearsay testimony in violation of both state law and his rights under the federal Constitution's Confrontation Clause. At the guilt phase, FBI Special Agent Holliday testified that Williams told him about a conversation that Williams had with Eric (defendant's brother). In this conversation, Williams said Eric told her that he and defendant had planned a robbery at CompUSA. Eric further explained that two robbers were involved, that they had the people tied up, and that something had gone wrong and "a lady was killed."

Defendant has forfeited this claim because he failed to object below. (*People v. Harrison* (2005) 35 Cal.4th 208, 239.) As recounted in the previous claim, defendant did raise in limine objections to *other* hearsay statements of Williams, namely those in her grand jury testimony and in her tape-recorded conversations with Inspector Grasso.[40] But defendant did not make a hearsay objection to this Williams statement reported by Holliday.

The second layer of hearsay in Agent Holliday's testimony is Eric's statement, as recounted by Williams. Once again, defendant failed to raise a specific challenge to the double-hearsay nature of Holiday's testimony. Defense counsel did discuss Eric's statement as Williams reported it to Inspector Grasso in the context of a hearing under Evidence Code 1101, subdivision (b). The trial court stated that Eric's statement was arguably "admissible under the double layer as a statement against his own penal interest." (See Evid. Code, § 1230.) Because defense counsel failed to object to the court's tentative basis for considering the statement admissible and failed to raise any subsequent hearsay objection

---

[40] See footnote 39, *ante*.

58

pertaining to Holliday's testimony about Williams's report of Eric's statement, defendant has forfeited this claim on appeal.

### D. Failure to Produce Holliday's Notes or Strike his Testimony

Defendant contends the trial court should have struck Agent Holliday's testimony under Evidence Code section 771[41] because he declined to turn over to the defense notes that he consulted during his testimony unless defense counsel received permission from the FBI to obtain the notes. Defendant forfeited the claim below because he failed to move the trial court to strike the testimony under Evidence Code section 771. Indeed, defense counsel did not seek any ruling from the court on the matter, and the failure to do so deprived the court of the opportunity to remedy the asserted problem by compelling disclosure or striking the testimony. Finally, defendant fails to provide authority that the court had a sua sponte duty to strike the testimony under these circumstances.

### E. Prosecutorial Misconduct Based on Eliciting Testimony About Defendant's Collaboration in a Prior Crime with Williams

Defendant contends the prosecutor engaged in misconduct because he elicited testimony about defendant's collaboration with Williams in a 1990 theft from a computer store, Soft Warehouse, in violation of the trial court's in limine ruling forbidding the presentation of evidence of defendant's prior thefts from computer stores. Defendant has forfeited his prosecutorial misconduct claim by failing to raise it below and, even if it had not been forfeited, there was no

---

[41] Evidence Code section 771, subdivision (a) provides: "Subject to subdivision (c), if a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, the testimony of the witness concerning such matter shall be stricken."

59

misconduct because the evidence was properly admitted with a limiting instruction.

### 1. Background

Citing Evidence Code section 1101, subdivision (b), the prosecution made a pretrial motion arguing for admission of evidence that, between August 29 and October 9, 1989, defendant entered five computer stores in Los Angeles County and stole computers.[42]  The trial court denied the motion to introduce the proffered evidence of these 1989 computer store thefts.  The motion made no mention of the 1990 theft at Soft Warehouse in Torrance, California, where Williams, working as a cashier, had allowed defendant to take several laptop computers without paying.

At trial, the prosecution called Richard Highness, an employee of the Soft Warehouse store, who testified, without defense objection, that on November 1, 1990, a man who called himself "Tom Jones" came into the store to buy computer equipment.  Highness identified defendant in court as that man.  Highness gave defendant several laptop computers (worth approximately $10,000) and a customer service agreement to present to Williams for payment.  When Highness

---

[42]    Evidence Code section 1101, subdivision (a) provides:  "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Evidence Code section 1101, subdivision (b) adds the following provision: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

reviewed the sales receipts at the end of the day, he noticed there was no receipt for the sale to "Tom Jones." Highness questioned Williams about the incident, who denied any knowledge of it. Highness reported the theft to the police, giving a description of "Tom Jones" as about six feet, two inches tall, thin build, and about 38 to 40 years old.

On the following day, outside the presence of the jury, the trial court raised some issues related to Highness's testimony. As the court pointed out, the 1990 Soft Warehouse theft was not included in the earlier Evidence Code section 402 hearing concerning the admissibility of defendant's prior crimes, where the court had ruled that evidence of defendant's 1989 computer store thefts were inadmissible. Although defense counsel did not argue that the 1990 Soft Warehouse theft was covered by the court's ruling on the 1989 computer store thefts, he expressed his surprise that that the prosecutor presented evidence of the 1990 theft. In response, the prosecutor explained that it was his understanding that the crimes committed jointly by defendant and Williams were not subject to the Evidence Code section 402 hearing concerning the admissibility of defendant's prior crimes. The prosecutor also noted that the defense had not objected when the prosecutor mentioned the Soft Warehouse theft during his opening statement, in the context of recounting Williams's statements to Inspector Grasso, and that the defense had withdrawn its objection to Williams's statements being offered for their truth. The court stated that it would entertain a request for a limiting instruction to the jurors about this evidence to make sure it was considered in compliance with Evidence Code section 1101, subdivisions (a) and (b). Later at trial, the Soft Warehouse theft was again mentioned when Grasso testified that Williams had described her involvement with defendant in the theft. At the conclusion of the case, the court, at the request of the prosecution, instructed the jury as follows:

"Evidence has been introduced for the purpose of showing the defendant was involved with Ardell Williams in crimes other than that for which he is on trial, specifically, the Soft Warehouse theft on November 1, 1990 in Torrance, and possession of stolen traveler's checks on September 22, 1991, in Las Vegas. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the relationship between the defendant and Ardell Williams and motive and intent. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all the other evidence in the case. You are not permitted to consider such evidence for any other purpose."

### 2. *Analysis*

Under the federal Constitution, a prosecutor commits misconduct when his or her conduct "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) Under California law, a prosecutor commits reversible misconduct when "he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted." (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) To preserve a claim of prosecutorial misconduct on appeal, "the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Price*, *supra*, 1 Cal.4th at p. 447.)

Defendant has forfeited his claims by failing to object below and request an admonition. (*People v. Price*, *supra*, 1 Cal.4th at p. 447) Defendant, however, contends that he should be excused from this requirement based on the argument that a timely objection or request for admonition would have been futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Defendant contends that the trial court had previously ruled that all prior walk-in computer thefts were inadmissible, that the prosecutor disregarded this ruling by calling Highness as a witness, and that when a prosecutor chooses to disregard a binding ruling, any objection would be futile because the court has already ruled in the defense's favor.

We reject defendant's contentions here. First, the trial court had not ruled that all prior walk-in computer thefts were inadmissible; it only ruled on the computer thefts that were the subject of the prosecutor's motion, which were the five computer thefts in 1989. Second, even if the court's order had encompassed the 1990 theft, there is no reason to presume that defense counsel's drawing the court's attention to this fact would have been futile. Indeed, we presume that judges lawfully perform their duties. Had the defense reminded the court it had previously excluded certain evidence the prosecution was attempting to present, it is reasonable to expect that the court would have effectuated its earlier ruling by preventing its admission. Accordingly, defendant's failure to raise the issue of supposed prosecutorial misconduct below is not excused, and his appellate claim is forfeited.

In any event, the misconduct claim is without merit. Defendant's argument that the prosecutor committed misconduct appears to be that the prosecutor misled defendant and the trial court by not including the 1990 theft in his in limine motion because he was asked to list the prior crimes evidence he sought to introduce. The prosecutor, however, did not represent that the five computer thefts in 1989 were the only prior crimes that the prosecutor would ever seek to

admit at trial, but only that the 1989 crimes were "at this point in time" the only ones it was seeking to present.

Moreover, the prosecutor's conduct here was proper because he did not attempt to elicit *inadmissible* evidence. As recounted, the evidence was properly admitted with a proper limiting instruction. The jury was instructed that this evidence was only to be considered for the limited purposes of showing the relationship between defendant and Williams and defendant's motive and intent, and not for the purpose of showing defendant's bad character or predisposition to commit crimes. As reflected in the limiting instruction to the jury, admission of the 1990 Soft Warehouse theft was supported by the same theory of Evidence Code section 1101, subdivision (b) admissibility under which the trial court admitted evidence of defendant's and Williams's Las Vegas 1991 traveler's checks crime — that is, the 1990 Soft Warehouse theft was relevant to show defendant's closeness to Williams and defendant's motive to have her killed.

F. Admission of Moore's Testimony

As recounted, *ante* at pages 6 and 7, Jeanette Moore was a prosecution witness who testified that defendant helped her to obtain a fraudulent driver license and that defendant later instructed her to use the license to rent a U-Haul van he intended for use in a robbery at CompUSA. Defendant unsuccessfully moved to exclude Moore's testimony both at the preliminary hearing and at trial on the ground that it was coerced through "outrageous police conduct." Defendant contends the trial court erred in admitting her testimony because Inspector Grasso misled Moore into believing that defendant was responsible for an attempt on her life, which created a motive for Moore to present damaging testimony against defendant. Defendant also contends that Moore's testimony at trial was coerced because of her immunity agreement. As we conclude below, the court did not err

64

in admitting Moore's testimony because Grasso did not engage in police misconduct and Moore's testimony at trial was not coerced.

### 1. *Background*

Before the preliminary hearing, defendant moved to exclude Moore's testimony. Defendant contended that during an interview in Arizona, Inspector Grasso misled Moore into believing that defendant was responsible for an attempt on her life. Defendant further contended that this belief acted like a death threat and created a continuing condition of coercion on Moore to give damaging testimony against defendant. The magistrate denied the motion. Moore testified at the preliminary hearing subject to lengthy cross-examination about the interview with Grasso. Moore explained that Grasso and the Chandler Arizona police had told her about an incident occurring the night before her interview, in which unidentified men had entered the house where Moore had been staying, fired guns, and stated, "Where is that bitch at?" Grasso also told Moore during this interview that defendant was responsible for Williams's murder. Moore stated that Grasso did not expressly state that defendant was responsible for the home invasion at Moore's former dwelling, but she assumed that defendant was because the woman present at the house was not killed. Moore believed that the woman had not been the target and that the unidentified men had been looking for her instead.

Before trial, defense counsel again moved to exclude Moore's testimony because of "outrageous police conduct," based on the theory that Inspector Grasso had misled Moore into believing that defendant was responsible for an attempt on her life, and that this belief "established a compelling and life-threatening motive" for Moore to give damaging testimony against defendant. Defense counsel contended he could not cross-examine Moore about the possible bias created by

her conversation with Grasso without running the risk that the jury would assume that defendant was behind the Chandler home invasion, despite the fact that no evidence supported such a connection.

At a hearing on the motion, Inspector Grasso testified that when he had interviewed Moore in Arizona on June 8, 1994, he was aware of the home invasion in Chandler the night before: two men went to a house where Moore had previously been staying, fired several rounds into the house, and were heard to say, "Where's the bitch?" Grasso testified that he was concerned that the incident could have been an attempt on Moore's life by defendant and that Moore could have been in danger — Yancey had previously called Moore and sent Moore money (and was therefore aware of Moore's location in Arizona), and Williams had been killed to prevent her from testifying. Grasso had also learned from Arizona police that one of the women living in the house thought that her ex-husband or boyfriend might have been responsible for the incident. Grasso acknowledged that this was a possible explanation of the incident, but he did not mention this to Moore.

The trial court denied defendant's motion to exclude Moore's testimony based on outrageous police conduct. The court stated that it did not find any intentional or bad faith action by Inspector Grasso in communicating what he knew about the Chandler home invasion to Moore. The court stated that, although the parties now agreed that there was no evidence connecting defendant to the incident, Grasso had not acted improperly when he related to Moore his concerns that the incident could have been an attempt against her life and that she might be in danger. The court stated that it would formulate an admonition to the jury that there was no evidence connecting defendant with the Chandler home invasion if the defense chose to raise the issue during its cross-examination of Moore as part of a defense strategy to establish Moore's possible bias against defendant. But

66

neither the prosecution nor the defense raised the incident during Moore's testimony at trial.

### 2. *Analysis*

We reject defendant's argument that Inspector Grasso's discussion of the Chandler home invasion represented outrageous police misconduct. We have acknowledged that in some instances — such as those involving statements obtained by torture or other conduct belonging only in a police state — courts analyzing claims of third-party coercion have expressed the view that, to ensure the integrity of the judicial system, the evidence should be excluded without inquiring whether the statements were unreliable or subject to the ongoing effects of coercion. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 968.) But Moore's testimony was not "obtained by torture or by other conduct belonging only in a police state." (*Ibid*.) In his reply brief, defendant claims, alternatively, that Moore's testimony should have been excluded not only because of outrageous police misconduct, but also because it was coerced in violation of Moore's Fifth Amendment rights. Defendant forfeited this claim by failing to raise it in his opening brief (*People v. Tully*, *supra*, 54 Cal.4th at p. 1075), or at trial. In any event, this claim lacks merit.

Although a defendant lacks standing to complain about a violation of a third party's Fifth Amendment privilege against self-incrimination, a defendant does have standing to assert that a violation occurred of his or her own due process right to a fair trial because of an asserted violation of a third party's Fifth Amendment right. (*People v. Badgett* (1995) 10 Cal.4th 330, 343.) "[D]efendant can prevail on his suppression claim only if he can show that the trial testimony given by [the third party] was involuntary at the time it was given." (*Id*. at 347.) "The purpose of exclusion of evidence pursuant to a due process claim such as

defendants' is adequately served by focusing on the evidence to be presented at trial, and asking whether *that evidence* is made unreliable by ongoing coercion, rather than *assuming* that pressures that may have been brought to bear at an earlier point ordinarily will taint the witness's testimony." (*Id.* at pp. 347-348.) "Thus, it is not enough for a defendant who seeks to exclude trial testimony of a third party to allege that coercion was applied against the third party, producing an involuntary statement before trial. In order to state a claim of violation of his *own* due process rights, a defendant must also allege that the pretrial coercion was such that it would actually affect the reliability of the evidence to be presented at trial." (*Id.* at p. 348, fn. omitted.)

Defendant fails to meet his burden of showing ongoing coercion that would have actually affected the reliability of Moore's testimony at trial. At most, Inspector Grasso's discussion of the Chandler home invasion involved an issue of Moore's possible bias against defendant. Defense counsel could have explored this issue at trial, but chose not to, despite the trial court's willingness to admonish the jury that no evidence connected defendant to the Chandler home invasion. We also note that by the time Moore testified at defendant's trial, she had been cross-examined by defense counsel for then codefendant Yancey at the preliminary hearing about the Chandler home-invasion incident. Counsel for Yancey informed Moore that the police report for the incident mentioned that Tanya, the woman there at the time of the incident, had stated her belief that her ex-husband was responsible for the shooting. Thus, before her trial testimony, Moore was exposed to the defense position that the home invaders were seeking Tanya, another resident of the house, not Moore. This further undercuts defendant's contention that Grasso's discussion with Moore represented a deception that acted as an ongoing basis of coercion when she testified at defendant's trial.

68

As an additional argument to explain how Moore's testimony was coerced, defendant contends that Moore's immunity agreement was coercive. Defendant never raised this argument below and therefore has forfeited it on appeal. Furthermore, if we were to consider this argument on the merits, we would reject it. Defendant points to the statement in *People v. Medina* (1974) 41 Cal.App.3d 438, 455, that "a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." Defendant accurately notes that Moore was an accomplice who received immunity for testifying truthfully. Defendant then proceeds to draw the conclusion that "although the requirement of truthful testimony does not seem coercive, it in fact is." Defendant contends that because Moore's immunity agreement did not cover perjury at the present trial, the agreement required Moore to testify similarly to the "coerced" statements she initially gave to Inspector Grasso "after he put fear into her, lest the prosecutor decide that she was no longer being truthful." Not so; as Moore acknowledged in her testimony, the immunity agreement did not require her to give testimony in conformity to any of her previous statements, whether to the police, or in her testimony at any previous trials or proceedings. Although any plea agreement or grant of immunity involves a certain amount of compulsion, it is valid so long as it only requires full and truthful testimony. (*People v. Badgett*, *supra*, 10 Cal.4th at p. 358.) Defendant therefore fails to show improper coercion from Moore's immunity agreement.

G. Admission of Pseudonymous Letter Sent to Moore

While Moore was in custody at the Orange County Jail before defendant's preliminary hearing, she received a two-page letter addressed to her and signed

69

with the pseudonym, "Outlaw Jack."[43]  The letter urged her not to testify and included a photocopy of a newspaper article describing a witness who had been released from jail after refusing to testify at a trial.[44]  Defendant contends the trial court erred in admitting this letter over defense counsel's objections that there was no evidence linking defendant to the letter and that it was therefore irrelevant.  As we conclude below, the court did not abuse its discretion in admitting the letter.

### 1. Background

The prosecution sought to admit the letter to Moore as relevant evidence of defendant's attempt to prevent Moore from testifying against him at trial.  The prosecutor linked defendant to the letter to Moore through the letter's connection to inmate Sean Birney, who was housed with defendant in the same module in the Orange County Jail.  The calligraphy on the envelope of the letter sent to Moore was distinctive and looked like the distinctive calligraphy in another letter that Birney had written — a threatening letter addressed to Garrett, which was confiscated from defendant's cell five days before Moore received the "Outlaw Jack" letter.[45]  The prosecution also made an offer of proof that Birney's

---

[43]    The letter was postmarked June 12, 1994.  Moore testified at Eric's trial on July 13, 1994; Moore testified at defendant's preliminary hearing on July 18, 1994.  Moore was in custody under a section 1332 commitment to ensure her availability as a witness.

[44]    The lengthy letter states the following, in relevant part:  "I am aware of why the DA has you locked up.  They can't make you testify.  You have a right not too [sic].  You know that.  You can exercise your constitutional right against self-incrimination. . . .  I know you don't want to help these ruthless, unfair and evil white folks convict the innocent."

[45]    The letter to Garrett read as follows:

"Alonzo!  We just wanted to let you know that the secret meetings you've been having with those folks from Orange County aren't so secret.  They have put your business all in the street.  Also, your friends in Gardena are recording your

(footnote continued on next page)

fingerprints were found on both the letter addressed to Garrett and on the envelope of the "Outlaw Jack" letter sent to Moore. The prosecutor had previously successfully moved, over defense objection, to admit the letter to Garrett based on the fact that the letter was seized from defendant's cell along with another letter, in defendant's handwriting, to inmate Gordon Bridges asking Bridges to contact Garrett. Based on the connection between defendant and Birney (based on the letter to Garrett), the prosecutor contended that the evidence linking Birney to the letter to Moore also linked defendant to the letter to Moore.

The defense objected that the circumstantial connection to defendant was too tenuous to meet the prosecution's burden of establishing the admissibility of the letter. The trial court disagreed, ruling that the prosecutor had shown a sufficient nexus. The defense also objected under Evidence Code section 352. In this analysis, the court considered whether the defense's possible argument that Eric, not defendant, authorized the letter would open defendant's trial up to collateral issues that would be confusing to the jury. The court overruled the Evidence Code section 352 objection finding that the letter was not unduly inflammatory and that its probative value outweighed its prejudicial effect on the defense.

---

*(footnote continued from previous page)*

phone calls. And turning them over to those folks. We really thought you were smarter. You know it never pays to make a deal with the devil. But from all the reports and calls we see you are trading, we never thought you would go out backwards. From a man to a bitch. You have no integrity, you weak coward. For every action there is a [sic] equal reaction. Sleep on it!"

As recounted, *ante* at pages 10 to 11 and 36 to 40, Garrett ultimately testified at trial that defendant made incriminating statements in Garrett's presence about defendant's concern that Williams would testify against defendant.

71

At trial, the prosecution presented evidence in conformity with its earlier offer of proof that inmate Birney's fingerprints were on both the envelope and letter sent to Moore and on the threatening letter to Garrett, which was found in defendant's cell. Deputy Desens testified that, after the guards confiscated the threatening letter to Garrett from defendant's cell, defendant admitted that the letter belonged to him and asked for its return.[46]

### 2. Analysis

Defendant contends that the letter to Moore was not relevant unless defendant authorized it — and there was, according to defendant, no evidence that he did.[47] The evidence linking defendant to the letter to Moore was through Birney, a third party, and depended on the preliminary fact that defendant authorized Birney to write the letter. When the relevance of evidence depends on the existence of a preliminary fact, the trial court must determine whether the evidence was sufficient for a trier of fact to reasonably find the existence of the preliminary fact by a preponderance of the evidence. (Evid. Code, § 403, subd. (a)(1); *People v. Guerra* (2006) 37 Cal.4th 1067, 1120, overruled in part on

---

[46] The deputy's exact testimony is as follows: "[Defendant] asked me if I took anything from his cell. I asked him what was missing. He told me he was missing a couple of notes. At that time I said, do you mean the kites to Bridges and Rembert? And he said, Yeah."

"Kite" is prison slang for an unauthorized letter, i.e., one not sent through the official prison mail system. The kite to Bridges refers to the note written in defendant's handwriting that was addressed to inmate Gordon Bridges asking him to contact Garrett, which was found together with the threatening note to Garrett written in Birney's handwriting. The kite to Rembert refers to a letter to another inmate, Rembert, apparently unconnected to the Garrett affair, which was also among the papers confiscated from defendant's cell at that time.

[47] Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Here, substantial evidence supported the prosecution's theory that defendant had utilized Birney to write the threatening note to Garrett. The theory was supported by the finding of the threatening note to Garrett in defendant's cell along with another letter, in defendant's handwriting, to inmate Gordon Bridges asking Bridges to contact Garrett, together with the fact that defendant admitted ownership of these materials. Defendant does not directly challenge on appeal the trial court's admission of the threatening note to Garrett, but he appears to question the significance of Deputy Desens's testimony. Desens's testimony supports the prosecution's theory on the Garrett letter. Desens established that defendant was trying to contact Garrett, and defendant was in possession of a threatening note to Garrett written by Birney, which linked defendant and Birney together in a scheme to dissuade at least one witness against defendant.

Based on the strength of the evidence connecting Birney to defendant's scheme to dissuade Garrett from testifying, there was sufficient evidence through Birney's fingerprints on the letter to Moore to permit the trial court to admit the evidence based on the theory that defendant had also utilized Birney as part of a plan to dissuade Moore from testifying. We therefore conclude that the court did not abuse its discretion in finding the letter to Moore to be relevant.[48]

We also find no abuse of discretion in the trial court's denial of defendant's motion to exclude the letter to Moore under Evidence Code section 352. The court properly rejected defense counsel's argument that the letter should be

---

[48] "The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (*People v. Lucas* (1995) 12 Cal.4th 415, 466.) And we will not reverse unless the trial court exercised its discretion " ' "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Ochoa*, *supra*, 26 Cal.4th at pp. 437-438.)

excluded because it could raise the question of whether Eric might be the author of the letter, which could become a collateral issue that would confuse the jury. As it turns out, far from becoming a confusing collateral issue to the jury, neither side raised the issue of Eric's possible authorship of the letter at trial.

In his reply brief, defendant raises for the first time the argument that the letter should have been excluded as unduly prejudicial because it was racially charged. As part of the author's attempts to dissuade Moore from testifying, the author appeals to Moore to not allow "these ruthless, unfair and evil white folks [to] convict the innocent" (i.e., defendant). Because defendant never raised this argument below in his Evidence Code section 352 objection, he has forfeited this argument. And defendant forfeits his additional argument, also raised for the first time on appeal, that the newspaper article attached to the letter was inflammatory because it described how a jailed witness was granted immunity in a gang-related murder of a young teacher's aide and the shooting of his wife. In any event, these aspects of the evidence do not make the risk of undue prejudice so substantial that we could conclude the court acted outside the bounds of reason in declining to exclude the letter.

> H. Admission of Letters from Defendant to Yancey; Sexually Explicit Nature of the Letters; Refusal to Agree with Defense Motion to Stipulate that a Close Relationship Existed Between the Two of Them; Other Crimes Evidence in the Letters

Defendant contends the trial court erred in admitting, over defense objection, letters that defendant wrote to Yancey. Defendant contends that the letters should have been excluded under Evidence Code section 352 because their probative value was substantially outweighed by the risk of undue prejudice arising from the sexual content in the letters. Defendant also contends the letters should have been excluded under Evidence Code section 1101, subdivision (a)

74

because they referred to bad acts by defendant. The court did not err in admitting the letters.

### 1. Background

When police searched Yancey's apartment after the Williams murder, they seized numerous letters defendant wrote to Yancey. These writings fell into two categories: (1) 11 "relationship letters" where the incarcerated defendant expressed his love for Yancey, along with explicit sexual fantasies; and (2) the "Billy file," a file folder containing letters about defendant's various business endeavors and an inventory of expenses, all in defendant's handwriting. The prosecutor moved to admit both groups of writings. The prosecutor contended that the relationship letters were relevant to show the intense relationship between defendant and Yancey and to establish the existence of a conspiracy; the Billy file was relevant to show economic planning between the two, as well as their close relationship. Defense counsel objected to the admission of the relationship letters under Evidence Code section 352 and the Billy file under Evidence Code section 1101, subdivision (b). After several hearings, the trial court excluded some pages of the relationship letters but admitted the bulk of them, and admitted the Billy file in its entirety. At trial, the court furnished a copy of the letters to the jurors to read. The court admonished the jury to only use the letters for the "limited purpose of tending to show the nature of the relationship between Mr. Clark and Ms. Yancey. Such evidence is not being received and may not be considered by you to show that defendant is a person of bad character or bad morals. These letters are not received and may not be considered by you in any way to show how he treats women in general or Yancey in particular, nor may they be considered by you as showing any criminal predisposition."

75

*2. Analysis*

*a. The Relationship Letters*

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time.  [Citation.]" (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1124.)  "A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion."  (*People v. Lewis* (2001) 26 Cal.4th 334, 374.)

Defendant accurately summarizes the relationship letters as containing "explicit sexual fantasy, in which [defendant] writes at length about such things as having sex in public, having sex for two to four days without stopping, anal sex, oral sex, watching other men with his woman or lesbians having sex, bondage, incest, group sex, and videotaping sex."  Defendant contends that the court should have excluded these letters under Evidence Code section 352 because the letters "were likely to inflame the passions of the jury because they contained details of sexual practice that would appear highly deviant to the average jurors."

In this particular case, however, it is precisely the strong sexual language of the letters that renders them probative.  We agree with respondent's characterization that the sexual content, though perhaps distasteful to some jurors, was essential for showing how close Yancey was to defendant and how defendant utilized sexuality to manipulate Yancey into conspiring with him to murder Williams.  In response, defendant contends that the letters had no probative value because they do not mention Williams by name or expressly describe a plot to kill someone.  Defendant's argument is unavailing.  The letters are probative of the close relationship between Yancey and defendant, and therefore circumstantial evidence of the conspiracy to kill Williams, when considered with the other evidence offered at trial.  Also unavailing is defendant's argument that admission

76

of the letters was unnecessary and therefore unduly prejudicial because the closeness of the relationship between defendant and Yancey could have been proven by other evidence, such as jail visitation and telephone records.[49]  As the prosecutor correctly argued, he was entitled to present as forceful a case he could with the evidence that he had.  The content of the letters presented a whole dimension of the relationship between defendant and Yancey that went far beyond the mere fact that Yancey had frequently phoned and visited defendant in jail.  Defendant acknowledges that "the letters contain themes of both [defendant's] sexual domination and submission," but contends this was "merely part of a sexual fantasy that is common to prison life."  Defendant forfeits this argument on appeal because he did not present it as a basis for excluding the evidence at trial.  In any event, such an argument does not change our conclusion that the trial court acted within the bounds of reason in ruling that the probative value was not substantially outweighed by the risk of undue prejudice.  (Evid. Code, § 352.)  That defendant shared these most intimate fantasies with Yancey was highly probative of the closeness of their relationship, which supported the prosecution's case that they conspired to murder Williams to protect defendant.

In a final related issue, at oral argument defendant made a claim concerning defendant's March 9, 1994 letter to Yancey, which was the letter that included the statement "Babe, I will be in bed with you in a few weeks."  The prosecution pointed to this statement as supporting the inference that defendant's reference to his imminent release reflected his confidence in his plan to have Williams, the chief witness against him, murdered.  At oral argument, defendant contended that

---

[49]     Defendant raised this argument below at the penalty retrial, in a motion for stipulation of a close relationship between defendant and Yancey, which is discussed on pages 142 to 143, *post*.

this statement could not be used as evidence of the defendant's conspiracy to kill Williams because the trial court had given the same admonishment for the letter containing this statement as it had for all the letters between defendant and Yancey, namely that it was for "the limited purpose of tending to show the nature of the relationship between Mr. Clark and Ms. Yancey." But what the trial court meant by "the nature of the relationship between Mr. Clark and Ms. Yancey" encompassed both their personal relationship and their conspiratorial relationship. Indeed the evidence of their personal relationship was only relevant to the case insofar as it supported the prosecutor's theory that they had a conspiratorial relationship. It is clear from the record that the trial court intended that the "be in bed with you in a few weeks" letter should be presented to the jury as evidence of the conspiracy. It was so argued to the court and was the first of the letters to be admitted by the trial court. The prosecutor explored the conspiratorial implications of this letter during the testimony of legal expert Attorney John Barnett, who testified that there was no legal means by which defendant could have anticipated being out of custody in a few weeks. (See pages 98 to 102, *post*.) The defense did not object to this line of questioning of the legal expert concerning this letter, nor did the defense object to the prosecutor's closing argument, which also drew this inference. In his closing argument, defense counsel contested that the conspiratorial interpretation of the letter was the most reasonable interpretation, but never argued that a conspiratorial interpretation fell outside the scope of what the letters were admitted to show. To the extent that defense counsel raises this issue for the first time on appeal, it is forfeited.

### b. The Billy File

Defense counsel sought to exclude two sections of the Billy file on the grounds that they recounted bad acts and consequently were in violation of

Evidence Code section 1101's prohibition against using evidence of misconduct to show that defendant had a criminal character. The first section objected to described the people that defendant wrote "we MUST have on our team," and included the following list: "TRW — person who can access credit profiles[;] [¶] Bank — names, driver's license numbers, SSN #'s, addresses, etc.[;] [¶] D.M.V. — I.D's etc.[;] [¶] Social Security Administration — SSI cards, names, etc.[;] [¶] Printer — one who can duplicate checks, ID, etc.[;] [¶] Post office employee — credits cards, etc."

This list implied, as the trial court noted, that defendant was seeking someone inside TRW (the credit reporting agency) to disclose credit profiles, someone at the post office who could grab credit cards that were in the mail, someone at the bank who could disclose personal identity information, and someone at the various other institutions listed (including the Department of Motor Vehicles) to similarly disclose information, along with a printer to duplicate checks and identification cards.

The second section objected to was a letter instructing Yancey to obtain identification using a false name and to use it to open a bank account: "When you get the I.D. for Keisha Jackson, open an account at Long Beach Bank. I'll explain to you what the benefits are."

What defendant contends is that the trial court erroneously admitted these two sections of the Billy file, over defense objection, in violation of Evidence Code section 1101. "[Evidence Code] [s]ection 1101 subdivision (a) prohibits the admission of character evidence if offered to prove conduct in conformity with that character trait, sometimes described as a propensity to act in a certain way." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405-406, fn. omitted.) Defendant appears to argue that evidence of uncharged acts by, or connected to, a defendant is presumptively inadmissible under Evidence Code

79

section 1101, subdivision (a). But we have rejected this interpretation. "Section 1101 subdivision (a) 'expressly prohibits the use of an uncharged offense if the *only* theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' " (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 406.)

The trial court did not admit evidence from the Billy file to prove propensity because the court explicitly instructed the jury that it could not use the evidence for that purpose. As described above, the prosecution sought to admit the Billy file as relevant to show economic planning between defendant and Yancey, which reflected their close relationship and their partnership in defendant's various enterprises. The two objected-to sections of the Billy file described above were also relevant to show a common plan or scheme. Both instances involved the manipulation or fabrication of official documents to further a scheme. This modus operandi corroborates Moore's testimony, *ante* at pages 6 to 7, that defendant obtained a fraudulent driver license for her to rent the U-Haul truck that was intended for use in the attempt to rob CompUSA.

Finally, the trial court did not err in denying defendant's Evidence Code section 352 objections to these items in the Billy file. The court's limiting instruction directed the jury not to consider the letters as "showing any criminal disposition." We generally presume the jury follows its instructions. Thus, the risk of undue prejudice from the proper use of this evidence (i.e., to show the economic planning relationship between defendant and Yancey) was low. In light of the charges against defendant for two capital murders, the implication that defendant was also possibly involved in unrelated instances of identity fraud was not something that was likely to inflame the prejudices of the jurors.

80

I. Ervin's Statement, "Lady, Don't Die"

Defendant moved to have a statement made by Ervin, the shooter at the CompUSA murder, admitted as nonhearsay to preclude the prosecution from admitting other evidence to impeach the truth of the statement. But the trial court agreed with the prosecutor that the statement was also admissible for its truth. Subsequently, neither the defense nor the prosecution presented the statement at trial. Defendant contends that the court's evidentiary ruling was erroneous and deprived him of useful evidence. As we conclude below, the court's evidentiary ruling was not erroneous.

1. *Background*

As recounted above, Ervin was the gunman at CompUSA who fatally shot Kathy Lee. At the time of Ervin's arrest, a short time after the shooting, Police Officer Larry Griswold heard Ervin say, " 'Oh, my gosh, not a 187, please, lady, don't die.' " Outside the presence of the jury, the prosecutor raised the issue of the admissibility of this statement. The prosecutor objected to the statement as hearsay, but contended that the court could admit the statement under Evidence Code section 1240 as a spontaneous statement. In this case, the prosecutor further contended, inconsistent statements later made by Ervin about the shooting could be admitted under Evidence Code section 1202 to impeach Ervin as a hearsay declarant. The trial court agreed that the statement would come in as a spontaneous statement, if defendant chose to ask Griswold about it.

Defense counsel did not question Officer Griswold about Ervin's statement, and the court excused Griswold, subject to recall. Later, during the defense case, defendant moved to admit Ervin's statement for a nonhearsay purpose only. Defense counsel did not cite Evidence Code section 1240 but argued that the statement was not admissible under Evidence Code section 1250 as a statement of declarant's then-existing mental or physical state. Defendant contended that

81

"[t]his statement does not directly declare a mental state. It is merely circumstantial evidence of that state of mind and is not hearsay." At the hearing on the motion, defense counsel acknowledged that the trial court had previously ruled that Ervin's statement was admissible under Evidence Code section 1240, but contended that he was now offering Ervin's statement for a nonhearsay reason. Thus, the prosecutor would not be able to impeach it. The prosecutor responded that the essence of the issue was, "[W]hat is the relevancy if [Ervin's statement is] not offered for the truth?" The court agreed with the prosecutor and ruled, "The statement may be received. The court will permit it to be received for all purposes, subject to your argument. You may argue it as circumstantial evidence only . . . . But I'm going to let it in, but for other purposes, hearsay, non-hearsay. And if that leads to impeachment, if it is relevant impeachment, and in fact, impeachment, then we will address that issue, also." The defense thereafter did not present testimony about the statement (nor did the prosecution).

### 2. *Analysis*

Defendant contends the trial court erred by ruling it would admit Ervin's testimony for all purposes, including a hearsay purpose, i.e., for the truth of the matter stated, such that Ervin's other statements would be admissible to impeach the statement Officer Griswold heard. Defendant contends that this error deprived him of helpful evidence because the defense consequently refrained from presenting the statement. The standard of review for the court's ruling, along with its determination of issues concerning the hearsay rule, is abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 264.)

Defendant notes that the case law, including *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389, describes two different theories under which statements of a declarant's present state of mind can be admitted: (1) as hearsay under the

Evidence Code section 1250 exception for the declarant's present state of mind,[50] and (2) as nonhearsay circumstantial evidence of a declarant's state of mind. (See also 1 Witkin Cal. Evidence (5th ed. 2012) Hearsay, § 199, p. 1057 [describing the latter theory as "[s]tatements that do not directly declare a mental or emotional state, but are merely circumstantial evidence of it," which are "outside the hearsay rule," and describing the former theory's "[d]eclarations of mental condition, which directly assert it," which "are hearsay, and admissible only under this hearsay exception," i.e., Evidence Code section 1250.)

First, to the extent that defense counsel sought a ruling from the trial court to generally preclude the prosecution from impeaching Ervin's statement, the court did not abuse its discretion in denying the motion, and the denial of such a broad requested ruling does not require us to decide the question of whether Ervin's statement was admissible as hearsay.[51] Defense counsel never articulated a theory of admissibility for the Ervin statement such that all questions of its truth

---

[50]     Evidence Code section 1250 states:

(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

(2) The evidence is offered to prove or explain acts or conduct of the declarant.

(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed.

[51]     At one point, defense counsel argued to the court, "First of all, I don't believe his [Ervin's] impeachment would be proper impeachment, anyway, the statement, for whatever reason."

83

or falsity would be irrelevant — such as, for example, if the statement were being offered solely for its influence on a listener. Defendant now contends that defense counsel would have offered Ervin's statement as circumstantial evidence that Ervin was shocked and afraid after he shot the victim, which, he further contends, showed by implication that Ervin had not intended to shoot the victim. The prosecutor, in turn, indicated his intention to introduce as impeachment evidence Ervin's conflicting and incriminating statements about the shooting.[52]

Admitting the statement as evidence of Ervin's state of mind would have opened the issue to being contested by the prosecution. This is true whether the trial court admitted Ervin's statement as nonhearsay circumstantial evidence of his state of mind, or as admissible hearsay under Evidence Code section 1250 as an expression of his present state of mind. If the trial court admitted the statement as hearsay, the prosecutor could have sought to impeach Ervin as a hearsay declarant under Evidence Code section 1202. If the court admitted the statement as nonhearsay, the prosecutor could have sought, through other avenues of admission such as Evidence Code section 1230 (declarations against interest), to introduce Ervin's other incriminating statements to contest defendant's interpretation of Ervin's statement. Therefore, to the extent that trial counsel sought a broad preemptive ruling against the introduction by the prosecutor of other statements by Ervin to contest the statement, the court properly denied the motion.

Alternatively, even if defendant's motion is understood more narrowly as one to preclude the admission of Ervin's statement as hearsay, the trial court did

---

[52] The prosecutor described Ervin's other statements as follows: "The fact of his testimony at trial where he denies being the shooter, his statements to the police department where he talks about pulling the trigger. There [are] a lot of statements of Mr. Ervin having to do with his participation in this crime."

not err because Ervin's statement was admissible as hearsay under Evidence Code section 1250, the state of mind exception to the hearsay rule. An initial issue raised is whether this kind of statement — "Oh, my gosh, not a 187, please, lady, don't die" — even falls under the hearsay rule, which defines hearsay evidence as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200.) Ervin's statement is grammatically in the form of a command or a request. We have often characterized commands not as hearsay but rather as "simply verbal conduct consisting of a directive that was neither inherently true nor false." (*People v. Curl* (2009) 46 Cal.4th 339, 362; *id*. at p. 361 [statement to someone "to 'get rid' of a pair of boots"]; see also *People v. Jurado* (2006) 38 Cal.4th 72, 117 and cases cited therein.) But on at least one occasion, we have treated a grammatical command as a hearsay statement and found it admissible under section 1250. (*People v. Crew* (2003) 31 Cal.4th 822, 840 ["If you don't hear from me in two weeks, send the police." properly admitted as hearsay under Evid. Code § 1250, subd.(a)(2)].)

Ervin's statement should be treated as hearsay because, although it is grammatically in the form of a command, what Ervin was expressing was not a command but rather a desire reflecting his state of mind. Ervin's apparent command to the dying victim not to die cannot be understood literally as a request in which the person issuing the request does so with the expectation that the recipient has the ability to comply with it, such as the declarant in *Curl* who asked someone to get rid of a pair of boots. (*People v. Curl*, *supra*, 46 Cal.4th at p. 361.) Rather Ervin's statement expressed Ervin's hope and desire that his victim not die because he was afraid that he would be charged with murder under section 187 of the Penal Code. So understood, Ervin's statement is a hearsay expression of his

85

then-existing state of mind or emotion, admissible under Evidence Code section 1250.

Furthermore, in this case, the two theories of admissibility for statements concerning mental states — hearsay and nonhearsay — are not mutually exclusive. (See 1 Witkin, Cal. Evidence, *supra*, Hearsay, § 40, p. 834, and the cases cited therein.) The trial court's ruling was that Ervin's statement was admissible for both hearsay and nonhearsay purposes. Defendant was free to make the argument that Ervin's statement could be used for a nonhearsay purpose. But the trial court correctly rejected defendant's arguments that the statement was inadmissible as hearsay and was *only* admissible as nonhearsay circumstantial evidence.

Finally, defendant contends that the trial court's ruling admitting the statement for all purposes violated defendant's Sixth Amendment right to confrontation under *Crawford*, *supra*, 541 U.S. 36, because Ervin's statement was testimonial in nature. Once again, defendant failed to raise a confrontation clause objection at trial. But, once again, because defendant's trial occurred before the decision in *Crawford*, he has not forfeited his *Crawford* challenge. (*People v. Rangel*, *supra*, 62 Cal.4th at pp. 1215-1216.) In any event, defendant's argument fails on the merits. Neither the prosecution nor the defense introduced Ervin's statement at trial. Consequently, defendant was not denied the right to confront any witness against him. (Accord, e.g., *State v. Durrett* (Ind. 2010) 923 N.E.2d 449, 455 [where witness never presented at trial either in person or through deposition, defendant's right of confrontation with regard to that witness is not implicated].)

86

J. Admission of Taped Phone Call from Defendant to Liz Fontenot

As recounted, *ante* at page 10, Inspector Grasso supplied a tape-recorder to Liz Fontenot, the sister of Ardell Williams, and asked her to record defendant's conversations when he phoned. The court admitted these tape recordings over defense objections at trial. Defendant contends the trial court erred in admitting the tapes because their recording violated federal and state laws on wiretapping. As we conclude below, the court properly admitted the recordings.

### 1. Background

Defendant, in response to the prosecution's opposition to defendant's motion to suppress other evidence, contended that the telephone conversations between defendant and Fontenot, recorded at the request of Inspector Grasso, should also be suppressed. Defendant contended that the recording violated both federal and state wiretapping statutes. After a hearing on the motion with testimony and argument by the parties, the trial court denied the motion on both federal and state law grounds.

### 2. Analysis

#### a. Federal law

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 provides a " 'comprehensive scheme for the regulation of wiretapping and electronic surveillance.' " (*People v. Otto* (1992) 2 Cal.4th 1088, 1097, quoting *Gelbard v. United States* (1972) 408 U.S. 41, 46.) The act prohibits the interception or attempt to "intercept any wire, oral, or electronic communication" except as otherwise permitted by other provisions of the statute. (*Otto*, at p. 1097; 18 U.S.C. § 2511(1)(a).) It also forbids the willful disclosure of the contents of communications by a person who knows or has reason to know that the information was obtained through an unlawful interception. (*Otto*, at p. 1097; 18 U.S.C. § 2511(1)(c).) Exceptions are contained in 18 United States Code section

2511(2). One such exception provides that it shall not be unlawful for a person to intercept a communication where "such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception . . . ." (*Id.*, § 2511(2)(d); *Otto*, at p. 1097.) Inspector Grasso testified at the motion hearing that Fontenot agreed to his request that she record her conversations with defendant. Defendant acknowledges that "the circumstances of the present interception fit within an exception to the federal wiretap laws." Nonetheless, defendant now contends that Grasso's vague instructions, lack of oversight, and failure to follow up with Fontenot were "an abuse of the exception provided for by Congress, and thus outside the scope of his duties." Defendant fails to present any authority concerning his abuse of the exception argument for the federal statute. As we discuss below, defendant also fails to show that a certain level of direct and ongoing police supervision is implied or required by the state statute, even if defendant at least has a textual basis for his state law argument. Defendant does not even point to any possible textual basis for such an argument in regards to the federal statute. This challenge therefore fails.

### b. State Law

The California Invasion of Privacy Act (§ 630 et seq.) regulates improper and unauthorized electronic surveillance. Violation of the wiretapping (§ 631) or eavesdropping (§ 632) provisions can result in the exclusion of evidence.[53] (§ 631, subd. (c) ["Except as proof in an action or prosecution for violation of this section, no evidence obtained in violation of this section shall be admitted in any judicial, administrative, legislative, or other proceeding."]; § 632, subd. (d) [same

---

[53] The technical differences between "eavesdropping" and "wiretapping" under sections 631 and 632 make no difference to our legal analysis here.

88

for eavesdropping].)  The exclusion of evidence in a criminal trial by these statutory provisions may have been affected by the Right to Truth-in-Evidence provision the California Constitution, article I, section 28, subdivision (f)(2).  The relevant provision states that "relevant evidence shall not be excluded in any criminal proceeding," with the exception of certain statutory provisions not applicable here or unless two-thirds of the members of each house of the Legislature subsequently vote to create an exclusionary rule or to revive one. (*Ibid*.)  But we need not reach this issue concerning article I, section 28, subdivision (f)(2) of the California Constitution, because even if this provision did not abrogate section 631's exclusionary provisions, the claim still fails on the merits.

Section 633 creates an exception to sections 631 and 632 for police officers "or any person acting pursuant to the direction" of a police officer "acting within the scope of his or her authority."  Defendant renews on appeal his contention below that, because Inspector Grasso did not provide sufficient supervision to Fontenot's taping activities, Fontenot was not "acting pursuant to the direction" of a police officer within the terms of the statute, and therefore the taping did not fall within that exception.  The leading case on the meaning of "acting pursuant to the direction" of a police officer in this statute is *People v. Towery* (1985) 174 Cal.App.3d 1114 (*Towery*).  In *Towery*, a police officer investigating a conspiracy to steal and resell oil from a number of petroleum refineries directed an informant to record all telephone calls he received at his home regarding the stolen oil.  (*Id*. at p. 1127.)  The officer provided the informant with tapes for recording, but the informant used his own tape recording equipment.  Thus, the police were not present when the informant made the recordings.  (*Ibid*.)  The defendant contended that the lack of police supervision over the recordings rendered the exception in section 633 inapplicable because the tapes could have been altered or the

89

conversations selectively recorded. (*Towery*, at p. 1127.) The Court of Appeal rejected this argument, finding that "the looseness of law enforcement's direction to [the informant] in making the tape recordings properly goes to the weight given to those recordings and not their initial admissibility." (*Id*. at p. 1129.)

Defendant seeks to distinguish *Towery*. Defendant points to the fact that, in *Towery*, the tapes were given to the police within days of being recorded. (*Towery*, *supra*, 174 Cal.App.3d at p. 1127.) In contrast, in defendant's case, there was a two-year gap between the taping and the handing over of the tape. But we do not find this factual difference to be dispositive. The statute's exception requires law enforcement authorities to authorize the tape-recording activities of civilians, not that they necessarily engage in ongoing supervision of the taping. The issues raised in *Towery* about the asserted "looseness" of the supervision go toward reliability issues surrounding the evidence. The defendant in *Towery* contended that without "direct supervision" by the police of the recording process, the civilian could "manipulate the recordings, either by erasing portions of conversations or electing not to record certain conversations altogether." (*Id*. at p. 1127.)

We agree with the *Towery* court's conclusion that these reliability issues go toward the weight to be given the recordings, not their admissibility. Defendant here contends that the Court of Appeal's decision on this point is "not well reasoned" because it ignores the plain language of the text that the recording be done "pursuant to the direction" of the police. But the interpretive question itself turns on whether the word "direction" in the statute simply means initial authorization by the police or whether it also entails a certain level of ongoing supervision by the police. Defendant is no more persuasive than the defendant in *Towery* in advancing the argument that courts should impose an ongoing supervision requirement on the basis of reliability concerns. Once again, we agree

90

that the Court of Appeal in *Towery* correctly distinguishes the admissibility issue from reliability concerns in analyzing this statute.

Finally, defendant also contends that Inspector Grasso was not "acting within the scope of his . . . authority" under the requirements of the statute because he told Fontenot that he wanted her to record defendant's calls for his investigation of the Las Vegas case. Defendant contends that, because Grasso was an Orange County District Attorney investigator, the investigation of the Las Vegas case did not fall within his duties. Defendant's argument fails. Regardless of what Grasso said to Fontenot, it was established that at the time he directed her to make the recordings, Grasso was investigating defendant for the CompUSA murder in Orange County and was therefore acting within the scope of his authority.

### K. Exclusion of Third Party Culpability Evidence

Defendant sought to admit evidence that Tony Mills, the father of Williams's child, was involved in a custody dispute with Williams and had been involved in a confrontation with her two months before her murder. The defense contended that this evidence suggested that Mills could have murdered Williams. The trial court granted the prosecutor's motion under Evidence Code sections 350 and 352 to exclude this evidence. Defendant contends the court erred, but the court did not abuse its discretion. Defendant also presents other, less developed, claims based on the penalty phase exclusion of evidence for the Mills third party culpability theory. We conclude these other claims are also without merit.

#### 1. Background

The prosecutor made a motion in limine under Evidence Code sections 350 and 352 to exclude certain evidence, including that of third party culpability. During the hearing on the motion, defendant argued for admission of evidence that

91

Mills, the father of Williams's child, was involved in a custody dispute with Williams and had a confrontation with her two months before her murder. Defendant proffered the testimony of Kevin Hardeman, Williams's boyfriend, that two or three months before her death, he was in the car with her when Mills tried to run them off the road. Later there ensued a heated exchange of words between Mills and Williams. The court excluded Hardeman's testimony. The court recited for the record the totality of the third party culpability offer about the evidence concerning Mills and noted that much of it had already been presented to the jury, namely that Mills and Williams were involved in a custody dispute, and that Mills was sufficiently spiteful to have informed Williams's employer, the Disney Store, that she was stealing merchandise and trying to pass credit cards illegally, which caused her to be fired.

Defendant also sought to introduce affidavits, contained in a family court file, from members of Williams's family about the child custody dispute between the family and Mills. The trial court rejected the admission of these affidavits on hearsay grounds and because the risk of confusing the jury substantially outweighed the affidavits' probative value (Evid. Code, § 352.)

### 2. *Analysis*

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 578.) Defendant contends that here we should instead engage in de novo review because the court used an unconstitutionally high standard to evaluate admissibility and failed to consider the totality of the facts. Defendant fails to show that the court used the wrong standard in evaluating admissibility and, as we discuss below, the court did consider the totality of the evidence that defendant presented in his offer of proof. Defendant also seeks to support his argument on appeal based on additional

evidence that was not offered at the time of the motion.  Accordingly, we reject defendant's argument that the court's admissibility decision is subject to de novo review.[54]

"Only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant.  But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime.  [Citation.]  Evidence that is relevant still may be excluded if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time.  (See Evid. Code, § 352.)"  (*People v. Brady* (2010) 50 Cal.4th 547, 558.)

The trial court did not abuse its discretion in excluding the proffered evidence about Mills because defendant proffered no direct or circumstantial evidence linking Mills to Williams's murder.  As the court noted, Mills certainly had animosity toward Williams.  This was reflected in his efforts to have Williams fired from her job at the Disney Store and in his confrontations with her.  But this showed only motive.

Defendant contends that the trial court failed to consider all the evidence linking Mills to Williams's murder.  But the court summarized defendant's offer of proof, which defendant did not challenge.  Furthermore, the additional evidence

---

[54]    Defendant also makes the general argument that any exclusion of third party culpability evidence violates his federal constitutional right to present a defense.  We have previously rejected this claim, and defendant gives us no cause to revisit it.  (*People v. Hall* (1986) 41 Cal.3d 826, 834-835.)

that defendant now points to — that Mills visited the Williams house the same day as Yancey did, that Mills lived within walking distance of the murder scene, and that Mills did not have an alibi for the time of the murder — likewise do not show anything more than motive or opportunity.

Defendant fails to show that the trial court abused its discretion in excluding the affidavits of Williams's family members.[55] The one affidavit discussed in detail by the parties was that of Wardell Williams, Williams's father, who had died eight months before the trial began. His affidavit stated: "I, Wardell Williams, have been informed that the Sheriff's department, which is investigating [Ardell Williams's] murder, considers Tony Mills to be a suspect, although he has not yet been arrested." As the prosecutor pointed out in objecting to the admission of this affidavit, Wardell Williams was both unavailable as a witness, and his affidavit contained hearsay as to what the sheriff's department had allegedly told him about Mills. Defendant failed below to offer any basis to admit this affidavit over the hearsay objection of the prosecutor. On appeal, defendant also fails to present any basis for admissibility.

Finally, defendant contends that evidence of third party culpability was also relevant in the penalty phase to show lingering doubt, and the trial court also erred in excluding certain evidence about Mills. Defendant's claim in the penalty phase fails for the same reasons discussed above in the guilt phase.

---

[55] Defendant also contends that the trial court improperly considered the credibility of the family court evidence in its decision not to admit the third party culpability evidence. But, as discussed below, the court's ruling not to admit the family court evidence is independently supported on hearsay grounds.

L.  Admission of Tape Recordings of Weaver

Defendant contends the trial court erred in admitting the tape recordings of the interviews of Weaver conducted by Inspector Grasso.  As we conclude below, the trial court properly admitted this evidence under Evidence Code section 356, the rule of completeness.

### 1.  *Background*

As recounted, *ante*, at pages 5 to 6, Weaver testified he was present at the CompUSA, and he testified about defendant's presence and participation in the events that night.  During cross-examination, defense counsel questioned Weaver about interviews he had with Inspector Grasso, in which Weaver admitted his involvement in the CompUSA attempted robbery.  Based on defense counsel's cross-examination of Weaver, the prosecutor sought to introduce the tape recordings of the Weaver interviews in their entirety.  The defense opposed the admission of the tapes on the ground that they were hearsay for which no exception applied.  The prosecutor initially moved to admit the tapes under Evidence Code section 791 subdivision (b), but the trial court denied the motion.[56] The prosecution then moved to admit the tapes under Evidence Code section 356. The prosecutor argued that it was necessary for the jury to hear the entirety of the interviews in order to rebut the misleading impression that defense counsel had created during cross-examination that Inspector Grasso had "spoon-fed" details of the crime to Weaver during these interviews.  After reviewing the transcripts of

---

[56]  Evidence Code section 791 subdivision (b) states:  "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Weaver's direct and cross-examination testimony, the court admitted the tapes, which were later played to the jury.

### 2. Analysis

Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." The purpose of Evidence Code section 356 is "to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156.)

Defendant contends that defense counsel only used the transcripts of Weaver's interview with Inspector Grasso to refresh Weaver's recollection during cross-examination and that no portion of the transcript was ever put into evidence. But defendant acknowledges that he did cross-examine Weaver concerning the interview with Grasso and thus put the conversation itself into evidence as a subject of cross-examination. Defendant contends that, under these circumstances, Evidence Code section 356 would only allow the complete conversation to be admitted *in the form of further questioning of Weaver*, rather than allowing the admission of the conversation in its recorded form as a tape or its written form as a transcript. But defendant fails to cite any authority to support his position that, for the purposes of Evidence Code section 356, a tape recording constitutes a different conversation than the conversation recounted by a declarant under cross-

96

examination.**57**  As defendant acknowledges, we have taken a broad approach to the admissibility of the remainder of a conversation under Evidence Code section 356:  " ' "In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry.  'In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with*, the admission or declaration in evidence . . . .'  " ' "  (*People v. Harris* (2005) 37 Cal.4th 310, 334-335.)  Here, whatever the form of the evidence, the "subject of inquiry" under Evidence Code section 356 concerned the same conversation, the one Grasso had with Weaver.  The trial court therefore did not err in admitting the tape recordings under Evidence Code section 356.

Finally, defendant contends that the admission of the Weaver tape and transcript violated the confrontation clause of the Sixth Amendment to the federal Constitution, as construed in *Crawford*, *supra*, 541 U.S. 36.  Once again, defendant failed to raise a confrontation clause objection at trial.  But, once again,

---

**57**    Defendant does not challenge the accuracy of the recording.  In rejecting the argument that the taping of a conversation by a government agent violated a defendant's Fourth Amendment rights, the United States Supreme Court stated: "Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment.  For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory." (*Lopez v. United States* (1963) 373 U.S. 427, 439, fn. omitted.)  Such a characterization also seems applicable to defendant's argument that the prosecutor should have been restricted to eliciting more of the conversations between Inspector Grasso and Weaver only through Weaver's testimony, even though recordings of the conversations existed.

because defendant's trial occurred before the decision in *Crawford*, he has not forfeited his *Crawford* challenge. (*People v. Rangel*, *supra*, 62 Cal.4th at pp. 1215-1216.) In any event, defendant's argument fails on the merits. Both Weaver and Inspector Grasso testified at defendant's trial and were subject to cross-examination. "The Sixth Amendment confrontation clause does not bar hearsay statements of a witness who testifies at trial and is subject to cross-examination." (*People v. Stevens* (2007) 41 Cal.4th 182, 199, citing *Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.) Defendant "received what the confrontation clause requires: a full opportunity to confront and cross-examine" the parties to the conversation. (*People v. Stevens*, *supra*, 41 Cal.4th at p. 199; see also *People v. Vines* (2011) 51 Cal.4th 830, 862-863 [concluding that Evidence Code section 356 is an equitable exception to the confrontation requirement akin to forfeiture by wrongdoing].)

## M. Admission of Expert Testimony on Criminal Defense

Defendant contends the trial court erred in permitting the testimony of defense attorney John Barnett, who testified as an expert witness regarding the general practice of the defense bar in providing discovery information to clients in criminal cases. As we conclude below, the court did not abuse its discretion in permitting Barnett's testimony.

### 1. Background

The prosecutor's theory of Williams's murder was that defendant had ordered the killing because he knew that she was cooperating with the police and had testified in front of the grand jury about defendant's involvement in the CompUSA murder. The prosecution further theorized that defendant had gained access to Williams's grand jury testimony through the discovery of the grand jury transcripts that the prosecutor provided to defense counsel, which defense counsel shared with defendant. The prosecutor presented information about the discovery

98

process by calling Barnett as an expert witness and asking him whether a competent defense lawyer would have communicated to his or her client the information gained as a result of the discovery process. Barnett testified that a competent defense lawyer would have communicated this information.

### 2. *Analysis*

Defendant contends that the trial court erred in allowing Barnett's testimony about what a competent defense lawyer would have communicated to a client because such testimony did not tend to prove or disprove what actually took place in conversations between defendant and his defense counsel and was therefore not relevant to any disputed fact in the case. As an initial matter, we note that defense counsel below did not raise this kind of general relevancy challenge to Barnett's testimony. Rather, defense counsel objected to the prosecutor's posing questions about how a hypothetical defense lawyer representing defendant would have made specific tactical evaluations based on the perceived strength of various witnesses — for example, whether a hypothetical defense lawyer would have concluded that Williams's testimony against defendant would have been unimpeachable. The court agreed with defense counsel's objection and ruled that the prosecutor could not ask questions about what a competent attorney would advise a client concerning specific trial tactics to be followed or the relative importance or unimportance of a witness. But the court ruled that "[t]he other areas of expertise that [the prosecution expert witness would touch upon] on knowledge of the legal system, upon the procedures of discovery, the parameters of discovery . . . are appropriately the subject of expert testimony." To the extent that defendant did not raise the kind of general relevancy challenge below that he now does on appeal, he has forfeited it. (Evid. Code, § 353.) Even if defendant did not forfeit his claim, it fails on the merits. The trial court did not

99

err in admitting the expert witness's testimony as relevant under Evidence Code section 210 — that is, as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." An explanation of the discovery process and how a criminal defense attorney would have shared information with a client gained through discovery was relevant to proving the prosecutor's contention that defendant was motivated to kill Williams because he learned that she had been cooperating with the police and had testified before the grand jury about defendant's involvement in the CompUSA murder.

Defendant contends that Barnett's testimony was irrelevant because it only contained his opinion about what a competent attorney would have done; the testimony did not show what happened in the case. Defendant argues that, based on Barnett's testimony alone, it would only be speculation that defendant obtained information concerning Williams's testimony before the grand jury from trial counsel. But the prosecutor presented other evidence indicating that defendant had obtained the transcript of Williams's grand jury testimony from trial counsel, namely, Garrett's testimony that, while he was incarcerated with defendant, defendant showed Garrett transcripts and referred to Williams as the woman who could "put [defendant] away." Barnett's testimony about the discovery process and his opinion that a competent lawyer would share certain information with a client was therefore relevant to help the jury understand Garrett's testimony that defendant had indeed obtained the grand jury transcripts and how that could have happened. Barnett's testimony was not *based on* speculation about what actually did happen in this case, nor did it merely invite the jury to speculate regarding the events — it supported a logical inference the jury could draw from all the evidence.

100

Defendant further contends that Barnett's testimony violated the attorney-client privilege. Defendant's failure to object on this specific ground below forfeits his claim on appeal. (Evid. Code, § 353.) In any event, defendant fails to present any authority that Barnett's testimony implicated defendant's attorney-client privilege. Evidence Code section 954 creates a privilege for the nondisclosure of "a confidential communication between client and lawyer." Barnett did not disclose the content of any confidential communication between defendant and his counsel. Rather, Barnett testified to the procedures of discovery in a criminal case and how this could have been the vehicle by which defendant learned about Williams's grand jury testimony. Because Barnett's testimony did not disclose any actual communication between defendant and his attorney, it did not implicate the attorney-client privilege.

To the extent that defendant also claims a broader violation of his Sixth Amendment right to counsel, his claim also fails. Defendant contends that the only way defendant could have defended himself from the asserted speculation raised by Barnett's testimony about what defense counsel might have shared with defendant would be for defense counsel to testify about what was actually said, which would have forced defendant to relinquish the privilege behind the right to counsel. But, following the logic of defendant's claim, the only way that defendant could have defended against much of the prosecutor's theories concerning defendant's guilt was for defendant to take the stand and personally deny them, although in doing so he would have to relinquish his own Fifth Amendment right not to testify. Indeed, defendant contends that he "could not defend himself by telling the jury what did occur during his conversation with his attorney." To the contrary, defendant was free to waive either the attorney-client privilege or his own privilege not to testify if he so desired. He was not actually *required* to waive any of his rights, however, because the prosecution had the

101

burden of proof, and defendant was not obligated to present any particular defense. (See *People v. Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 368.) [making a defendant choose between difficult options is not unconstitutional].) Defendant therefore fails to show that his Sixth Amendment right to counsel was violated.

## V. GUILT PHASE JURY INSTRUCTION ISSUES

Defendant raises claims about various jury instructions given at the guilt phase. To the extent that defendant failed to object to any of these instructions below, we assume for the sake of argument that section 1259 preserves his claims.[58]

### A. Instruction on Reasonable Doubt

Defendant contends that CALJIC No. 2.90, the instruction on reasonable doubt, is incomprehensible to a modern jury. We have previously affirmed CALJIC No. 2.90 as " 'a constitutionally sound description of reasonable doubt,' " and do so again here. (*People v. Turner* (1994) 8 Cal.4th 137, 203, quoting *People v. Morris* (1991) 53 Cal.3d 152, 214.) Defendant also contends that two instructions on circumstantial evidence, CALJIC Nos. 2.01 and 2.02, undermined the constitutional requirement of proof beyond a reasonable doubt. We have previously rejected this argument and are not persuaded to revisit that conclusion. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1084-1085; *People v. Kipp* (1998) 18 Cal.4th 349, 375.)

---

[58] Section 1259 states, in relevant part: "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

B.  Instruction with CALJIC No. 2.05:  Efforts by Third Parties to Fabricate Evidence

The trial court instructed the jury with CALJIC No. 2.05, which concerns efforts by third parties to procure false or fabricated evidence.[59]  Defendant contends that the instruction should not have been given because there was no evidence that defendant authorized any third party efforts to fabricate evidence. As we conclude below, there was evidence to support giving the instruction.

*1. Background*

During a hearing on the proposed jury instructions, the prosecutor indicated there were three instances in which CALJIC No. 2.05 was applicable: (1) defendant's effort, during his tape-recorded conversation with Liz Fontenot, to persuade Fontenot to persuade Williams to get "amnesia;" (2) defendant's effort to have Birney write a threatening letter to Garrett to dissuade him from talking to the authorities about defendant; and (3) defendant's effort to have Birney write a letter to Moore to dissuade her from testifying against defendant.  Although defense counsel objected to the first of these three instances, the Fontenot incident, he was silent on the other two, the Garrett and Moore incidents.  Defense counsel also agreed to the giving of CALJIC No. 2.06, on efforts to suppress evidence, based on the Garrett and Moore incidents.[60]

---

[59]    CALJIC No. 2.05, as given at trial provided:  "If you find that an effort to procure false or fabricated evidence was made by another person for the defendant's benefit, you may not consider that effort as tending to show the defendant's consciousness of guilt unless you also find that the defendant authorized such effort.  If you find defendant authorized that effort, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

[60]    CALJIC No. 2.06, as given at trial, provided:  "If you find that a defendant attempted to suppress evidence against [himself] in any manner, such as [by the intimidation of a witness] [by destroying evidence] [by concealing evidence], such

*(footnote continued on next page)*

103

*2. Analysis*

Defendant challenges on appeal whether there was evidence presented at trial to support that he authorized or encouraged efforts by third parties to fabricate or suppress evidence. " 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record, which, if believed by the jury, will support the suggested inference.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 137.) We conclude that such evidence appeared in the record. A defendant's authorization of a third party to procure false or fabricated evidence may be established by circumstantial evidence. (*People v. Terry* (1962) 57 Cal.2d 538, 565-566.) As discussed, *ante* at pages 70 to 73, the calligraphy on the envelope of the letter sent to Moore was distinctive and looked like the style of another letter that Birney had written — the threatening letter to Garrett, which had been confiscated from defendant's cell five days before Moore received her letter. Birney's fingerprints were found on both the threatening letter addressed to Garrett and on the envelope of the letter sent to Moore. After guards confiscated the threatening letter addressed to Garrett from defendant's cell, defendant told prison deputies that the letter belonged to him, and he wanted it back. Because defendant admitted ownership of the letter to Garrett, the jury could infer that defendant had "authorized the effort" — that is, he had authorized Birney's creation of the threatening letter. Likewise, the same evidence allowed the jury to infer that defendant had also authorized the letter to

---

*(footnote continued from previous page)*

attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

Moore because the envelope that contained it was also in Birney's distinctive calligraphic style.[61]

C. Refusal to Instruct with CALJIC No. 3.16 on Accomplices as a Matter of Law

With regard to Weaver, Williams, and Moore, defendant contends the trial court erred in instructing the jury with CALJIC No. 3.19, which directs the jury to determine whether certain witnesses were accomplices.[62] Defendant contends the trial court should have instead given CALJIC No. 3.16, which instructs the jury that certain witnesses are accomplices as a matter of law.[63]

"Section 1111 defines an accomplice as a person 'who is liable to prosecution for the identical offense charged against the defendant on trial . . . .' ' "Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury 'unless the evidence permits only a single inference.' [Citation.] Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' " ' " (*People v. Riggs*, *supra*, 44 Cal.4th at p. 312.)

---

[61] Because these two instances supported the giving of the instruction, we need not discuss the other instance mentioned by the prosecutor involving defendant's effort to persuade Fontenot to convince Williams to get "amnesia."

[62] The jury was instructed with CALJIC No. 3.19 as follows: "You must determine whether the witnesses Ardell Williams, Jeanette Moore and/or Matthew Weaver were accomplices as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that a witness was an accomplice in the crimes charged against the defendant. [¶] In determining whether the defendant has met this burden you may consider evidence presented by the prosecution as well as that presented by the defense."

[63] CALJIC No. 3.16 (5th ed. 1988) provides: If the crime of _____ was committed by anyone, the witness_____ was an accomplice as a matter of law and [his] [her] testimony is subject to the rule requiring corroboration.

The trial court correctly concluded that the evidence of these three witnesses' status as accomplices was not "clear and undisputed." An accomplice must act "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90-91.) Although defendant sought to cast Weaver as a culpable participant in the CompUSA attempted robbery, Weaver's statements to the police and his in-court testimony indicated that he was an unwitting participant who believed that defendant owned the computer store and that he would receive $100 for simply moving computers. Although Williams accompanied defendant while he made a surveillance of the CompUSA store at some point before the attempted robbery, there was no evidence specifically establishing that she provided defendant with any advice or assistance or shared his criminal intent to commit a robbery. Similarly, although Moore obtained a fraudulent driver license and used it to rent the U-Haul van at defendant's request, there was no evidence that she was aware of defendant's intended use of the van or the robbery plan. Even to the extent the evidence was sufficient for the jury to reasonably infer that the witnesses were accomplices, the evidence was not clear and undisputed. Thus, their criminal culpability and possible status as accomplices were jury questions to be resolved under CALJIC No. 3.19. The court did not err in so instructing the jury.

D. Failure to Instruct with CALJIC Nos. 17.10 and 17.49

Defendant contends that, for count 7, the murder of Williams, the trial court had a sua sponte duty to instruct the jury with CALJIC No. 17.10,[64] which

_____

[64] CALJIC No. 17.10 (5th ed. 1989 re-rev.) provides: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict [him] [her] of any lesser crime, if you are

*(footnote continued on next page)*

106

concerns how the jury should approach deliberations on lesser included offenses, and its companion instruction CALJIC No. 17.49,[65] which concerns how the jury should complete the verdict forms.  As we conclude below, the court acted within its discretion in not giving these instructions.

### 1. Background

During the discussion of jury instructions, the trial court said it was considering instructing the jury with CALJIC No. 17.10, stating that it could be useful to the jury.  Both the prosecutor and defense counsel stated that they did not believe the instruction was applicable.[66]  Ultimately, the court did not instruct with

---

*(footnote continued from previous page)*

convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime.

"[The crime of [as charged in Count_____ ] is lesser to that of charged in Count_____ .]

"Thus, you are to determine whether [a] [the] defendant[s] [is] [are] guilty or not guilty of the crime[s] charged [in Count[s] ] or of any lesser crime[s]. In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it.  You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdict[s].  However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the [charged] [greater] crime."

[65]     CALJIC No. 17.49 (5th ed. 1988) provides:  "In this case there are _____ possible verdicts [as to each count] [as to Counts _____, _____].  These various possible verdicts are set forth in the forms of verdict which you will receive.  Only one of the possible verdicts may be returned by you [as to any particular count].  If you all have agreed upon one verdict [as to a particular count], the corresponding form is the only verdict form to be signed [as to that count].  The other forms are to be left unsigned.

[66]     Both the prosecutor and defense counsel appeared to be unaware that second degree murder is a lesser included offense of first degree murder.  (*People*

*(footnote continued on next page)*

107

CALJIC No. 17.10 or its companion instruction, CALJIC No. 17.49. It simply instructed the jury on the lesser included offense of second degree murder under CALJIC Nos. 8.30, 8.70, and 8.71.[67] (See *Blair*, *supra*, 36 Cal.4th at p. 745.)

### 2. *Analysis*

CALJIC No. 17.10 expresses the so-called *Kurtzman* instruction. (*People v. Fields* (1996) 13 Cal.4th 289, 309, citing *People v. Kurtzman* (1988) 46 Cal.3d 322, 334.) "*Kurtzman* established that the jury may deliberate on the greater and lesser included offenses in whatever order it chooses, but that it must acquit the defendant of the greater offense before returning a verdict on the lesser offense." (*People v. Fields*, *supra*, 13 Cal.4th at p. 309.) Contrary to defendant's argument on appeal that CALJIC Nos. 17.10 and 17.49 concern general principles of law

---

*(footnote continued from previous page)*

*v. Blair* (2005) 36 Cal.4th 686, 745 (*Blair*).) Despite the failure to raise the issue below, defendant's claim is reviewable under section 1259. (See fn. 58, *ante*.)

[67] The trial court instructed the jury with CALJIC No. 8.30 (5th ed. 1989) as follows: "Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation."

The trial court instructed the jury with CALJIC No. 8.70 (5th ed. 1988) as follows: "Relating to Count 7 only, you are instructed as follows: Murder is classified into two degrees, and if you should find the defendant guilty of murder, you must determine and state in your verdict as to Count 7 whether you find the murder to be of the first or second degree."

The trial court instructed the jury with CALJIC No. 8.71 (5th ed. 1988) as follows: "If you are convinced beyond a reasonable doubt that the crime of murder as charged in Count 7 has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree."

that a court must give to properly guide the jury's deliberations, we have held that a trial court "retains discretion to dispense with instructing the jury pursuant to *Kurtzman* until such time as a jury deadlock arises." (*Fields*, at p. 309.) The court followed this procedure here. There is no indication in the record that the jury deadlocked on Count 7. Thus, the court did not abuse its discretion in dispensing with CALJIC Nos. 17.10 and 17.49.

## VI. SPECIAL CIRCUMSTANCES ISSUES

The jury found true the five special-circumstance allegations charged against defendant. The following were based on the CompUSA murder: (1) murder while engaged in the commission of a burglary (§ 190.2, subd. (a)(17)(G)); and (2) murder while engaged in the attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)). The following were based on the murder of Williams: (3) killing of a witness (§ 190.2, subd. (a)(10)); and (4) murder while lying in wait (§ 190.2, subd. (a)(15)). The last was based on the two murders: (5) the multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)). Defendant challenges these special circumstance findings on various grounds. As discussed below, we find that the evidence is insufficient to support the jury's true findings as to the two special-circumstances pertaining to the CompUSA murder. Consequently, we vacate these two special-circumstance findings. But we find sufficient evidence to support the jury's true findings as to the two special-circumstance allegations pertaining to the Williams murder, and the true finding pertaining to the multiple-murder special-circumstance allegation.

### A. Felony-Murder Special-Circumstance Allegations Unconstitutional for an Aider and Abettor Without Intent to Kill

Defendant contends his convictions for the burglary and robbery special-circumstance allegations violate the federal Constitution because, under *Enmund v. Florida* (1982) 458 U.S. 782, 797, the federal Constitution requires an aider and

109

abettor to capital murder to have the intent to kill, and California's death penalty law permits the jury to find the felony-murder special-circumstance allegation true without finding an intent to kill. But, as defendant acknowledges, in *Tison v. Arizona* (1987) 481 U.S. 137, 158 (*Tison*), the United States Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." Section 190.2, subdivision (d) provides that, for the purposes of those special circumstances based on the enumerated felonies in paragraph (17) of subdivision (a), which include robbery and burglary, an aider and abettor must have been a "major participant" and have acted "with reckless indifference to human life . . . ."[68] (§ 190.2, subd. (d); 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Introduction to Crimes, § 110, p. 167; 3 Witkin & Epstein, Cal. Criminal Law, *supra*, Punishment, § 460, pp. 613-614.) "This subdivision brings state law into conformity with *Tison v. Arizona* (1987) 481 U.S. 137, 158 . . . ." (*Tapia v. Superior Court*, *supra*, 53 Cal.3d at p. 298, fn. 16.) Defendant acknowledges that the court instructed his jury with CALJIC No. 8.80.1, which is in accordance with section 190.2, subdivision (d).

Yet defendant contends that the United States Supreme Court's decision in *Kennedy v. Louisiana* (2008) 554 U.S. 407 "pointedly suggests that under the

---

[68] Section 190.2, subdivision (d) now provides, in full: "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

Eight Amendment, *Tison*'s requirement of reckless disregard for human life is no longer sufficient." We have previously rejected the argument that *Kennedy* has overruled *Tison*, and defendant gives us no cause to revisit the issue. (*People v. Contreras* (2013) 58 Cal.4th 123, 165; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197-198.)

    B. Insufficient Evidence to Support the Findings on the Special
       Circumstance Allegations

Defendant challenges the sufficiency of the evidence for the true findings of four of the special circumstance allegations.[69] The standard of review for a sufficiency of the evidence claim as to a special circumstance is whether, when evidence that is reasonable, credible, and of solid value is viewed "in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." (*People v. Dickey* (2005) 35 Cal.4th 884, 903; *People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) The standard is the same under the state and federal due process clauses. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1082-1083.) We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce

---

[69] Defendant briefly mentions the fifth special circumstance, the multiple-murder special circumstance, and states, "Obviously, if the People are unable to prove the elements of the [Kathy] Lee murder (the robbery-murder, burglary-murder special circumstances outlined above), then the multiple-murder special circumstance must likewise fail." But section 190.2, subdivision (a)(3), is applicable when "the defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree." The jury found the defendant guilty of two counts of first degree murder. The multiple-murder special-circumstance allegation is independent of the jury's findings on the other special-circumstance allegations. Contra defendant's argument, therefore, the jury could have found the multiple-murder special-circumstance allegation to be true without finding any of the other special-circumstance allegations to be true.

111

from the evidence, whether direct or circumstantial. (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)

### 1. *Special Circumstances Relating to the CompUSA Crimes: Robbery-Murder and Burglary-Murder Special Circumstances*

As recounted, the evidence presented at trial established that Ervin shot Lee at CompUSA. Defendant was charged with first degree murder and with the robbery-murder and burglary-murder special-circumstance allegations based on his aider and abettor liability in the CompUSA shooting. There was no evidence presented from which the jury could find that defendant intended to kill Lee. Defendant contends that the evidence at trial was also insufficient to establish that he was a major participant in the CompUSA crimes and that he acted with reckless indifference to human life.[70] We need not decide whether defendant was a major participant under the circumstances of this case because, as we conclude below, the evidence was insufficient to uphold a finding that defendant acted with reckless indifference to human life. Consequently, we vacate the robbery-murder and burglary-murder special-circumstance findings. But we uphold defendant's death sentence, for the reasons discussed below.

### a. *Major Participant*

We have recently examined the issue of "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to

---

[70] Defendant notes that, at the conclusion of the prosecutor's case-in-chief, defense counsel brought a motion under section 1118.1 for entry of judgment of acquittal based on the argument that the evidence was insufficient to show he had the necessary intent for the robbery and burglary-murder special circumstances. He contends this was sufficient to preserve his claim on appeal. In any event, defendant's sufficiency of the evidence claims against all the special circumstance findings are preserved for appeal as a federal constitutional due process claim under *Jackson v. Virginia* (1979) 443 U.S. 307, 322.

be statutorily eligible for the death penalty." (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).) The ultimate question pertaining to being a major participant is "whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [Citation]' " (*Id.* at p. 803.) Among the relevant factors in determining this question, we set forth the following: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death? What did the defendant do after lethal force was used?" (*Ibid.*)

We discussed these factors in relation to the nonshooter aider and abettor in *Banks*, Lovie Troy Matthews, and noted that no evidence was introduced establishing his role in planning the robbery or in procuring weapons, and that during the robbery and murder he was absent from the scene, sitting in a car and waiting. (*Banks*, *supra*, 61 Cal.4th at p. 805.) We concluded that, on this record, Matthews was "in short, no more than a getaway driver, guilty like Earl Enmund of 'felony murder *simpliciter*' " and ineligible for the death penalty. (*Ibid.*, fn. omitted.)

In contrast, in this case, substantial evidence supports the inference that defendant was the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime. Williams's grand jury testimony recounted that defendant conducted a surveillance of the CompUSA store, in which he studied the number of employees and their activities and movements at the store's closing time. Moore testified that defendant helped

113

her to obtain a false driver license and asked her to use the license to rent the U-Haul truck that was parked near the store. Weaver testified that defendant was present at the scene of the crime and was driving towards CompUSA when the arrival of the police caused defendant to flee. From the fact that Ervin, the gunman at CompUSA, sought to escape the scene by attempting to jump into defendant's automobile (unsuccessful as the effort was), the jury could reasonably have inferred that Ervin knew defendant and that defendant was also engaged in attempting to rob the store.

The record also contains Williams's testimony about her conversation with defendant's brother Eric, who described the plan for the robbery and how events went awry.[71] Because defendant was the leader of the robbery enterprise (as established by the testimony of Williams and Weaver), it is a reasonable inference that Eric's description reflected defendant's plan for the robbery.

In the first of her two April 1, 1992 conversations with Inspector Grasso — both of which were tape-recorded and played to the jury — Williams recounts Eric's account of the robbery as follows:

"I [Williams] said 'Eric, by the way, did you ever do that, um, the little job at that computer store?' He [Eric] was like, 'Oh yeah, you hear about it?' I'm like, 'what, hear about what?' He [Eric] said 'It went, it went, it went down bad,' or it went down or something. I said 'What, what are you talking about?' He [Eric] said, uh, they did it and they had too many people. They, they did it too early where they had to[o] many people inside, and, um, I guess, I forget what exactly

---

**71** Defendant objected, *ante* pages 58 to 59, to Agent Holliday's recounting of Williams's description of her conversation with Eric as double hearsay. As discussed there, defendant failed to object below and has forfeited this objection on appeal. Similarly, trial counsel did not make any objections to the double hearsay nature of the other instances of Eric's reported speech quoted below.

he [Eric] said, but something about, um, a person inside was taking too long as far as one of the customers and he [Eric] said, um, the mother or the parent came to see what was going on and it scared the guy and, [he] um, shot her. He [Eric] said there weren't even supposed to be any bullets in the gun and, um . . . ."

Williams' second conversation with Inspector Grasso on April 1,1992 was also recorded and played to the jury. There she gives a similar, if less detailed, account:

"[O]h man, he [Eric Clark] said, nobody knows but it went down bad . . . . What do you mean[?] [A] couple of guys panicked  . . . they were supposed to have everything under control . . . . I guess someone in there that, oh, someone would be waiting for them outside or something because they said a lady that came up to them, one of them had a gun shot her. I said, are you serious[?]  [O]h yeah they shot her  . . . bullets in the gun. I said what[?]  [H]e [Eric] said yep."

Williams's later grand jury testimony on September 24, 1992, which was also read at defendant's trial, described Eric's account of the robbery as follows:

"I [Williams] said speaking of something, whatever happened to the computer store[?]  He [Eric] said it went down bad. I said what do you mean[?] He [Eric] said oh, man, they went in there and they tied up a cashier and a night manager in the bathroom. They handcuffed them to a handicap rail in the bathroom. As they were taking care of business in the front I guess one of the — one of the people's mothers came by to say what was taking him so long from closing the store and she surprised him, and he turned around and shot her. And I said what? He [Eric] said yeah. I said what happened to her. He [Eric] said I don't know, but they got out of there."

While these accounts are brief and somewhat sketchy, they do indicate the role defendant planned for Ervin in the robbery. Ervin was to be in the store as part of the first stage of the robbery. His role was to handcuff the remaining

115

employees so they could be removed from the scene so the second phase of the robbery — the removal of the computers — could get underway. Defendant's plan therefore anticipated that employees would be in the store, that they would be handcuffed to keep them out of the way and to prevent them from alerting the police. Some means of having Ervin compel them to be handcuffed was therefore also anticipated. Eric's comments indicate that the use of a gun was anticipated for this, although apparently the gun was to be unloaded.[72] The gun recovered from Ervin, the murder weapon, had been loaded with one bullet.

In reviewing the *Banks* factors concerning major participation in defendant's case, we can conclude that defendant had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death of Kathy Lee. No evidence was presented about defendant's role in supplying the weapon, although inferences can be drawn from Eric's discussion with Williams that use of a weapon was part of his plan for the robbery. No evidence was presented about defendant's awareness of the particular dangers posed by the crime, beyond his concern to schedule the robbery after the store's closing time. No evidence was presented about his awareness of the past experience or conduct of Ervin, the shooter. Defendant was in the area during the robbery, orchestrating the second wave of the burglary after Ervin secured the store, but defendant was not in the immediate area where Ervin shot Kathy Lee.

There may be some question as to the amount of culpability that should be assessed for a planner of a felony leading to a murder who is not present during the immediate circumstances leading to the murder. In *Enmund,* there was some

---

[72]     The significance of defendant's apparent steps to minimize the risks of violence for the robbery are discussed at length below in the analysis of the reckless indifference to human life element.

evidence presented at trial that Enmund had been involved in the planning of the robbery murder for which he served as the getaway driver. (*Enmund*, *supra*, 458 U.S. at pp. 786-787, fn. 2.) But according to the *Enmund* majority, such evidence was not considered by the Florida Supreme Court because the Florida Supreme Court held "that the only supportable inference with respect to Enmund's participation was that he drove the car." (*Ibid*.) The *Enmund* majority reversed Enmund's death sentence based on the Florida Supreme Court's holding that "driving the escape car was enough to warrant conviction and the death penalty." (*Ibid*.) Consequently, *Enmund* provides no guidance on this issue.

We have previously upheld a finding that a defendant was a major participant and showed reckless indifference to human life when the defendant, although not present at the murder, was "the founder, ringleader, and mastermind behind" a criminal gang engaged in carjacking. (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.) The defendant in *Williams* was not present at the scene of some of the murders committed by his subordinate gang members, but he had given them "a carjacking tutorial and instructed them that a resisting victim was to be shot." (*Ibid*.) Because such an instruction is practically the same as instructing a cohort to kill, we held that this was more than sufficient to uphold a finding that the defendant was a major participant who acted with reckless indifference to human life. (*Id*. at p. 1282.)

But we need not decide whether, under the circumstances of this case, defendant was a major participant for the purposes of section 190.2 subdivision (d), because, as discussed below, we conclude that the evidence was insufficient to support that he exhibited reckless indifference to human life.

### b. Reckless Indifference to Human Life

As an initial matter, we consider the interrelationship between the two elements, being a major participant, and having reckless indifference to human life. *Tison* stated: "These requirements significantly overlap both in this case and in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." (*Tison*, *supra*, 481 U.S. at p. 153.) The high court also stated: "Although we state these two requirements separately, they often overlap. For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding." (*Id*. at p. 158, fn. 12.) In *Banks*, we observed that *Tison* did not specify "those few felonies for which any major participation would 'necessarily exhibit[] reckless indifference to the value of human life.' " (*Banks*, *supra*, 61 Cal.4th at p. 810, fn. 9.) We surmised a possible example would be "the manufacture and planting of a live bomb." (*Ibid*.) Yet we also concluded that armed robbery, by itself, did not qualify. (*Ibid*.)

To determine whether a defendant is culpable on an aider and abettor theory, we have differentiated the elements required for first degree felony murder from those required for the felony-murder special circumstance. (*Banks*, *supra*, 61 Cal.4th at p. 810) The statutory definition of first degree felony murder is as follows: "All murder . . . which is committed in the perpetration of, or attempt to perpetuate [certain enumerated felonies including robbery and burglary] . . . is murder in the first degree." (§ 189.) "The mental state required is simply the specific intent to commit the underlying felony [citation] . . . ." (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.) The actus reus requirement for an aider and abettor

to first degree felony murder is aiding and abetting the underlying felony or attempted felony that results in the murder. (§§ 31, 189.) The mens rea for an aider and abettor to first degree felony murder is the same as that for the actual shooter: "The purpose of the felony-murder rule is to deter those who commit the enumerated felonies by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetuation of the felony." (*People v. Cavitt*, *supra*, 33 Cal.4th at p. 197.)

In contrast, the actus reus for the felony-murder aider and abettor special circumstance requires more than simply being an aider and abettor of the underlying felony under section 31. The special circumstance requires that the defendant be a " 'major participant' " in the underlying felony. (*Banks*, *supra*, 61 Cal.4th at p. 798.) Likewise, the mens rea requirement for the felony-murder aider and abettor special circumstance is different from that required for first degree felony murder. The special circumstance requires that the defendant have " 'reckless indifference to human life.' " (*Ibid*.)

Because the elements are different, what is sufficient to establish the elements for an aider and abettor of first degree felony murder is not necessarily sufficient to establish the elements of the felony-murder aider and abettor special circumstance. In *Banks*, we rejected the argument that any defendant involved in a felony enumerated in the first degree felony-murder statute (§ 189) automatically exhibited reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at pp. 809-810.) We observed that, although the felonies listed in section 189 are those that the Legislature views as "inherently dangerous," this did not collapse the differences between an analysis involving felony murder, on the one hand, and an analysis of reckless indifference to human life, on the other. (*Banks*, at p. 810.) As we concluded, "[w]hether a category of crimes is sufficiently dangerous to

119

warrant felony-murder treatment, and whether an individual participant has acted with reckless indifference to human life, are different inquiries." (*Ibid.*)

Because *Tison* is the source of the language of section 190.2, subdivision (d), we analyze *Tison* for the meaning of the statutory phrases derived from it. (*Banks*, *supra*, 61 Cal.4th at p. 798.) As with "major participant," the phrase "reckless indifference to human life" in section 190.2, subdivision (d) is taken from *Tison*, where the phrase "reckless disregard for human life" is alternatively used. (*Tison*, *supra*, 481 U.S. at p. 157.) *Tison* observed that both the common law and Model Penal Code recognized this reckless indifference to the value of human life can be "every bit as shocking in the moral sense as an 'intent to kill.'" (*Ibid.*) In support of the conclusion that such perpetrators may be death eligible under the Eighth Amendment to the federal Constitution, the high court observed that historically these kinds of murders have incurred equal opprobrium as intentional ones. (*Ibid.* [" '[I]n the common law, intentional killing is not the only basis for establishing the most egregious form of criminal homicide . . . . For example, the Model Penal Code treats reckless killing, 'manifesting extreme indifference to the value of human life,' as equivalent to purposeful and knowing killing." (citing Fletcher, Rethinking Criminal Law (1978) § 6.5, pp. 447-448 (1978))]; Model Pen. Code § 210.2, subd. (1)(b).)

*Tison* held that the necessary mens rea for death eligibility may be "implicit in knowingly engaging in criminal activities known to carry a grave risk of death." (*Tison*, *supra*, 481 U.S. at p. 157.) As examples, the high court cited: "the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property," and the "the person who tortures another not caring whether the victim lives or dies" as two examples of such murderers. (*Ibid.*) Notably, both examples involve a defendant who personally killed the

120

victim — not, as in this case, *Enmund*, *Tison*, or *Banks*, a vicariously liable defendant who was not the actual killer.  Nevertheless, these examples provide some indication of the high court's view of "reckless indifference," namely, that it encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.

The Model Penal Code generally defines acting recklessly as follows:  "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."  (Model Pen. Code § 2.02, subd. (2)(c).)[73]

This definition encompasses both subjective and objective elements.  The subjective element is the defendant's conscious disregard of risks known to him or her.  But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities.  Rather, recklessness is also determined by an objective standard, namely what "a law-

---

[73]    The Model Penal Code definition of recklessness has been recognized in other areas of California criminal law.  The definition of "recklessly" in the California arson statute, section 450, subdivision (f), is closely modeled on the Model Penal Code language and reflects the same subjective/objective model. As the Court of Appeal concluded, the phrase "reckless disregard" in section 11411 reflects the Model Penal Code meaning of "recklessness" because "the word has acquired a peculiar meaning in the law of California — the meaning adopted by the drafters of the Model Penal Code."  (*In re Steven S.* (1994) 25 Cal.App.4th 598, 615.)

abiding person would observe in the actor's situation." (Model Pen. Code, § 2.02, subd. (2)(c).) The commentary to this section of the code makes this clear: "[T]he point is that the jury must evaluate the actor's conduct and determine whether it should be condemned. The Code proposes, therefore, that this difficulty be accepted frankly, and that the jury be asked to measure the substantiality and unjustifiability of the risk by asking whether its disregard, given the actor's perceptions, involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe." (Model Pen. Code & Commentaries com. to § 2.02, p. 237, fn. omitted.)

Finally, while the fact that a robbery involves a gun is a factor beyond the bare statutory requirements for first degree robbery felony murder, this mere fact, on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life for the felony-murder aider and abettor special circumstance.[74] (*Banks*, *supra*, 61 Cal.4th at p. 809.) As we stated: "The Supreme Court thus made clear felony murderers like Enmund, who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life." (*Ibid.*)

In determining whether Clark exhibited "reckless indifference to human life" within the meaning of section 190.2, subdivision (d), we look to whether the prosecution has introduced sufficient evidence of "reasonable, credible, and of solid value" to "support a finding beyond a reasonable doubt" that Clark had the requisite mental state. (*Banks*, *supra*, 61 Cal.4th at p. 804.) To aid our analysis,

---

[74] A robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun is what we meant by "a garden-variety armed robbery" in *Banks*, *supra*, 61 Cal.4th at page 802. We do not otherwise propose to set up a judicial standard for what constitutes a typical armed robbery.

we consider the specific facts of Clark's case in light of some of the case-specific factors that this court and other state appellate courts have considered in upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors to commercial armed robbery felony murders. Just as we said of the factors concerning major participant status in *Banks*, "no one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks*, *supra*, 61 Cal.4th at p. 803.)

### (1)  Knowledge of weapons, and use and number of weapons

The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at p. 809.) At the same time, the high court in *Tison* found significant the fact that Ricky and Raymond Tison "brought an arsenal of lethal weapons into the Arizona State Prison," and Raymond "guarded the victims at gunpoint while they considered what next to do." (*Tison*, *supra*, 481 U.S. at p. 151.)

A defendant's *use* of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed robber killed the victim, can be significant to the analysis of reckless indifference to human life. For example, the Texas Court of Criminal Appeals upheld a defendant's death sentence against a challenge based on *Enmund* in a case in which the defendant fired at individuals while attempting to flee from an armed robbery, even though no evidence showed whether it was defendant or one of his cohorts who had shot the victim. (*Selvage v. State* (Tex. 1984) 680 S.W.2d 17, 22.) The court concluded that "[a]ppellant's action indicate a reasonable expectation that the death of the deceased or another would result." (*Ibid.*)

123

Here the evidence introduced by prosecutors showed only that there was one gun at the scene of Lee's killing, that this gun was carried by Ervin and not defendant, and that this gun had only been loaded with one bullet.

### (2) Physical Presence at the Crime and Opportunities to Restrain the Crime and/or Aid the Victim

In *Tison*, the high court stressed the importance of presence to culpability. Each Tison brother was physically present during the entire sequence of events culminating in the murders. (*Tison*, *supra*, 481 U.S. at p. 158.) Proximity to the murder and the events leading up to it may be particularly significant where, as in *Tison*, the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." (McCord, *State Death Sentencing for Felony Murder Accomplices under the* Emnund *and* Tison *Standards* (2000) 32 Ariz. St. L.J. 843, 873 (hereafter *State Death Sentencing*.) In *Tison*, the high court noted this failure to render aid; after the shooting, "[n]either [of the brothers] made an effort to help the victims." (*Tison*, *supra*, 481 U.S. at p. 141.) Other appellate courts have considered relevant a defendant's failure to provide aid while present at the scene. The Supreme Court of Arizona, in affirming that a defendant had acted with reckless indifference to human life, noted that the defendant had "failed to render aid knowing that one victim might not be dead." (*State v. Dickens* (Ariz. 1996) 187 Ariz. 1, 23.)

124

At the same time, physical presence is not invariably a prerequisite to demonstrating reckless indifference to human life. Where, for example, a defendant instructs other members of a criminal gang carrying out carjackings at his behest to shoot any resisting victims, he need not be present when his subordinates carry out the instruction in order to be found to be recklessly indifferent to the lives of the victims. (See *People v. Williams*, *supra*, 61 Cal.4th at pp. 1281-1282.)

According to prosecution witness Weaver's testimony, defendant was waiting across the parking lot for Ervin to secure the store when Ervin shot Kathy Lee. No evidence was introduced, unlike in *Williams*, to suggest he instructed Ervin to use lethal force. Nor did defendant have an opportunity to observe Ervin's response to Lee's unanticipated appearance or to intervene to prevent her killing. Weaver, who was a passenger in the car that defendant was driving, testified that he (Weaver) saw Lee's body in the parking lot as they drove up to the loading door. Eric's conversation with Ardell Williams implies that the participants in the robbery knew what had transpired on the night of the crime, but does not rule out the possibility that they pieced together what happened later. The jury may have inferred that Clark was aware that Lee had been shot when he drove from the scene without Ervin.

As Weaver and Officer Rakitis testified, Rakitis's patrol car was approaching defendant's vehicle at the time that defendant drove into the scene. One might infer from this that defendant was motivated to flee the scene by that point to avoid arrest, whether or not he had seen the body of the victim. Defendant's failure to help Ervin enter defendant's car and defendant's subsequent abandonment of Ervin can be interpreted either as defendant's rejection of Ervin's actions in committing the shooting or as defendant's desire to flee the scene as quickly as possible, without regard for Ervin's welfare or that of the shooting

125

victim. But, unlike in the Tisons' case, defendant would have known that help in the form of police intervention was arriving. Defendant's absence from the scene of the killing and the ambiguous circumstances surrounding his hasty departure make it difficult to infer his frame of mind concerning Lee's death.

### *(3) Duration of the Felony*

Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant.[75] The Tisons, the high court noted, "guarded the victims at gunpoint while [the group of perpetrators] considered what next to do." (*Tison*, *supra*, 481 U.S. at p. 151.) Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" (*State Death Sentencing*, *supra*, 32 Ariz. St. L.J. at p. 882), possibly culminating in murder. The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life.

Here, defendant planned the robbery for after closing time, when most of the store employees were gone. Defendant anticipated some employees would be present, but the plan was to handcuff them in a bathroom, while the robbery itself was conducted outside of their presence. Thus, although the planned robbery was to be of substantial duration, involving multiple individuals loading computers into a U-Haul van, the period of interaction between perpetrators and victims was designed to be limited. Because the robbery was planned for a public space and involved the prolonged detention of employees, the crime did involve the risk of

---

[75] See, for example, *Brumbley v. State* (Fla. 1984) 453 So.2d 381, which involved an extended robbery in which the victim was kidnapped and taken to a remote spot before being killed.

126

interlopers, such as Lee, happening upon the scene. But overall, the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that defendant exhibited reckless indifference to human life.

### (4)  Defendant's Knowledge of Cohort's Likelihood of Killing

A defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life. Defendant's knowledge of such factors may be evident before the felony or may occur during the felony. *Tison*, for example, emphasized the fact that the Tison brothers brought an arsenal of lethal weapons into the prison which they then handed over to two convicted murders, one of whom the brothers knew had killed a prison guard in the course of a previous escape attempt. (*Tison*, *supra*, 481 U.S. 137, 151.) The Supreme Court of Arizona, in affirming that a defendant had acted with reckless indifference to human life, noted that he was aware that his cohort in a series of robberies "had a violent and explosive temper." (*State v. Dickens*, *supra*, 187 Ariz. 1 at p. 23.)

The facts in *Tison* also indicate that the Tison brothers had advance notice of the possibility that their father would shoot the family because, in response to one of the victim's plea not to be killed, the father stated that he "was thinking about it." (*Tison*, *supra*, 481 U.S. 137, 140.) A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a "grave risk of death." (*Tison*, *supra*, 481 U.S. at p. 157.) But no evidence was presented at trial that Ervin was known to have a propensity for violence, let alone evidence indicating that defendant was aware of such a propensity. Because defendant was across the parking lot while Ervin carried out the first phase of the robbery, defendant had no

127

opportunity to observe anything in Ervin's actions just before the shooting that would have indicated that Ervin was likely to engage in lethal violence. This factor thus does not increase defendant's culpability.

### (5) *Defendant's Efforts to Minimize the Risks of the Violence During the Felony*

Defendant raises the issue of his apparent efforts to minimize the risks of violence at CompUSA by citing the following three factors, all of which have some support in the record. First, the attempted robbery was undertaken after closing time, when most of the employees had left the building. Second, there were not supposed to be any bullets in the gun, according to Eric's comment to Williams. Third, the gun, as recovered after the shooting, had only been loaded with one bullet.

The effect of a defendant's apparent efforts to minimize the risks of violence in the commission of a felony on the analysis of reckless indifference to human life is an issue of first impression. The issue arises here primarily because defendant was the principal planner and instigator of the robbery. We conclude that a defendant's apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis. If the evidence supports an argument that defendant engaged in efforts to minimize the risk of violence in the felony, defendant may raise that argument and the appellate court shall consider it as being part of all the relevant circumstances that considered together go towards supporting or failing to support the jury's finding of reckless indifference to human life. But the existence of evidence that defendant made some effort to minimize the risk of violence does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life, for the reasons set forth below concerning the two-part nature of the mens rea analysis for recklessness under *Tison* and section 190.2, subdivision (d).

128

As noted above, recklessness, as defined under the Model Penal Code and applied in our caselaw, implicates both subjective and objective elements for the offense. This allows us to address how a defendant's apparent efforts to minimize the risks of violence in a felony affects the *Tison* reckless indifference to human life analysis. If the only relevant aspect of recklessness were the defendant's subjective awareness of his or her disregard of risk to human life, one might argue that a defendant's good faith belief that he or she was not undertaking actions involving a substantial and unjustifiable risk to human life would be sufficient to negate a conclusion of reckless indifference to human life under *Tison*. According to this view, evidence of any effort by defendant to minimize the risks of violence could possibly be sufficient to rebut a conclusion of defendant's subjective awareness of engaging in activities risky to human life. But under the Model Penal Code definition, although the presence of some degree of defendant's subjective awareness of taking a risk is required, it is the jury's objective determination that ultimately determines recklessness. Therefore, it would be possible for the defendant to have engaged in apparent efforts to minimize the risk of violence but still be determined by the jury to have been reckless, given all the circumstances known to defendant surrounding the crime. Therefore we conclude that a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life under *Tison*.

This analysis fits with the holding of *Tison*. The dissent in *Tison* described how the Tison brothers "expressed feelings of surprise, helplessness, and regret" over their father's shooting of the kidnap victim. (*Tison*, *supra*, 481 U.S. at p. 166 (dis. opn. of Brennan, J.).) In order to illustrate this, the dissent quoted the following statement by Raymond Tison: "Well, I just think you should know when we first came into this we had an agreement with my dad that nobody would

129

get hurt because we [the brothers] wanted no one hurt. And when this [killing of the kidnap victims] came about we were not expecting it. And it took us by surprise as much as it took the family [the victims] by surprise because we were not expecting this to happen." (*Ibid.*) The fact that the Tison brothers had taken some step reflecting their intent that nobody would get hurt — a purported agreement with their father — was insufficient, by itself, to foreclose the majority's holding that the brothers might have nonetheless exhibited reckless indifference to human life.[76]

In conclusion, after considering those aspects of the present felony that provide insight into both the magnitude of the objective risk of lethal violence and a defendant's subjective awareness of that risk, we conclude that there is insufficient evidence to support the inference that defendant was recklessly indifferent to human life. Defendant's culpability for Lee's murder resides in his role as planner and organizer, or as the one who set the crime in motion, rather than in his actions on the ground in the immediate events leading up to her murder. But also relevant to his culpability as planner, there is evidence supporting that defendant planned the crime with an eye to minimizing the possibilities for violence. Such a factor does not, in itself, necessarily preclude a finding of reckless indifference to human life. But here there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery. Given defendant's apparent efforts to minimize violence and the relative paucity of other evidence to support a finding of reckless indifference to human life, we conclude that insufficient evidence supports the

---

[76]   *Tison* did not hold that the brothers exhibited reckless indifference to human life, but rather the court remanded the case for determination under its newly announced standard. (*Tison*, *supra*, 481 U.S. at p. 158.)

130

robbery-murder and burglary-murder special circumstance findings, and we therefore vacate them.

### c. Effect of the Vacated Special Circumstance Findings on Defendant's Sentence of Death

The United States Supreme Court held in *Brown v. Sanders* (2006) 546 U.S. 212, 220, that an "invalidated sentencing factor" does not "render [a death] sentence unconstitutional" if "one of the other sentencing factors enables the sentence to give aggravating weight to the same facts and circumstances." As explained in footnote 69, *ante*, our vacating of the robbery-murder and burglary-murder special circumstances does not affect the validity of the multiple-murder special-circumstance finding, which allowed the jury to consider all the facts and circumstances of the Kathy Lee murder. The jury could also consider the facts and circumstances of the Kathy Lee murder under the witness-murder special-circumstance finding connected to the Williams murder, since Williams was murdered to silence her as a witness in the CompUSA felony murder, in which Kathy Lee was murdered. Because the jury was authorized to give aggravating weight to the facts and circumstances of the Kathy Lee murder under these two other special-circumstance findings, our vacating of the robbery-murder and burglary-murder special-circumstance findings does not require reversal of the death penalty. (*People v. Debose* (2014) 59 Cal.4th 177, 196.)

### 2. Insufficient Evidence to Support the Witness Killing Special Circumstance for the Williams Murder

Defendant contends there was insufficient evidence to support the jury's true finding of the witness-killing special-circumstance allegation for the Williams murder (§ 190.2, subd. (a)(10)). The prosecution's theory was that defendant

131

intentionally planned and orchestrated the murder of Williams through his accomplice (and the probable shooter) Yancey.**77** The jury found defendant guilty of first degree murder for the Williams murder, and the only theory of first degree murder that the prosecutor argued to the jury was premeditated murder. The mental state required to support a finding of first degree premeditated murder is "a deliberate and premeditated intent to kill with malice aforethought." (*People v. Hart* (1999) 20 Cal.4th 546, 608.) Under section 190.2, subdivision (c), the mental state required to support a true finding for an aider and abettor to the witness-killing special-circumstance allegation is "intent to kill."**78**

Substantial evidence supports the finding that defendant aided and abetted the Williams murder with an intent to kill. Williams's mother and sister identified Yancey as the "Carolyn" who delivered flowers to the Williams household, and they also identified Yancey's voice as that of the "Janet Jackson," whose fabricated story of a job interview lured Williams to the street in front of the Continental Receiving Company where she was murdered. Yancey's phone

---

**77** As defendant notes, in Yancey's trial, which was bifurcated from defendant's, the jury, while finding her guilty of first degree murder, did not find her personal gun use allegation true. Defendant contends this shows that it was equally likely that another person was involved in the shooting. However, for the purposes of a sufficiency of the evidence analysis, "We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Prince*, *supra*, 40 Cal.4th at p. 1251.) That Yancey was the trigger person remains a reasonable inference. In any event, the possibility that another person may have assisted Yancey in the murder does not absolve defendant of liability.

**78** Section 190.2, subdivision (c) provides in full: "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4."

records for the period of January through March 1994 indicated numerous phone calls to defendant's attorney, to the defense investigator, to a pay telephone in the Orange County jail accessible to defendant, and to the Williams home. Defendant showed Garrett the transcripts of Williams's grand jury testimony, stating "this is the woman right here that could put me away." In a letter dated March 9, 1994, defendant told Yancey he would "be in bed with [her] in a few weeks," even though his jury trial date had not even been set. The jury could reasonably have inferred that defendant's reference to his imminent release reflected his confidence in his plan to have Williams, the chief witness against him, murdered. Based on this evidence, the jury could reasonably conclude that defendant intended to murder Williams to prevent her from testifying against him in the CompUSA case.

Defendant protests that the evidence linking him to the murder of Williams is predominantly, if not entirely, circumstantial. But, as we have frequently stated, " ' "[t]he standard of review is the same in cases in which the prosecutor relies mainly on circumstantial evidence." ' " (*People v. Tully*, *supra*, 54 Cal.4th at p. 1006.) Defendant furthers points to CALJIC No. 2.01 (5th ed. 1988), the jury instruction on the sufficiency of circumstantial evidence, which states, in relevant part, that "if the circumstantial evidence [as to any particular count] permits two reasonable inferences, one of which points to the defendant's guilt and the other to [his] [her] innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation that points to [his][her] guilt." Defendant acknowledges that the evidence in this case establishes communications between defendant and Yancey, and also supports the conclusion that defendant viewed the prospect of Williams's testimony at his trial as damaging to him. But defendant contends that the evidence in this case also permits the reasonable inference that Yancey acted on her own and without

133

defendant's instruction in killing Williams, because Yancey was jealous of defendant's previous relationship with Williams.

The appellate standard of review, however, provides a different role for the appellate court than that accorded to the jury. "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

We affirmed another death penalty case, *People v. Lopez* (2013) 56 Cal.4th 1028 (*Lopez*), which was also predominantly based on circumstantial evidence and which has similar facts. To the extent that a review of *Lopez* casts light on issues involved in the sufficiency of evidence in cases based primarily on circumstantial evidence, we discuss it below. The determination of the sufficiency of the evidence is case specific and does not depend on intercase review.

In *Lopez*, defendant Juan Lopez was sitting in a jail cell when the defendant's brother Ricardo shot and killed the defendant's former girlfriend Melinda "Mindy" Carmody (Mindy). The defendant was convicted of first-degree murder with a true finding of the witness-killing special-circumstance allegation. (*Lopez*, *supra*, 56 Cal.4th at p. 1036.) The prosecution theory was that the defendant had conspired with his brother Ricardo to have Mindy killed because Mindy was prepared to testify against the defendant at defendant's trial for assaulting and kidnapping Mindy. (*Id*. at pp. 1036-1041.)

134

Defendant Lopez contended that there was insufficient evidence that he was an aider and abettor of Mindy's murder "because there was no direct evidence that he instigated the murder or encouraged or advised its commission." (*Lopez*, *supra*, 56 Cal.4th at p. 1069.) We observed that there was no requirement that the substantial evidence supporting the defendant's conviction had to be direct evidence and described the circumstantial evidence and the reasonable inferences drawn from it that supported the conviction. (*Id.* at pp. 1069-1070.) We described how the evidence showed that the defendant had a strong motive for the murder, namely, to retaliate against Mindy for testifying against him at the preliminary hearing on his assault and kidnapping case, and to prevent her from testifying at his trial. (*Id.* at p. 1070.) As we stated, citing *People v. Estep* (1996) 42 Cal.App.4th 733, 738, the "presence of motive is a circumstance that may establish guilt." (*Lopez*, at p. 1070.)

We also concluded that "there was also strong evidence of defendant's active involvement in the murder even though he was in custody." (*Lopez*, *supra*, 56 Cal.4th at p. 1070) We stated that the evidence supported the inference that defendant orchestrated Mindy's presence at the alley where she was murdered by insisting that Mindy's friend "Happy" be initiated into the girl's gang in the alley rather than in the park where the girls had originally planned to jump her into the gang. (*Ibid.*) The documentary evidence demonstrated that one and two days before the shooting and on the day of the shooting calls were made from and where defendant was being held in custody to his family's residence where his brother Ricardo lived. (*Ibid.*)

We observed that the defendant's sister had told police that, in the days before the killing, she had arranged a three way call between the defendant, his brother Ricardo, and Uribe, another gang member, who ultimately supplied the murder weapon that Ricardo used. (*Lopez*, *supra*, 56 Cal.4th at p. 1070) We

135

concluded that the jury could reasonably have inferred that the subject matter of this call was Mindy's murder. (*Ibid.*) Gang member Alma Cruz testified that, the day before the shooting, the defendant asked her whether she could kill a "homegirl," which he then followed by the statement, "I already have someone doing it for me." (*Ibid.*) We observed that the jury reasonably could have inferred that the "homegirl" in question was Mindy. (*Ibid.*)

After the shooting, the defendant acted and made statements that the jury could reasonably have inferred his consciousness of guilty: he did not profess shock or grief when he was told about the shooting; he lied when he was asked about when he learned about Mindy's death; and he lied about not having spoken to either his brother or Uribe in the days before the shooting. (*Lopez*, *supra*, 56 Cal.4th at pp. 1070-1071.)

Many of the same kinds of circumstantial evidence are present in the instant case. Defendant had a strong motive for the murder of Williams, namely, to prevent her damaging testimony against him for his role in the CompUSA murder. This was shown by defendant's statement to Garrett, that "this is the woman right here that could put me away." Defendant's concern that Williams would testify against him was also shown by defendant's suggestion to Williams's sister that she should tell Williams that she could come to court and "get complete amnesia."

In *Lopez*, the fact that defendant orchestrated Mindy's presence at the alley where she was murdered was strong circumstantial evidence of his role in the conspiracy. Similarly, in the instant case there was strong circumstantial evidence that defendant orchestrated the elaborate "Janet Jackson" plan to lure Williams to a desolate location where she could be killed. In the instant case there is ample evidence of the phone calls between defendant and Yancey, during which they could have conspired to kill Williams. What the instant case lacks is a confession or a direct admission of defendant's concerning that conspiracy. *Lopez* has

136

something closer to an admission in the defendant's question about "killing a homegirl" and the defendant's statement that he already had someone doing it for him. However, even this statement is not a direct admission. In the instant case, defendant's comment to Yancey about anticipating being in bed with her in a few weeks plays a similar role of providing a statement by which the jury could infer defendant's knowledge of and involvement in the conspiracy to kill Williams.

The postmurder consciousness of guilt evidence in *Lopez* is more extensive than in the instant case, but the postmurder evidence in *Lopez* mostly draws its strength from the premurder evidence. The instant case has some post-murder evidence that implies guilt, namely the fact that Yancey visited defendant at the jail immediately after the Williams murder. All in all, while *Lopez* is arguably a stronger circumstantial evidence case, the instant case is not so radically different from it that we would not conclude that sufficient evidence supports defendant's conviction for the first degree murder of Williams and the jury's true finding for the witness-killing special-circumstance allegation.

As a final argument against the jury's true finding of the witness-killing special-circumstance allegation, defendant contends that this special circumstance allegation should have been dismissed because Williams was not an eyewitness to the CompUSA murder. We have previously rejected this argument, noting that "nothing in the language of the applicable special circumstance or in our decisions applying this special circumstance supports the conclusion that the special circumstance is confined to the killing of an 'eyewitness,' as opposed to any other witness who might testify in a criminal proceeding." (*People v. Jones* (1996) 13 Cal.4th 535, 550.)

137

### 3. Insufficient Evidence to Support Lying-in-Wait Special-Circumstance Finding for the Williams Murder

Defendant contends there was insufficient evidence to support the true finding on the lying-in-wait special-circumstance allegation for the murder of Ardell Williams. "The lying-in-wait special-circumstance allegation requires proof of ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.' " ' [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 330.) As discussed above, there was sufficient evidence to find that defendant aided and abetted the killing; the claim here is that the killing does not satisfy the elements of a lying-in-wait murder.

The evidence supports the first element, concealment of purpose. Yancey posed as "Janet Jackson," fabricated a story about a job interview, and lured Williams to the street in front of the Continental Receiving Company where Williams was murdered. " 'The element of concealment [of purpose] is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' " (*People v. Moon* (2005) 37 Cal.4th 1, 22.) A reasonable juror could find that Yancey's posing as "Janet Jackson" and fabricating the job interview story concealed the true purpose of luring Williams to Continental Receiving in order to murder her.

The evidence also supports the second element, a substantial period of watchful waiting. Williams's body was found near her parked car. The investigating officer testified that there were two job application forms: one on the trunk of the car, and the other one on the ground. The one on the ground was partially completed. Patterns in the dust on the trunk of the car, shown in a crime

138

scene photograph, suggest that an arm had been resting on the hood near where the partially completed form had been. The jury therefore could have reasonably inferred from this evidence that some substantial period of time elapsed while Williams filled out the job application on the trunk of her car.[79] "[T]he lying in wait special circumstance requires no fixed, quantitative minimum time, but the lying in wait must continue for long enough to premeditate and deliberate, conceal one's purpose, and wait and watch for an opportune moment to attack." (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 333.) Here, the facts support that the time period was long enough to satisfy this element.

Finally, the evidence supports the third element: a surprise attack from a position of advantage. According to the testimony of the medical examiner, Williams died as a result of close gunshot wound on the left side of the back of her head. Thus, the jury could reasonably infer that while Williams was engaged in filling out the application form, Yancey positioned herself behind Williams and out of her field of view to deliver the fatal shot.

In sum, substantial evidence supports the jury's true finding of the lying-in-wait special-circumstance allegation.

---

[79] Defendant points out that the date on the application form was March 8, 1994, but that the murder occurred on March 13, 1994. Defendant contends that this suggests Williams started filling out the application prior to attending the interview. Defendant does not point to any evidence in the record that Williams could have obtained the application form before going to the fabricated job interview. In any event, that possibility does not mean that a reasonable trier of fact could not have inferred from the physical evidence that Williams was filling out some part of the application on the trunk of her car when she was shot.

VII. PENALTY PHASE ISSUES

A. Denial of Funds for a Polygraph Test

Defendant contends that the judge overseeing defense funding requests erred in denying his applications for funds to obtain a polygraph expert to administer a polygraph examination of defendant, to be used as mitigating evidence of lingering doubt at the penalty phase. Denying the application was not error because the results of a polygraph examination would have been inadmissible at trial under Evidence Code section 351.1

### 1. Background

Defense counsel submitted three requests under section 987.9 seeking $1,275 for consultation with Dr. Edward Gelb, a forensic psychophysiologist.[80] In denying the final request on August 8, 1997, the judge stated that defendant had failed to make a sufficient offer of proof that polygraph testing had been granted general acceptance in the scientific community because the witnesses cited in his motion were actively involved in promoting the acceptance of polygraph testing, and their statements were not offered in the traditional offer of proof format. Defense counsel had cited no authority admitting a defendant's polygraph evidence in either the guilt or penalty phase of a murder prosecution. The judge further stated that "generally, where there is a serious question as to whether certain evidence would be admissible or not, the court is not required to approve payment for the evidence on behalf of an indigent defendant until such time that the trial court has determined that the evidence would be admissible." The judge

---

[80]     Under section 987.9, subdivision (a), defense counsel can make confidential motions seeking funding for an expert from a trial court judge other than the one conducting defendant's trial.

140

noted that no such determination had been made in this case and denied the request for funds.

### 2. *Analysis*

" '[T]he right to counsel guaranteed by both the federal and state Constitutions includes . . . the right to effective counsel [citations] and thus also includes the right to reasonably necessary defense services.' [Citations.] [Citation.] Section 987.9 codifies this right in capital cases." (*Blair*, *supra*, 36 Cal.4th at pp. 732-733.) But "the right to ancillary services arises only when a defendant demonstrates such funds are 'reasonably necessary' for his or her defense by reference to the general lines of inquiry that he or she wishes to pursue." (*Id.* at p. 733.) " 'Section 987.9 commits to the sound discretion of the trial court the determination of the reasonableness of an application for funds for ancillary services' . . . ." (*People v. Box* (2000) 23 Cal.4th 1153, 1184.) "An appellate court reviews a trial court's ruling on an application for authorization to incur expenses to prepare or present a defense for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 234.)

The trial court did not abuse its discretion in denying the application for funds for the polygraph expert to administer a polygraph test on defendant. As we have stated, "there is no point in spending money to obtain inadmissible evidence." (*People v. Daniels* (1991) 52 Cal.3d 815, 877.) The court correctly observed that defendant failed to establish a likelihood that a polygraph test by defendant would be admissible. Indeed, Evidence Code section 351.1 "generally bans the admission of polygraph test results in criminal proceedings" in the

141

absence of a stipulation by the parties.[81]  (*People v. Richardson* (2008) 43 Cal.4th 959, 1032.)  Defendant additionally contends that Evidence Code section 351.1 violates the federal Constitution, particularly in a capital case.  But we have previously rejected such an argument about the unconstitutionality of this provision in both noncapital and capital cases, and we are not persuaded to revisit the issue.  (*Richardson*, at pp. 1032-1033.)

B.  Motion to Exclude the Letters Between Defendant and Yancey and Require Stipulation of Close Personal Relationship Between Them

As discussed on pages 74 to 80 *ante*, at the guilt phase, over defense objection, the prosecution introduced letters that defendant wrote to Yancey to demonstrate the close personal relationship between the two and to support the prosecution's theory that defendant had conspired with Yancey to kill Williams.  At the penalty retrial, defendant filed a motion in limine to exclude the letters and to have the prosecution enter into a stipulation that defendant and Yancey had a close and intimate relationship.  The prosecutor rejected the defense offer to stipulate because the offer did not amount to a stipulation to an element of the offense.  The trial court allowed the admission of the letters, observing that the stipulation "is just not going to do what the People think they have to prove."

Because this was a penalty retrial, the prosecution was entitled to present the facts of the circumstances of the crime, for which the letters were a crucial part of the prosecutor's case.  "At least where the defense proposal does not constitute

---

[81]    Evidence Code section 351.1, subdivision (a) provides in relevant part: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results."

an offer to admit completely an element of a charged crime [citation], the
' "general rule is that the prosecution in a criminal case cannot be compelled to
accept a stipulation if the effect would be to deprive the state's case of its
persuasiveness and forcefulness." ' " (*People v. Sakarias* (2000) 22 Cal.4th 596,
629.)  The trial court therefore did not err in admitting the letters at the penalty
retrial.

C.  Admission of Evidence of Soft Warehouse Burglary

As discussed at pages 59 to 64, *ante*, at the guilt phase, the prosecutor
presented evidence that, in November 1990, Williams aided defendant in stealing
laptops from a Soft Warehouse computer store.  Williams, then a cashier at the
store, allowed defendant to pass through her checkout counter without paying for
the laptops.  Against defense objection, the prosecution presented this evidence at
the penalty retrial.  The trial court did not err in admitting this evidence.

*1.  Background*

At the penalty phase retrial, defendant filed a motion in limine to exclude
any reference to the 1990 Soft Warehouse theft perpetrated by defendant and
Williams as irrelevant to the penalty determination as evidence in aggravation
under section 190.3, factor (b) (criminal activity involving force or violence) or
factor (c) (prior felony convictions), and as unduly prejudicial under Evidence
Code section 352.  At the hearing, the prosecutor explained that the evidence of
the Soft Warehouse burglary was not being offered under section 190.3, factors (b)
or (c).  Rather, the prosecutor intended to introduce it under section 190.3, factor
(a) as evidence of the circumstances of Williams's murder.  The prosecutor argued
that the evidence showed the relationship between defendant and Williams. Thus,
the evidence tended to establish defendant's motive to murder Williams to prevent

143

her testifying, which rebutted defendant's proposed penalty phase argument of lingering doubt about the Williams murder.

The trial court admitted the evidence as relevant to defendant's motive to commit the Williams murder. At the penalty retrial, the prosecutor called Soft Warehouse salesperson Richard Highness, whose testimony about the theft was substantially the same as that he gave at the guilt phase. The court gave the jury the following limiting instruction on the Soft Warehouse evidence: "The evidence concerning the alleged theft from the Soft Warehouse, if believed, is being offered by the people for a limited purpose to show a criminal relationship, if any, between [defendant] and Ardell Williams."

### 2. Analysis

Defendant contends the Soft Warehouse theft evidence was inadmissible under (1) section 190.3, (2) Evidence Code section 1101, subdivision (a), and (3) Evidence Code section 352. We reject all of defendant's contentions and conclude that the trial court did not err in admitting this evidence.

### a. Section 190.3

Defendant contends that section 190.3 creates a blanket prohibition against the admission of evidence at the penalty phase of criminal activity not involving violence, and he cites the second paragraph of section 190.3.[82] But no such blanket prohibition exists. The paragraph defendant cites pertains to the *admission of aggravating and mitigating evidence* at the penalty phase. It does not apply to evidence from the guilt phase that is presented at the penalty phase for some other

---

[82] "However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence." (§ 190.3, 2d par.)

144

reason. (See *People v. Cordova* (2015) 62 Cal.4th 104, 140-141; *People v. Riel* (2000) 22 Cal.4th 1153, 1207-1208.) Here, the evidence of the Soft Warehouse theft, which the prosecution presented at the guilt phase, was not presented as evidence in aggravation, per se. Rather, the court admitted evidence of the Soft Warehouse theft as tending to prove defendant's guilt, which at the penalty retrial was relevant to rebut the potentially mitigating factor of lingering doubt. And the court gave a limiting instruction on the purpose for which the jury would consider the evidence — the relationship between defendant and Williams. That evidence was relevant to corroborate Williams's testimony about the CompUSA murder and was related to defendant's motive to murder her.

### b. Evidence Code section 1101, subdivision (a)

Defendant contends the evidence of the Soft Warehouse theft was inadmissible at the penalty retrial because of Evidence Code section 1101, subdivision (a). He essentially repeats his guilt phase claim, *ante* at pages 59 to 64, about this evidence. At the penalty retrial, defendant failed to object on this basis and thus forfeited his claim on appeal. In any event, the admission of the evidence did not violate this provision because it was admitted for a limited relevant purpose other than to prove defendant's propensity for engaging in criminal activity, as the court explicitly instructed the jury.

### c. Evidence Code section 352

Defendant contends evidence of the Soft Warehouse theft should have been excluded under Evidence Code section 352 as substantially more prejudicial than probative at the penalty retrial. Respondent contends that defendant forfeits this claim because, although defendant's written motion mentioned an Evidence Code section 352 claim, defendant never sought a ruling, and the trial court never ruled on it. Defendant's claim in the written motion was that evidence of the Soft

145

Warehouse theft should have been excluded as cumulative because defendant's criminal association with Williams was established by other facts. In addressing the motion, the parties discussed the instances of criminal association between defendant and Williams that the prosecution proposed to introduce, which were the Las Vegas traveler's check-passing incident, a theft at Capri Jewelers, and the Soft Warehouse theft. The prosecution characterized the defense's position as requesting that only two out of these three crimes should be used to show the criminal association. The prosecution agreed to not present evidence on the Capri Jewelers theft. After this agreement, defense counsel did not raise the issue of the cumulative nature of the Soft Warehouse theft as evidence of the criminal association between defendant and Williams. Thus, to the extent that defendant's written motion raised an Evidence Code section 352 issue on the cumulative nature of this evidence, defendant has forfeited the claim on appeal.

### D. Burglary-Murder and Robbery-Murder Special Circumstances Arose from Same Course of Conduct

Defendant contends that section 654 prohibited the jury from considering both the robbery-murder and burglary-murder special-circumstance allegations because both special circumstances related to the same course of conduct at the CompUSA store. Section 654 provides that the same act or omission shall not be punished under more than one provision of law. We have previously rejected arguments similar to defendant's and held that section 654 does not bar a jury in a capital case from considering both robbery-murder and burglary-murder special circumstances, even where the multiple special circumstances were part of the same course of conduct, because each special circumstance " 'involved violation of [a] distinct interest that society seeks to protect, and a defendant who commits both offenses in the course of a murder may be deemed more culpable than a

146

defendant who commits only one.' " (*People v. Sanders* (1990) 51 Cal.3d 471, 529, quoting *People v. Bean* (1988) 46 Cal.3d 919, 954-955.)

   E. Exclusion of Evidence that Defendant Would Always be Incarcerated in a High Security Facility if Sentenced to Life Without the Possibility of Parole

Defendant contends the trial court improperly sustained the prosecutor's objections to questions posed to defendant's expert witness on prison conditions about whether defendant would always be housed in a high security facility if sentenced to life in prison without the possibility of parole. Defendant contends that the exclusion of this testimony prevented defendant from rebutting the prosecutor's argument of defendant's future dangerousness in prison if sentenced to life in prison without the possibility of parole. As we conclude below, defendant never sought to admit the excluded evidence on the basis of the issue of future dangerousness, so defendant has forfeited this claim on appeal. The court properly excluded the evidence on the basis that certain testimony of defendant's future conditions of confinement was speculative and irrelevant.

   *1. Background*

The prosecutor raised the issue of the testimony of defense expert witness Norman Morein in a hearing on Thursday, October 16, 1997. That morning, the prosecutor received Morein's report which included references to letters that defendant had written from jail.. The prosecutor stated that he was not prepared to cross-examine this witness without some time to review the letters. Defense counsel confirmed that the report had just been given to the prosecutor but stated that he was not going to ask Morein about defendant's letters. Instead, defense counsel would focus on "generic stuff." Defense counsel stated that Morein was "familiar with the institutions and that LWOP [life without the possibility of parole] people go to levels 3 and levels 4" and that Morein was going to talk about

147

the difference between a level 3 and a level 4. The prosecutor requested that, because of the late nature of the discovery of the report, Morein not testify until Monday, to which defense counsel agreed. Defense counsel then called as a witness inmate Marcos Enriquez. During the course of lengthy testimony about prison gangs and prison conditions, defense counsel asked for and was granted permission to question this witness about the security levels at the state prisons, of which level 1 was the least restrictive and level 4 was maximum security. Enriquez was then questioned by the prosecutor and defense counsel about the various recreational privileges that were available to a prisoner at the various security levels and how a prisoner could work his way to a lower level through good behavior.

On Monday, October 20, 1997, before expert witness Morein testified, the prosecutor made a motion in limine objecting to any questions "asked about the nature of the confinement that [defendant] may receive," including his security classification. In support of his motion, the prosecutor cited *People v. Thompson* (1988) 45 Cal.3d 86, 139, which holds that "evidence as to how the death penalty is carried out should not be admitted. [Citation.] Describing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do." Defense counsel replied that the proposed testimony by Morein included the prison security ratings, of which some evidence had already been presented to the jury, the differences between the security levels, the adaptability of inmates at certain ages, and the work programs that exist in prison institutions. The prosecutor acknowledged that defendant's potential adjustment and adaptability to prison was admissible. The trial court ruled that "[a]daptability of prison may be acceptable, but the conditions that an LWOP prisoner will be serving under is not. You may be able to get everything you want in from Mr. Morein. [¶] In

148

*Thompson* and in other cases the court talks about the irrelevance of telling how a death penalty is carried out and also what conditions life without possibility will be serving on sentences. That is speculative and not mitigating. It has nothing to do with the defendant's character adjusting inside an institution. One is relevant and the other is not."

Morein testified that he was a sentencing consultant who had worked for 25 years as a probation officer and a correctional attorney in the state prison system. He testified, over the prosecutor's objection, about the four security levels in state prison and the differences in physical security at the various levels. The trial court sustained the prosecutor's relevance objection to the question, "Is there . . . any other difference between the levels that we have talked about level 1, level 2, level 3, level 4 besides the physical security and the degree of supervision?" Morein testified, over the prosecutor's objections, about how a prisoner received a recommendation for his security level, the various types of work programs within the state prison system, and the adaptability of prisoners to the institution based on their ages. The court allowed Morein, over prosecution objection, to testify that life without the possibility of parole (LWOP) prisoners initially were assigned to level 4 institutions but would be able to go to a level 3 institution if they did well enough for a long period of time. But the court sustained the prosecutor's objection to the follow-up questions: "Can an LWOP prisoner ever get down to a level 2 or level 1 institution;" and "Based upon your background, training and experience in the California Department of Corrections system, have you ever known of an LWOP prisoner making his way down to level 2 or level 1 institutions?"

During cross-examination, the prosecutor asked Morein, "Is there anything that is in existence now with the department of corrections that can prevent an inmate from entering into an agreement with a person on the outside to kill a

149

person on the outside?" Defense counsel objected on the basis that the question exceeded the scope of the witness's expertise, called for speculation and a conclusion, and lacked a factual foundation. The trial court sustained the objection.

In his closing argument, the prosecutor stated, "What do we do with [defendant]? . . . This second murder he was across the street . . . in these big thick concrete walls with bars. And you have heard testimony about how he is going to adapt to prison, about how he is a calming influence. . . . He has demonstrated that he has the ability — not only the ability, it happened, to orchestrate, to create, to enter into an agreement to murder someone when he is in custody. And the person who got murdered was out of custody. And what is the punishment of life without possibility of parole, how is the California Department of Corrections going to stop that [which] the Orange County Jail could not?"

*2. Analysis*

As recounted above, through the testimony of both Enriquez and Morein, defendant presented a substantial amount of evidence concerning prison security classifications and prison conditions. The trial court, however, sustained objections to three questions in this area: one question inquiring about further differences in the conditions at the various security classifications, and two questions inquiring about the possibility of a LWOP prisoner's working his way to a lower security level (level 1 or 2) through good behavior. Defendant contends the court erred in excluding these portions of Morein's testimony because this prevented the defense from refuting the prosecutor's argument of defendant's future dangerousness in prison based on defendant's ability, while incarcerated, to order the murder of someone outside of prison.

150

"As a general rule, evidence of prison conditions is not admissible at a penalty trial. '[W]e have repeatedly held that evidence concerning conditions of confinement for a person serving a sentence of life without possibility of parole is not relevant to the penalty determination because it has no bearing on the defendant's character, culpability, or the circumstances of the offense under either the federal Constitution or section 190.3, factor (k).' " (*People v. Smith* (2015) 61 Cal.4th 18, 57.) "When, however, the prosecution raises an inference of future dangerous conduct in prison as part of its case in aggravation, the defendant is entitled to respond with evidence that his chances to inflict harm in prison will be limited." (*Id*. at p. 58.)

Defendant correctly points out that, both at his first penalty phase trial and at his penalty retrial, the prosecutor raised in closing argument the issue of defendant's future dangerousness to people outside of prison, based on defendant's ordering of the killing of Williams while he was incarcerated in the county jail. As we have recently explained in *People v. Smith*, *supra*, 61 Cal.4th at page 58, defendant was therefore entitled to respond with evidence rebutting this argument for future dangerousness. But defendant never made clear to the court how the objected-to questions on prison conditions were relevant to the argument that defendant would not pose a danger to people outside of prison. The potential relevance of the objected-to questions, as defendant now argues on appeal, is that, because defendant was unlikely to be assigned to a less-severe security level, he was likely to remain in a more-severe security level. Defendant's remaining in a more-severe security level would prevent his ability to communicate with people outside of prison. But defendant presented no offer of proof for the relationship between prison security levels and a prisoner's ability to communicate with people outside of prison. On appeal, defendant points to the excluded question — "[I]s there any other difference between the levels . . . ?" — as a line of inquiry that

151

would "predictably produce evidence" about security levels and communications with the outside world. But while such a question could *possibly* have led to such an inquiry, the import of the question was not clear at the time. Defendant bears the burden of establishing the foundation for mitigating evidence. (*People v. Smith*, *supra*, 61 Cal.4th at p. 56, fn. 16, citing *People v. Ramos* (1997) 15 Cal.4th 1133, 1177-1178.) Furthermore, when the prosecutor sought to raise the issue of whether any existing security arrangement could completely prevent defendant from communicating with the outside world in his cross-examination of Morein, *defense counsel* successfully objected to the prosecutor's question as outside the scope of Morein's expertise. Therefore, because defense counsel both failed to present an offer of proof for the relevance of Morein's testimony to the issue of communications to the outside world, and because defense counsel affirmatively sought to exclude this subject during cross-examination, defendant has failed to preserve this argument on appeal.

VIII. PENALTY PHASE JURY INSTRUCTION ISSUES

A. Rejection of Special Jury Instructions

1. *Modification of CALJIC No. 8.85*

Defendant contends the trial court erred in rejecting the defense's proposed modified version of CALJIC No. 8.85 on the factors in aggravation and mitigation. But defense counsel withdrew his original request for a modified instruction and requested instead a single additional sentence for the instruction — "The absence of a statutory mitigating factor does not constitute an aggravating factor," — which the court included when it instructed the jury with CALJIC No. 8.85. By withdrawing his modified version of CALJIC No. 8.85, defendant has forfeited the issue on appeal. In any event, as we have repeatedly concluded, the standard version of CALJIC No. 8.85 is adequate and not unconstitutional.

(*People v. Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 456; *People v. Moon*, *supra*, 37 Cal.4th at pp. 41-42.)

### 2. Modification of CALJIC No. 8.87

As described, *ante* at pages 69 to 72, a threatening letter addressed to Garrett, who ultimately gave incriminating testimony against defendant at the guilt phase, was confiscated from defendant's cell and offered in evidence against defendant at the guilt phase. The prosecution also presented the letter and Garrett's testimony at the penalty retrial. The prosecution offered the threatening letter under section 190.3 factor (b) as an unadjudicated criminal activity "which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The trial court instructed the jury, based on CALJIC No. 8.87, as follows:

"Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal activity: An attempt to prevent or dissuade a witness, Alonzo Garrett, from attending or giving testimony, which involved a threat or use of force or violence. Before a juror may consider any criminal activity as an aggravating circumstance in this case, a juror must be satisfied beyond a reasonable doubt that the defendant did in fact commit the criminal activity. A juror may not consider any evidence of any other criminal activity as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a factor in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

Defendant contends the trial court erred in rejecting his modification of CALJIC No. 8.87, which would have instructed the jury to determine whether the

153

acts involved the use or attempted use of force or violence or the express or implied threats to use force or violence.[83] Defendant contends that the instruction as given to the jury defined the alleged criminal activity — the letter written to Garrett as an attempt to intimidate a witness — as one that necessarily involved a threat of force or violence. But we have rejected this argument previously, concluding that "CALJIC No. 8.87 is not invalid for failing to submit to the jury the issue of whether the defendant's acts involved the use, attempted use, or threat of force or violence." (*People v. Nakahara* (2003) 30 Cal.4th 705, 720.) "The question whether the acts occurred is certainly a factual matter for the jury, but the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, would be a legal matter properly decided by the court." (*Ibid.*, italics in original.)

### 3. Proposed Special "Aggravating and Mitigating Factors" Instruction

Defendant proposed an instruction clarifying which factors could be considered aggravating and mitigating, and which could only be considered mitigating. The trial court refused the instructions, ruling that CALJIC No. 8.88 was sufficient to convey the necessary information. As we have repeatedly held, there is no requirement that a court instruct a jury as to which of the factors enumerated in section 190.3 are aggravating and which are mitigating. (*People v.*

---

[83] The relevant part of defendant's proposed instruction reads as follows: "You may not consider as aggravation any evidence of unadjudicated acts allegedly committed by Mr. Clark unless you first determine beyond a reasonable doubt that (1) the [*sic*] Mr. Clark committed the acts; (2) the acts involved the use of or attempted use of force or violence or the expressed [*sic*] or implied threat to use force or violence; (3) the acts were criminal."

*Hillhouse* (2002) 27 Cal.4th 469, 509; *People v. Espinoza* (1992) 3 Cal.4th 806, 827.)

### 4. *Proposed Special Scope of Mitigation: No Mitigation Necessary to Reject Death Instruction*

Defense counsel proposed an instruction on mitigation, stating, in relevant part, "You may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death." The trial court rejected the instruction, stating that it was adequately covered by CALJIC No. 8.88. Defendant contends that CALJIC No. 8.88 does not inform the jury that it may reject death even in the absence of mitigating evidence. We have previously rejected this argument, holding that CALJIC No. 8.88 adequately guides selection of the appropriate punishment, including the jury's discretion to reject a death sentence in the absence of mitigating evidence. (*People v. Ray* (1996) 13 Cal.4th 313, 356.)

### 5. *Proposed Special Instruction 8, Scope and Proof of Mitigation: Sympathy Alone is Sufficient to Reject Death Instruction*

Defense counsel requested the following instruction on sympathy, which stated, in relevant part, "If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty." The trial court rejected the instruction as argumentative and duplicative of factor (k) in CALJIC No. 8.85. The court did not err. We have previously held that "CALJIC No. 8.88 adequately informed the jurors that they could consider sympathy, mercy, and compassion in deciding whether death was the appropriate penalty." (*People v. Smith* (2005) 35 Cal.4th 334, 371.)

155

B.  Failure to Instruct with CALJIC No. 2.11.5 on Unjoined Perpetrators

Defendant contends the trial court erred by refusing to instruct the jury with CALJIC No. 2.11.5 on the absence at trial of other participants in the crimes.[84] But as the record indicates, defendant, in effect, withdrew the instruction.  Thus, the defendant forfeited this claim on appeal.

The trial court initially raised the issue of whether it should give CALJIC No. 2.11.5.  It pointed to the obvious problem that the instruction refers to the jury's duty to decide whether the prosecution has proved the guilt of the defendant, which only applies at the guilt phase and is inapplicable at the penalty phase.  The court also questioned whether, even if the sentence about the jury's deciding guilt were omitted, the instruction would benefit the defense, explaining that the language in the instruction telling the jury not to speculate as to why another person was not being prosecuted could prevent the jury from considering the credibility and motives of prosecution witnesses Weaver and Moore in connection with their grants of immunity from prosecution by the prosecutor.  Defense counsel then stated, "I was going to say 'withdrawn,' but it is not on our list.  It is the court's instruction."  The court answered, "I will just toss it then."

Because defense counsel considered the trial court's observation that the instruction would not in fact be beneficial to defendant given the circumstances of the testimony at the penalty phase and trial counsel stated that he would have

---

[84]     CALJIC No. 2.11.5 (1989 rev.) (5th ed. 1988) states:  "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial.  [¶]  There may be many reasons why that person is not here on trial.  Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether [he] [she] has been or will be prosecuted.  Your [sole] duty is to decide whether the People have proved the guilt of the defendant[s] on trial."

156

requested withdrawing the instruction if it had been on the defense list, we consider defense counsel's actions to be tantamount to withdrawing the instruction. Defendant therefore forfeits the claim that the trial court erred in not giving the instruction. Defendant additionally contends that the court had a sua sponte duty to give this instruction at the penalty retrial. But defendant fails to cite any authority, nor are we aware of any, that a court has a sua sponte duty to instruct with CALJIC No. 2.11.5 at the penalty phase of a trial.[85] Therefore, defendant also fails to show any error by the court on this basis.

C. Refusal to Instruct with CALJIC No. 2.40 on Traits of Character of Defendant

Defendant contends the trial court erred in refusing to instruct the jury at the penalty retrial according to CALJIC No. 2.40, Traits of Character of Defendant.[86] The court properly refused the instruction because it is, by its terms, a guilt phase instruction, and the jury was adequately instructed on consideration of defendant's character by CALJIC No. 8.85, factor (k), which states in pertinent part, "[y]ou shall consider, take into account and be guided by . . . any sympathetic or other aspect of the defendant's character or record that the defendant offers as a

---

[85] There is likewise no authority indicating that a trial court has a sua sponte duty to instruct with CALJIC No. 2.11.5 at the guilt phase. We need not and do not reach this issue.

[86] Defendant offered the following, slightly edited, version of CALJIC No. 2.40 (5th ed. 1988): "Evidence has been received for the purpose of showing the good character of the defendant for those traits ordinarily involved in the commission of a crime, such as that charged in this case. [¶] Good character for the traits involved in the commission of the crime[s] charged may be sufficient by itself to raise a reasonable doubt as to the guilt of a defendant. It may be reasoned that a person of good character as to such traits would not be likely to commit the crime[s] of which the defendant is charged. [¶] If the defendant's character as to certain traits has not been discussed among those who know [him], you may infer from the absence of this discussion that [his] character in those respects is good."

basis for a sentence less than death, whether or not related to the offenses for which he has been on trial." (Accord, *People v. Benavides* (2005) 35 Cal.4th 69, 112 [quoting].)

D. Intracase Proportionality Review

Defendant contends that his death sentence is unconstitutional because it is grossly disproportionate to the offense committed and disproportionate based on the treatment of the other participants in the CompUSA murder. Defendant notes that Ervin, who was the shooter, and Eric, defendant's brother, who also participated in the attempted robbery, were separately convicted and sentenced to life in prison without the possibility of parole. "[I]ntracase proportionality review examines ' " 'whether [a] defendant's death sentence is proportionate to *his* individual culpability, irrespective of the punishment imposed on others.' " ' " (*People v. Maury* (2003) 30 Cal.4th 342, 441.) Defendant organized and participated in the CompUSA attempted robbery that resulted in Kathy Lee's murder. Later, while incarcerated and awaiting trial for this first offense, defendant arranged for the murder of Williams to prevent her from testifying against him. Although defendant was not the actual killer in either murder, in light of these facts, we cannot conclude his death sentence is disproportionate to his individual culpability.

IX. CUMULATIVE ERRORS

Defendant contends the cumulative effect of the asserted guilt and penalty phase errors requires reversal of his conviction and death penalty even if none of the errors is prejudicial individually. We conclude that any errors or assumed errors were nonprejudicial, whether reviewed separately or cumulatively.

158

X.  GENERAL CONSTITUTIONAL CHALLENGES TO THE DEATH PENALTY

Defendant raises various challenges to California's death penalty law.  We reaffirm our decisions that have rejected similar claims and decline to reconsider them, as follows.

California law adequately narrows the class of persons eligible for the death penalty.  (*People v. Ramos* (2004) 34 Cal.4th 494, 532-533.)

Section 190.3, subdivision (a), which calls for consideration of "the circumstances of the crime," is not unconstitutionally vague.  (*People v. Ramos* (2004) 34 Cal.4th 494, 533.)

The jury need not make written findings, achieve unanimity as to specific aggravating circumstances, find beyond a reasonable doubt that an aggravating circumstance is proved (except for § 190.3, factors (b) and (c)), find beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or find beyond a reasonable doubt that death is the appropriate penalty.  (*People v. Morrison*, *supra*, 34 Cal.4th at pp. 730-731; *People v. Williams* (2010) 49 Cal.4th 405, 459.)  Moreover, the jury need not be instructed as to any burden of proof in selecting the penalty to be imposed.  (*People v. Burgener* (2003) 29 Cal.4th 833, 885.)  The United States Supreme Court's decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) have not altered our conclusions in this regard.  (*People v. Salcido* (2008) 44 Cal.4th 93, 167; *People v. Hoyos*, *supra*, 41 Cal.4th at p. 926.)

The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution.  (*People v. Thompson, supra,* 45 Cal.3d at p. 142.)

159

The jury may properly consider evidence of unadjudicated criminal activity involving force or violence under factor (b) of section 190.3 and need not make a unanimous finding on factor (b) evidence. (*People v. Brown* (2004) 33 Cal.4th 382, 402.)

The use of certain adjectives, such as "extreme" and "substantial," in the list of mitigating factors does not render the statute unconstitutional. (*People v. Brown*, *supra*, 33 Cal.4th at p. 402.)

The trial court is not required to instruct that certain statutory factors can only be considered in mitigation or to identify which factors are aggravating and which are mitigating. (*People v. Brown*, *supra*, 33 Cal.4th at p. 402.)

California's death penalty law does not violate the equal protection clause of the United States Constitution because it provides different procedural rights to capital defendants than those provided to non-capital defendants. (*Blair*, *supra*, 36 Cal.4th at p. 754.)

"International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Friend* (2009) 47 Cal.4th 1, 90.)

Factors (a), (b), and (i) of section 190.3 are not unconstitutionally vague. (*People v. Williams* (1997) 16 Cal.4th 153, 267.)

The trial court is not required to delete inapplicable mitigating factors, such as factors (e), (f), and (g), from CALJIC No. 8.85. (*People v. Maury*, *supra*, 30 Cal.4th at pp. 439-440; *People v. Montiel* (1993) 5 Cal.4th 877, 937, fn. 31.)

The trial court was not required to define the terms "death" and "life without the possibility of parole" for the jury. (*People v. Holt* (1997) 15 Cal.4th 619, 687-689.)

California's death penalty statute does not violate the equal protection clause of the United States Constitution because it fails to provide uniform

standards to prosecutors across counties to guide them in their decisions whether to seek the death penalty.  (*People v. Vines*, *supra*, 51 Cal.4th at pp. 889-890.)  The United States Supreme Court's decision in *Bush v. Gore* (2000) 531 U.S. 98 has not altered our conclusion in this regard.  (*Id*. at p. 890.)

"Defendant contends that lethal injection, as a method of execution, is unconstitutional under the Eighth Amendment to the federal Constitution.  A claim of alleged deficiencies in the method of a future execution is not cognizable on appeal because it does not affect the validity of the judgment."  (*People v. Davis* (2009) 46 Cal.4th 539, 628-629.)

The delay inherent in the death penalty appeals process is not a basis for concluding that either the death penalty itself or the process leading to it constitutes cruel and unusual punishment.  (*People v. Brown*, *supra*, 33 Cal.4th at p. 404.)  We have also recently rejected a variant of this constitutional argument as raised in *Jones v. Chappell* (C.D.Cal. 2014) 31 F.Supp.3d 1050, which was reversed by *Jones v. Davis* (9th Cir. 2015) 806 Fed.3d 538.  (*People v. Seumanu* (2015) 61 Cal.4th 1293.)

## XI. Disposition

For the reasons given above, we vacate the burglary-murder and robbery-murder special-circumstance findings, and otherwise affirm the judgment in its entirety.

CUÉLLAR, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
KRUGER, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Clark

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S066940
**Date Filed:** June 27, 2016

_____

**Court:** Superior
**County:** Orange
**Judge:** John J. Ryan

_____

**Counsel:**

Peter Giannini, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peter Giannini
P.O. Box 25732
Los Angeles, CA  90025
(310) 666-6051

Daniel Rogers
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2283